UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DESEAN HILL,


                              Plaintiff,
                                                        9:17-cv-00031
v.                                                      (BKS/TWD)

ALEXANDER KHODENKO,
                              Defendant.
_____

APPEARANCES:                                  OF COUNSEL:

DESEAN HILL
14-A-0857
Plaintiff, *pro se*
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821

HON. ERIC T. SCHNEIDERMAN                      KATIE E. VALDER, ESQ.
Attorney General of the State of New York      Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

    This prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been

referred to this Court for Report and Recommendation by the Hon. Brenda K. Sannes, United

States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

    On January 11, 2017, Plaintiff Desean Hill, an inmate presently confined at Great

Meadow Correctional Facility, commenced this action *pro se* by filing a civil rights complaint

pursuant to 42 U.S.C. § 1983 together with a motion for leave to proceed *in forma pauperis*,

("IFP Application").  (Dkt. Nos. 1, 5.)  By Decision and Order of Judge Sannes, filed March 23,

2017, Plaintiff's IFP Application was granted, but following a review of the complaint in

accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), several claims and

defendants were dismissed.  Plaintiff's claim for violation of his Fourteenth Amendment right to

privacy survived initial review.  (Dkt. No. 8 at 7-8.)

The matter is now before the Court on the motion to dismiss for failure to state a claim

pursuant to Federal Rule of Civil Procedure 12(b)(6) filed on behalf of Defendant Alexander

Khodenko.  (Dkt. No. 18.)  Plaintiff has not opposed the motion.  For the reasons that follow, the

Court recommends that Defendant's motion be granted and Plaintiff's complaint be dismissed,

with leave to amend.

## I.    BACKGROUND

The following relevant facts are derived from the face of Plaintiff's complaint and are

accepted as true for the purposes of deciding the pending motion.  *See Erickson v. Pardus*, 551

U.S. 89, 94 (2007).

On August 6, 2016, at the Shawangunk Correctional Facility, Defendant failed to check

the inmate DIN number on the medication and administered Plaintiff's medication to an inmate

with Plaintiff's last name.  (Dkt. No. 1 at 2[1].)  Having consumed Plaintiff's medication, the

inmate complained of the medication's side effects.  *Id.* at 6.  To assure the inmate that Plaintiff's

medication's side effects were not life threatening, Defendant took Plaintiff's medical chart and

read the name of the medication and its side effects to the inmate.  *Id.* at 2, 4.

Plaintiff states that as a result of Defendant's disclosure, inmates humiliated and taunted

---

[1]    Page references to documents identified by docket number are to the page number
assigned by the Court's CM/ECF electronic docketing system.

him, calling him "[b]etto juice, [c]razy [m]an." *Id.* at 3.  Plaintiff was also told "[he] should [k]ill [himself]." *Id.*  As a result, Plaintiff claims he suffered mental anguish, which resulted in his attempted suicide. *Id.* at 3, 4.  Plaintiff was then sent to the Mental Observation Unit where his Remeron medication dosage was increased. *Id.* at 3.

## II.    LEGAL STANDARD

A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . .  [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Id.* at 679 (internal citation and punctuation omitted).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the

material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). The court must do so even when deciding unopposed motions to dismiss. *See McCall v. Pataki*, 232 F.3d 321, 322 (2d Cir. 2000). Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## III. DISCUSSION

### A. Fourteenth Amendment Right to Privacy

Defendant moves pursuant to Rule 12(b)(6) to dismiss Plaintiff's claim of Fourteenth Amendment right to privacy violation. (Dkt. No. 18.)

The United States Constitution recognizes a right to privacy which protects "the individual interest in avoiding disclosure of personal matters." *Matson v. Bd. of Educ. of City Sch. Dist. of New York*, 631 F.3d 57, 63 (2d Cir. 2011) (citing *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994) (quoting *Whalen v. Roe*, 429 U.S. 589, 599 (1977))). Specifically, the Due Process Clause of the Fourteenth Amendment protects a "right to privacy [that] can be characterized as a right to 'confidentiality,'" which "includes the right to protection regarding information about the state of one's health." *Doe*, 15 F.3d at 267. "This constitutional right to privacy extends in a limited way to prisoners as well." *Matson*, 631 F.3d at 64 (citing *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999) ("[I]nmates retain those constitutional rights that are not inconsistent with their status as prisoners or with the legitimate penological objectives of the corrections system.") (internal quotation marks and alterations omitted)); *Byng v. Campbell*, No.

9:07-cv-471 (GLS/DRH), 2010 WL 681374, at *16 (N.D.N.Y. Feb. 24, 2010)[2] (noting a plaintiff's privacy right in his medical records is neither fundamental nor absolute).

In the prison context, "[t]his narrow constitutional right applies in the case of an unusual medical condition which, if disclosed unnecessarily, would likely expose an inmate to ridicule, discrimination, or even potentially violence, particularly when the word of the condition is likely to spread through 'humor or gossip[.]'" *Williams v. Perlman*, No. 9:06-CV-00936 (GLS/DEP), 2009 WL 1652193, at *11 (N.D.N.Y. Feb. 5, 2009) (quoting *Powell*, 175 F.3d at 112); *see also Khalfani v. Sec'y, Dep't of Veterans Affairs*, No. 94-CV-5270 (JG), 1999 WL 138247, at *6 (E.D.N.Y. Mar. 10, 1999) (distinguishing between "deeply personal" medical records, which are protected by the right to privacy, and "mundane" medical information, which is not). Whether an inmate is entitled to constitutional protection against the disclosure of a particular medical condition is determined on a case-by-case basis. *Matson*, 631 F.3d at 66.

In this circuit, courts have accorded constitutional privacy protection "only to a handful of medical conditions," including human immunodeficiency virus ("HIV"), transsexualism, and sickle cell anemia. *Cummings v. Clinton Cty. Legislature*, No. 9:14-CV-281 (DNH/ATB), 2014 WL 4265844, at *3 (N.D.N.Y. Aug. 27, 2014) (collecting cases). Courts have declined to recognize constitutional protection for many other medical conditions, including fibromyalgia, arthritis, sleep apnea, Hepatitis A, participation in mandated alcohol and drug rehabilitation, and exhibitionism. *Id.* (collecting cases); *see also Barrow v. Buren*, No. 9:12-cv-01268 (MAD/CFH), 2015 WL 417084, at *19-20 (N.D.N.Y. Jan. 30, 2015) (exhibitionism).

---

[2]     Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Courts have on occasion found a severe mental health condition could constitute a valid basis for a Fourteenth Amendment right to privacy claim. *See Hunnicutt v. Armstrong*, No. 04-1565-PR, 2005 WL 2573525, at *1 (2d Cir. Oct. 13, 2005) (holding the plaintiff had made a valid right to privacy claim based on the defendant's public discussion of the plaintiff's mental health issues); *Medina v. Watson*, 3:16-cv-2061 (VAB), 2017 WL 62512, at *2 (D. Conn. Jan. 5, 2017) (permitting the plaintiff's right to privacy claim to proceed where the defendant had improperly disclosed the plaintiff's mental health diagnosis to custodial staff); *Jones v. Forbes*, No. 3:16-cv-14 (VAB), 2016 WL 4435081, at *4-5 (D. Conn. Aug. 19, 2016) (permitting the plaintiff's right to privacy claim to proceed where the defendants had discussed the plaintiff's medical and mental needs in front of other inmates). However, at least one court has refused to recognize a right to privacy based upon the purported disclosure of an inmate's psychiatric condition and treatment by a counselor to other corrections workers and inmates. *See Williams*, 2009 WL 1652193, at *11 (dismissing the plaintiff's Fourteenth Amendment right to privacy claim where the inmate failed to alleged the "existence of any condition of such magnitude or nature as to place it on par with HIV positive status or transsexualism which was disclosed indiscriminately to non-medical personnel").

Here, although Plaintiff alleges that his confidential medical and mental health information was disclosed, Plaintiff has failed identify the severe physical or mental health condition from which he suffers and to which the disclosed medication relates. Plaintiff states generally that Defendant had disclosed the name of Plaintiff's medication and its side effects, but Plaintiff does not indicate the name of the medication disclosed. Plaintiff states that his Remeron medication dosage was increased upon placement in the Mental Observation Unit; however, it is still unclear whether Remeron was the medication disclosed to the inmate, considering Plaintiff

6

has not alleged, and the records do not indicate, that Remeron was the only medication prescribed to him. *See* Dkt. No. 1 at 3. According to the Prescribers' Digital Reference, Remeron is prescribed for the treatment of major depression.[3] Without having plead that he suffers a severe physical or mental health condition that is accorded a constitutional right to privacy, Plaintiff has failed to state facts plausibly showing a Fourteenth Amendment claim. *See Ruple v. Bausch*, No. 09-cv-1108 (NAM/DRH), 2010 WL 3171783, at *4-5 (N.D.N.Y. July 21, 2010) (granting the defendant's motion to dismiss the plaintiff's Fourteenth Amendment claim where plaintiff did not allege from what severe health condition he suffers). Therefore, the Court recommends that Plaintiff's claim be dismissed.

### B.  Leave to Replead

Ordinarily, a *pro se* plaintiff whose claims are found to be insufficient to withstand scrutiny under Rule 12(b)(6) should be granted leave to replead at least once to afford him or her the opportunity to cure any perceived deficiencies and assert a proper claim. *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) (leave to replead shall "be freely given when justice so requires"). However, if an amendment would be futile, a court may deny leave to amend. *See Cuoco v. Mortisugu*, 222 F.3d 99, 112 (2d Cir. 2000). At this point, the Court cannot rule out that Plaintiff may have a valid basis for a Fourteenth Amendment right to privacy claim, if Plaintiff were to allege facts plausibly showing he suffers from a severe mental health condition, on par with HIV positive status or transsexualism.

In deference to Plaintiff's *pro se* status, the Court recommends that Plaintiff be permitted

---

[3]      Prescriber's Digital Reference, Remeron (Mirtazapine) Drug Information, http://www.pdr.net/drug-summary/Remeron-mirtazapine-384.8320 (last visited Oct. 19, 2016).

the opportunity to replead his Fourteenth Amendment right to privacy claim by alleging facts

showing he suffers from a medical condition that is afforded a constitutional right to privacy.

     **ACCORDINGLY**, it is hereby

     **RECOMMENDED** that Defendants' Rule 12(b)(6) motion to dismiss (Dkt. No. 18) be

**GRANTED**, and that Plaintiff's complaint be **DISMISSED WITH LEAVE TO AMEND**; and

it is further

     **ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-

Recommendation, along with copies of the unpublished decisions cited herein in accordance

with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

     Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.[4]  Such objections shall be filed with the Clerk of the

Court.  <u>**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**</u>

<u>**PRECLUDE APPELLATE REVIEW**</u>.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72, 6(a).


Dated: October 19, 2017
      Syracuse, New York

                    Therèse Wiley Dancks
                    United States Magistrate Judge

---

[4]    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2010 WL 681374
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Kevin V. BYNG, Plaintiff,
v.
James L. CAMPBELL, et al., Defendants.

No. 907-cv-471 (GLS/DRH).
|
Feb. 24, 2010.

**Attorneys and Law Firms**

Kevin V. Byng, Utica, NY, pro se.

Robert P. Roche, Esq., Albany, NY, for Albany County defendants.

Thuillez, Ford, Gold, Butler & Young, LLP., Karen A. Butler, Esq., Kelly M. Monroe, Esq., William Iam C. Firth, Esq., of CounseL, Albany, NY, for Correctional Medical defendants.

*MEMORANDUM-DECISION AND ORDER*

GARY L. SHARPE, District Judge.

### I. *Introduction*

**\*1** Pro se plaintiff Kevin Byng, formerly incarcerated at the Albany County Correctional Facility, brings this action under Title II of the ADA,[1] § 504 of the Rehabilitation Act,[2] and 42 U.S.C. § 1983. (*See* 2d Am. Compl. ¶ 20, Dkt. No. 100.) Byng alleges that defendants, Albany County Sheriff's Department and three of its employees, and Correctional Medical Services, Inc. (CMS) and five of its employees, violated his rights under the Eighth, Ninth, and Fourteenth Amendments. (*See id.*) CMS defendants and County defendants filed motions for summary judgment. (Dkt.Nos.112, 125.) Byng subsequently moved to strike certain affidavits submitted by County defendants. (Dkt. No. 194.) In a

Report-Recommendation and Order (R & R) filed on October 13, 2009, Magistrate Judge David R. Homer denied Byng's motion to strike and recommended that CMS defendants' motion should be granted, and that County defendants' motion should be granted in part and denied in part. (Dkt. No. 199.)[3] Pending are County defendants' objections to the R & R, (Dkt. No. 202), and Byng's objections to the R & R and responses to defendants' objections, (Dkt.Nos.201, 204, 205, 208). For the reasons that follow, the R & R is adopted in its entirety.

### II. *Discussion*[4]

#### A. *Order Denying Motion to Strike*

In deciding non-dispositive pretrial issues, magistrate judges in this district are afforded the broadest discretion, and will be reversed only when that discretion is abused. *See Miller v. Loughren,* 258 F.Supp.2d 61, 61 (N.D.N.Y.2003)* (citation omitted). This court will modify or set aside any portion of the magistrate judge's non-dispositive order only if it is found to be "clearly erroneous or contrary to law." FED. R. CIV. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A); *Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d Cir.1990). Because Judge Homer's denial of plaintiff's motion to strike the County defendants' affidavits was not an abuse of discretion, clearly erroneous, or contrary to law, it is affirmed.

#### B. *Report-Recommendation and Order*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews these findings and recommendations de novo. *See Almonte v. N.Y. State Div. of Parole,* No. 04-cv-484, 2006 WL 149049, at *6-7 (N.D.N.Y. Jan. 18, 2006)* (italics omitted). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews a magistrate judge's findings and recommendations for clear error. *See id.*

#### 1. County Defendants' Objections

County defendants object to Judge Homer's finding that questions of material fact remain regarding whether

Byng's failure to exhaust his administrative remedies is excusable and whether Delong and Rose used excessive force against Byng. (*See generally* Dkt. No. 202.) However, these objections amount to no more than misconstructions and misapplications of well-established law. While County defendants seek judgments as to credibility and weight and engage in an existential discussion of "proof" and "fact," they forget that "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Accordingly, having reviewed Judge Homer's recommendations regarding exhaustion and excessive force for clear error, and finding none, the court concludes that summary judgment on the claim of excessive force against Delong and Rose would be unwarranted at this juncture.

**2. Byng's Objections**

  **\*2** Byng has filed several submissions which the court will treat as serial objections to Judge Homer's R & R. (*See* Dkt. Nos. 201, 204, 205, 208.) However, Byng's objections either contest inconsequential aspects of Judge Homer's factual findings, or are non-specific, conclusory, [5] and fail to address the recommendations. Thus, upon review of the R & R for clear error, the court finds that Judge Homer correctly concluded that the remaining claims-minus the excessive force claim-against the CMS and County defendants should be dismissed.

In closing, the court is satisfied that the remainder of the R & R contains no clear error.

### III. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Homer's order denying Byng's motion to strike is **AFFIRMED;** and it is further

**ORDERED** that Magistrate Judge Homer's October 13, 2009 Report-Recommendation and Order is adopted; and it is further

**ORDERED** that CMS defendants' motion for summary judgment (Dkt. No. 112) is **GRANTED** and Byng's claims against CMS defendants are **DISMISSED** and

Correctional Medical Services, Inc., Dr. Robinowitz, Dr. Salzman, Rich, Debbie, Gloria Cooper, and Jill Harrington are hereby terminated from this action; and it is further

**ORDERED** that County defendants' motion for summary judgment (Dkt. No. 125) is **DENIED** in part as to Byng's claim against D. Delong and M. Rose for excessive force; and it is further

**ORDERED** that County defendants' motion for summary judgment (Dkt. No. 125) is **GRANTED** insofar as Byng's remaining claims against County defendants are **DISMISSED** and James Campbell and Albany County Sheriff's Department are hereby terminated from this action; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION AND ORDER [1]

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Kevin V. Byng ("Byng") was formerly incarcerated at the Albany County Correctional Facility ("ACCF") in the custody of defendant Albany County Sheriff's Department ("ACSD") as a pretrial detainee. Byng brings this action pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S .C. § 12101 *et seq., § 504* of the Rehabilitation Act ("RA"), and the Civil Rights Act of 1871, 42 U.S.C. § 1983, alleging that defendants, ACSD and Albany three employees of ACSD ("County defendants") as well as the Correctional Medical Services Inc. "CMS") and five of its employees [2] ("CNS defendants") violated his Eighth, Ninth, and Fourteenth Amendment rights. Second Am. Compl. (Docket No. 16).

Presently pending are motions for summary judgment by both the County defendants (Docket No. 125) and the CMS defendants (Docket No. 112) pursuant to Fed.R.Civ.P. 56. Byng opposes both motions. Docket Nos. 173, 187. Also pending is a motion to strike certain submissions in the County defendants' reply to Byng's opposition. Docket No. 194. The County defendants

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

oppose that motion. Docket No. 195. For the following reasons, (1) the motion of the CMS defendants should be granted in part and denied in part [3], (2) the County defendants' motion should be granted in part and denied in part, and (3) Byng's motion is denied.

## I. Background

**\*3** The facts are related herein in the light most favorable to Byng as the non-moving party. *See* subsection II(A) *infra.* Byng was held at ACCF in pretrial detention from January 30 to June 12, 2007 when he was transferred to state custody. Second Am. Compl. ¶ 2. Byng's seven causes of action concern events occurring during his incarceration at ACCF.

## A. Medical Treatment

In November 2004, Byng learned that he had acquired Hepatitis C. Byng Dep. (Docket No. 112-8) at 13. While incarcerated in 2005, Byng received over forty weeks of hepatitis treatment but did not receive the entire course of the drug therapy. *See generally* Docket No. 112, Ex. F; *see also* Docket Nos. 112-10 & 11 at 27-53, 108-12; Docket No. 112-11 at 118, 120-21 (over sixty-give ambulatory health entries documenting Byng's injections, side effects, mood, and refusals); Docket No. 112, Ex. F at 113-35 (detailing the daily administration of hepatitis drug therapy); Byng Dep. at 15-16.

In the Fall of 2006, prior to his incarceration at ACCF, Byng briefly treated with Dr. Richter, a gastroenterologist. Docket No. 112, Ex. E at 12-13; Docket No. 173 at 56-2A; Docket No. 173 at SE 56-91A-B. During a November 2006 appointment, the prior drug therapy was deemed successful in decreasing Byng's viral load, Byng had remained free of drug and alcohol abuse since January 2004, but treatment with Interferon and Ribavirin "is not at this time a current recommendation ... surveillance ... and ultrasound once a year and [liver functions tests] and [blood work] every six months comprises the current recommendations." Docket No. 112, Ex. E at 12; Docket No. 173 at SE 56-91A. Byng agreed to this treatment plan. Docket No. 112, Ex. E at 13; Docket No. 173 at SE 56-91 B; *but see* Byng Dep. at 23-25 (testifying that he did not have a complete recollection

of the encounter or the entire conversation and what the actual recommendation was from the physician).

On January 20, 2007, just prior to his reincarceration in ACCF, Byng was hospitalized for complaints of sore throat, wheezing, and shortness of breath. Docket No. 173 at SE 56-95D. Byng noted a history of alcohol abuse to the staff. *Id.* at 95D6. Ten days later, when Byng arrived at ACCF, Byng reported that he drank a six-pack of beer per day, his last drink being at 10 a.m. that morning, and that he uses cocaine. Docket No. 112, Ex. E at 34; [4] Byng Dep. at 19-20, 28 (detailing a two-week relapse where alcohol and cocaine when utilized on multiple occasions).

On January 31, 2007, Byng complained of difficulty breathing. Docket No. 112, Ex. E at 38; Docket No. 173 at 56-3A. While Byng's lungs were clear, he was placed on the list for evaluation. Docket No. 112, Ex. E at 38; Docket No. 173 at 56-3A. On February 2, 2007, when Dr. Salzman, a defendant, attempted to see Byng, Byng was unavailable as he was appearing in court. Docket No. 112, Ex. E at 38; Docket No. 173 at 56-3A; Byng Dep. at 30-31; Salzman Aff. (Docket No. 112-14) ¶ 10. Later that day, Byng again requested treatment for stomach and chest pains. Docket No. 112, Ex. E at 59. On February 5, 2007, Byng was seen by Dr. Salzman who noted Byng's previous Hepatitis C conditions and neutropenia [5] as well as the fact that his prior drug therapy was deemed ineffective. Docket No. 173 at 56-3H; Salzman Aff. ¶ 12. Byng also provided more of his medical history including anxiety, insomnia, anorexia, and blurry vision. Salzman Aff. ¶ 12.

**\*4** On February 7, 2007, Byng again requested treatment for his liver disease and pain as well as to see an optometrist. Docket No. 112, Ex. E at 60. The following day, Byng was told that he was on the list for an infectious disease ("ID") consultation. *Id.* Byng was found to be doing well. *Id.* at 38; Docket No. 173 at 56-3A. On February 9, 2007, Dr. Salzman evaluated Byng and wrote him a prescription. [6] Docket No. 112, Ex. E at 38.

On February 12, 2007, Byng was examined by ID physician Dr. Rabinowitz, a defendant herein. [7] Docket No. 112, Ex. E at 73-74; Docket No. 173 at 56-9T, B; Byng Dep. at 33. Rabinowitz ordered blood tests to assess Byng's liver function. Salzman Aff. ¶ 17. Rabinowitz's notes outlined a history of (1) substance abuse per the recent emergency room records, [8] (2)

Hepatitis C for which treatment was initiated but proved unsuccessful,[9] and (3) neutropenia aggravated by the Hepatitis treatments. Docket No. 112, Ex. E at 73; Docket No. 173 at 56-9B. Byng also reported that he had completed approximately forty-five weeks of hepatitis drug therapy. Docket No. 112, Ex. E at 73; Docket No. 173 at 56-9B. Byng was scheduled for a further visit. Docket No. 112, Ex. E at 74; Docket No. 173 at 56-9B.

On February 14, 2007, Byng sought treatment from the optometrist, claiming that the optometrist previously informed Byng that he could not receive glasses "unless [he had] a life threatening illness." Docket No. 112, Ex. E at 61. Byng had last seen an optometrist on February 8. *Id.* On February 16, Byng submitted another treatment request, this time for his neutropenia. Docket Nos. 173 at 56-10 B & T; 56-75AA. On February 17, 2007, a physician ordered blood tests and wrote a prescription for ibuprofen. Docket No. 112, Ex. E at 44; Docket No. 173 at 56-3D; Salzman Aff. ¶ 20.

On February 22, 2007, blood tests revealed that Byng's viral load had drastically increased, other critical measures were elevated, and his white blood cell count had decreased. Docket Nos. 173 at 56-12 A & C; SE 56-85 A & B; Byng Dep. at 35. Three days later, Byng requested treatment for a cough, trouble breathing, and a fever. Docket No. 112, Ex. E at 63. Examination revealed that his lungs were clear and his temperature was slightly elevated. *Id.;* Salzman Aff. ¶ 22. Cold medicine was ordered. Salzman Aff. ¶ 12.

On February 27, 2007, Byng requested medical attention after he fell coming out of the shower, injuring his nose. Docket No. 112, Ex. E at 62; Byng Dep. at 35-36. Byng was examined by a physician's assistant and was given antibiotics and a cream for his injured nose. Docket No. 112, Ex. E at 44, 62; Salzman Aff. ¶ ¶ 23-26; *see also* Byng Dep. at 36 (testifying that his treatment was "good").[10] On March 1, Byng was seen by an optometrist and provided a prescription for bifocals. Docket No. 112, Ex. E at 79-80; Docket No. 173 at 56-66D. On March 14, 2007, Byng requested new lenses for his bifocals because vision was blurry out of one lens. Docket No. 112, Ex. E at 67. Byng was placed on the schedule for optometry, was evaluated less than one month later, and was provided with new glasses. *Id.* at 67, 70-71; Docket No. 173 at 56-3F; Byng Dep. at 31-32.

*5 On March 11, 2007, Byng again requested treatment for his liver and sought health shakes because he was losing weight. Docket No. 112, Ex. E at 66; Docket No. 173 at 56-13 C1; Salzman Aff. ¶ 32. Health shakes were denied as not indicated since Byng had gained eleven pounds since his admission to ACCF. Docket No. 112, Ex. E at 66; Docket No. 173 at 56-13 C1; Salzman Aff. ¶ 33. However, Dr. Salzman ordered Byng's weight be recorded weekly for three weeks and then monthly for three months. Docket No. 173 at 56-3F; Salzman Aff. ¶ 34. Dr. Salzman received a complaint from Byng on March 18, regarding his weight, pain, and hepatitis. Docket No. 112, Ex. E at 56-58; Docket No. 173 at 56-14 T & B; Salzman Aff. ¶ 37.

From March 24 until April 17, Byng made five requests for treatment for pain in his feet,[11] treatment for his hepatitis, pain, and scratched nose, medicine for his sore throat, and assistance repairing his broken glasses. Docket No. 112, Ex. E at 51-55; Docket Nos. 173 at 56-15; 56-16; 56-17; 56-20. On April 15, Dr. Salzman examined Byng, who was still requesting retreatment for his hepatitis. Salzman Aff. ¶ 47. Byng had normal vital signs and Dr. Salzman requested another consultation with Dr. Rabinowitz. *Id.*

On April 18, Byng was again evaluated by Dr. Rabinowitz. Docket No. 112, Ex. E at 21, 75-76; Docket No. 173 at 56-30. Dr. Rabinowitz noted Byng's complaint of right flank and upper quadrant pain. Docket No. 112, Ex. E at 75; Docket No. 173 at 56-30A. The pain Byng was complaining of was inconsistent with the hepatitis process; however, pain from hepatitis is not uncommon. Docket No. 112, Ex. E at 75-76; Docket No. 173 at 56-30; Rabinowitz Aff. ¶ ¶ 46-47. Therefore, he recommended a higher dose of pain medication to alleviate Byng's discomfort. Docket No. 112, Ex. E at 76; Docket No. 173 at 56-30B.[12] Additionally, Dr. Rabinowitz noted that Byng did not require health shakes and that any further retreatment for the Hepatitis C would be contraindicated because of Byng's history of alcoholism and substance abuse. Docket No. 112, Ex. E at 76; Docket No. 173 at 56-30 B; *see also* Rabinowitz Aff. (Docket No. 112-13) ¶ 65 ("After careful assessment ... including Mr. Byng's history, treatment, complications including neutropenia, recent drug and alcohol use and based upon standards of medical care in 2007 ... I determined Mr. Byng was not a candidate for retreatment ...."); *see also* CMS Policy at 21 (discouraging treatment for "pre-trial and nonsentenced

federal detainees ... [because t]he potential for interrupted antiviral therapy ... places the inmates at risk for a number of undesirable outcomes, including treatment failure ... and adverse effects from medications ...."). [13]

Beginning on April 19, 2007, Byng sent grievances to numerous individuals concerning the medical care he was receiving for his hepatitis and pain. *See* Docket No. 173 at 56-23 (grievance to defendant Cooper dated April 17, 2007); Docket No. 112, Ex. E at 4, 17, 18, 24, 26 (complaint dated April 19, 2007 to Sheriff Campbell); Docket No. 173 at 56-27 (same); Docket No. 112, Ex. E at 25 (informal oral grievance dated April 28, 2007 to Campbell); Docket No. 173 at 56-28 (same); Docket No. 112, Ex. E at 46-48 (letters of complaint dated April 28 and 29 to Dr. Rabinowitz); *id.* at 30 (grievance to unnamed third party checking status of April 23 grievance); Docket No. 173 at 56-32 (same); Docket No. 112, Ex. E at 3 (grievance to New York State Commission of Corrections dated May 3, 2007); Docket No. 173 at 56-34, 56-66B (same); Byng Dep. at 60-71 (detailing official grievances and informal letters of complaint sent during incarceration). The New York State Commission of Corrections initiated an investigation and concluded that Byng was receiving appropriate care and that the bulk of his complaints involved a disagreement with the treatment he was receiving, and the Commission deferred to the medical judgment and recommendations. Docket No. 112, Ex. E at 14-16; Docket No. 173 at 56-39; Docket No. 173 at SE56-92. After the decision was announced, Byng grieved the outcome in a letter dated May 15, 2007, to an unnamed third party. Docket No. 173 at 56-41 A-C.; *see also Id.* at 56-60 (additional correspondence dated June 21, 2007 seeking outcome of Commission decision from May 10).

**\*6** On June 12, 2007, Byng was transferred to state custody at Downstate Correctional Facility. [14] Docket No. 112, Ex. F at 4. Byng continued to complain of right upper quadrant pain. *Id.* at 5-6. On August 31, 2007, Byng first reported a small lump on his abdomen which was still accompanied by right upper quadrant pain. *Id.* at 7. On December 1, 2007, possible signs of a hernia were observed and a hernia was diagnosed on January 3, 2008. *Id.* at 11; Docket No. 173 at 56-71 D. The hernia was repaired on March 7, 2009. Docket No. 173 at 56-72; Byng Dep. at 10.

Additionally, after Byng was transferred from ACCF, he continued to seek retreatment for his hepatitis.

Retreatment was denied on November 2, 2007 at Fishkill. Docket No. 112, Ex. F at 9. However, as of the Fall of 2008, it appeared that retreatment might be possible. Docket No. 173 at 56-77A. One reason why the initial treatment in 2005 was interrupted was Byng's neutropenia. *Id.* at 56-77B. After the ID consult, an unnamed, third party corrections commissioner commented that prior treatment was not ultimately successful, Byng's viral load had increased substantially, but Byng retained normal liver function which could be monitored unless the levels began to elevate in which case retreatment would be considered, hopefully with a more effective therapy than that which is currently available. *Id.* at 56-77B-C.

On December 4, 2008, Byng received correspondence from a liver specialist at St. Luke's Hospital in Utica recommending that Byng be retreated with drug therapy for his hepatits. Docket No. 173 at SE 56-85E1. This correspondence also indicated that another physician agreed with the recommendation. *Id.* The correspondence also advised that the "laboratory data suggest[ed] that [his] hepatitis C virus did damage [Byng's] liver, putting it on a quite rapid pathway towards cirrhosis, which is the worst degree of liver damage ... [and i]f there is a good time to treat, it is now. Abusing various chemical substances will not necessarily disqualify you from treatment .... " but continued alcohol abuse contributes to liver damage and continued substance abuse puts you at risk for developing new infections and viruses. Docket No. 173 at SE56-85G.

### B. Excessive Force

Byng contends that on May 23, 2007, he was assaulted by defendants Rose and Delong. Shortly before the incident, Byng filed a grievance against CMS for failure to provide appropriate medical care, and alleges that he became the object of verbal harassment by Rose and Delong for complaining about his care. Byng Dep. at 46-48. Byng contends that on the evening of May 23, medical staff gave him his medication in a crushed form and, when he asked what the powder was, he discovered that the medical staff had almost given him the incorrect medication. Docket No. 187-3, ¶49(P1). [15] After receiving the correct medication, Byng made a remark to Delong asking whether he would ever believe Byng and cease harassing him. *Id.* The gate to Byng's tier was opened [16] and Delong entered, with Rose and others, and slammed

Byng's right hand into the gate and elbowed Byng in the back by his right kidney. Docket No. 187-3, ¶ 54(c); Docket No. 187-7 at 66-67, ¶ 8,.

**\*7** Byng was then brought to the officer's desk at Rose's direction, where his face was pushed into the steel control box and Delong "slammed his knuckled fist down ... hard on top of [Byng's] head." Docket No. 187-3, ¶ 54(e); Docket No. 187-7 at 66-67, ¶ 8. Byng was then elbowed under his right eye, verbally threatened, and then pushed back into the vestibule. Docket No. 187-3, ¶ 54(f)-(g). Byng was then escorted off the tier.. Docket No. 187-3, ¶ 57, 59(2)-(3); *see also* Harris Aff. (Docket No. 187-7 at 60-63) ¶¶ 6, 8, 18-19, 23-24,26-29. [17] When Sgt. Frambach arrived, Byng was alone. Frambach Aff. (Docket No. 125-4) ¶ 3. Frambach ordered Byng to pack and leave the tier and Byng complied. *Id.* ¶ 4.

Later that evening, Byng wrote a letter to non-party Wigger, complaining of the events of May 23, 2007. Wigger Aff. (Docket No. 125-2 at 1-3) ¶ 2; Docket No. 125-2 at 6. A second letter was also sent to Wigger naming Rose and Delong as the assailants and reporting their refusal to provide him with a grievance form. Docket No. 173 at 56-47. Byng was charged with a disciplinary violation for which he eventually agreed to fifteen days of cell confinement. Wigger Aff. ¶ 6; *see also* Docket No. 173 at 56-51 (inmate disciplinary report form charging Byng with belligerence to medical staff). On May 24, 2007, in a letter to Frambach, Byng officially made a statement which indicated that he did "not want to file a grievance or sign any statement against any officer," explained what his version of the events of the evening were, and sought expungement of the disciplinary charge. Docket No. 125-2 at 22; Docket No. 173 at 56-53. After receiving the charge, Byng wrote a second letter to Frambach dated May 24 stating that he received a wrongful disciplinary charge based on retaliatory motives, he had been harassed and threatened by Delong and Rose, and his previous use of neutral language, such as "restrained", was solely because he was afraid he would suffer more retaliation if he exposed the truth. Docket No. 173 at 56-54 A-B.

On May 24, 2007, Byng requested medical attention after the assault. Docket No. 112, Ex. E at 50; Docket No. 173 at 56-55. Later that evening, Byng was evaluated. Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35; Docket No. 173 at 56-49. Byng complained of right hand pain and swelling but retained full range of motion and a normal grasp. Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35; Docket No. 173 at 56-49. Additionally, Byng alleged pain and tenderness in his right flank, but there was no visible swelling. Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35; Docket No. 173 at 56-49. Byng also alleged that he was thrown head first into metal objects but, although his right eye was swollen, his eye glasses were undamaged. Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35; Docket No. 173 at 56-49. X-rays were ordered for Byng's face, hand, and flank, and it was noted that he walked normally and without assistance, was provided with Tylenol, and sent back to his cell. Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35; Docket No. 173 at 56-49.

**\*8** Radiology reports were returned on May 29, 2007. Docket No. 112, Ex. E at 68; Docket No. 173 at 56-50. The reports for the ribs and hands were negative with no evidence of fracture or osteoporosis. Docket No. 112, Ex. E at 68; Docket No. 173 at 56-50. The facial bones showed no evidence of fracture or dislocation. Docket No. 112, Ex. E at 68; Docket No. 173 at 56-50. Photographs were taken of Byng, although he complained that the documentation was inadequate as there were no photographs taken of his bruised back. Docket No. 173, at 56-57 B-C. On June 10, 2009, a CT scan of Byng's head was completed showing two low dense lesions in his brain consistent with old conditions. Docket No. 173 at 56-110 A.

## II. Discussion

Liberally construing Byng's Second Amended Complaint, he alleges that medical treatment was withheld and that he was assaulted in retaliation for filing grievances against CMS. Additionally, Byng claims that the CMS defendants were deliberately indifferent to his serious medical needs and that the County defendants used excessive force against him on May 23, 2007 in violation of his Fourteenth Amendment rights. Byng also claims that the CMS defendants released his confidential medical records without his consent to the attorneys representing both the CMS and County defendants. Finally, Byng claims that the denial of drug therapy for his Hepatitis C constituted a violation of the ADA.

The CMS defendants assert that Byng's Fourteenth Amendment claims of deliberate indifference are

meritless, Byng waived any right of privacy or confidentiality he possessed in his medical records by filing the instant law suit, Byng's ADA claims are also meritless, and Byng has failed to exhaust his administrative remedies. The County defendants also assert that Byng has failed to exhaust his administrative remedies and that his Fourteenth Amendment claims of excessive force are meritless.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).* Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).* All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir.1997).*

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).* It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir.1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir.1988).*

**\*9** When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006); see also Sealed Plaintiff v. Sealed Defendant # 1, 537 F.3d 185, 191-92 (2d Cir.2008)* ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).. However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

### B. Exhaustion

As a threshold matter, defendants contend that Byng has failed to exhaust his administrative remedies. Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. *Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 126 S.Ct. 2378, 2382-83 (2006).* This exhaustion requirement applies to all prison condition claims. *Porter, 534 U.S. at 532.* "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." *Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999).* The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. *Nussle, 534 U.S. at 524.*

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir.2006)* (citing *Giano v. Goord, 380 F.3d 670, 677 (2d Cir.2004)).* A court must conduct a three-part inquiry to determine if an inmate's failure to folow the applicable grievance procedures is fatal to his or her claims. A court must consider whether

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero, 467 F.3d at 175* (citing *Hemphill v. New York, 380 F.3d 680, 686 (2d Cir.2004)).*

Administrative remedies are unavailable when there is no "possibility of [ ] relief for the action complained of." *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) (citing *Booth v. Churner,* 532 U.S. 731, 738 (2001)). The test to determine the availability of an administrative remedy is an objective one asking whether "a similarly situated individual of ordinary firmness" would have deemed it accessible. *Id.* at 688. Courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* No. CV-04-4587 (DST), 2007 WL 389003, at *8 (E.D.N.Y.2007) (internal citations omitted).

**\*10** The ACCF maintained a three-step procedure for inmates to file grievances concerning the conditions of their confinement. ACCF Rules & Regs. (Docket No. 125-8) at 22 (handbook given to inmates upon admission). First, an inmate must file a grievance with the Grievance Coordinator. *Id.* If dissatisfied with the Coordinator's determination, an inmate may then appeal to a Chief Administrative Officer within the facility. *Id.* If still dissatisfied, an inmate may then appeal to the state Commission on Corrections. *Id.* This procedure required that a grievance be filed in writing on a particular form to be provided to an inmate by the unit supervisor upon request of the inmate. *Id.*

Byng contends that his efforts to pursue administrative remedies here were impeded by defendants' failures to provide him with the inmate handbook describing the grievance procedure and the necessary grievance form. Viewing the facts in the light most favorable to Byng, defendants' failures, if proven, would constitute behavior excusing Byng's failure to exhaust. Docket No. 187-2, ¶ 13(b); Docket No. 187-3, ¶ 11. The necessity for Byng to file his grievances on the form designated by ACCF is underscored by the ACCF inmate handbook. *See* ACCF Rules & Regs. at 22. Thus, if proven, defendants' failure to provide either the facility rules and regulations or the necessary form when requested by Byng reasonably prevented compliance with the procedures. *Id.* Repeated failures by defendants to provide inmates with the facility rules to apprise them of grievance procedures and failure to provide inmates with the form when requested would deter a similarly situated individual from attempting to pursue a grievance. *See* Harris Aff. ¶ 30 (stating that he also did not receive the ACCF rules upon his entrance into the facility).

Assuming their truth for purposes of this motion, Byng's assertions suffice to raise material questions of fact as to whether Byng received the inmate handbook or the requested form. These questions of fact defeat defendants' motions on this ground. Accordingly, defendants' motions on this ground should be denied.

### C. Retaliation

Byng contends that the CMS defendants failed to provide him with drug therapy for his hepatitis and that the County defendants assaulted him, both in retaliation for the grievances that he filed against CMS. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008) *(citing Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)). Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.* Conclusory allegations alone are insufficient. *Id.* (*citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

**\*11** In this case, Byng has failed to allege facts sufficient to support a retaliation claim. Byng's actions in filing grievances constitutes an activity protected by the First Amendment. However, with respect to the CMS defendants, Byng has failed to show that he was subject to deliberate indifference or intentional delay of any medical treatment. As such, he has failed to prove any adverse action caused by the CMS defendants which he suffered. Moreover, to the extent that Byng's contentions can be construed as proof of an adverse action, Byng has made only conclusory allegations to demonstrate that the filing of his grievances was a substantial factor in any CMS defendant's decisions on treatment. These conclusory allegations, without more, are insufficient to maintain the present claims. *Id.* With respect to the County defendants,

Byng alleges no facts other than conclusory allegations to demonstrate that the filing of his grievance against CMS was a substantial factor in the May 23 assault. As previously stated, these conclusory allegations, without more, are insufficient to maintain the present claims. *Id.*

Accordingly, Byng has failed to present sufficient evidence to withstand a motion for summary judgment on his retaliation claims and defendants' motions as to those claims should be granted.

### D. Personal Involvement

Defendants contend that Byng has failed to establish the personal involvement of Sheriff Campbell or of CMS. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

### 1. Campbell

Campbell was the Albany County Sheriff during the period of Byng's detention at the ACCF. Campbell

Aff. (Docket No. 191-3) ¶ 1. Campbell's responsibilities included the management and operation of the ACCF. *Id.* Byng does not contend that Campbell was directly involved in any of the constitutional violations but that by virtue of Campbell's position and a letter of complaint sent to Campbell, Campbell was personally involved. To the extent that Byng claims that his grievances involved Campbell, those contentions are misplaced.

**\*12** First, grievances alone will not suffice to sustain a claim for personal involvement. *See Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (holding that Commissioner of DOCS not personally liable for ignoring plaintiff's letter of protest and request for an investigation). Thus, even construing the amended complaint in the light most favorable to Byng, any allegations of personal involvement by Campbell still lack any factual basis. Second, even assuming that a letter was filed, received by Campbell, and forwarded on, such actions would not alone suffice to give notice to Campbell of any deprivation. Additionally, such allegations fail to demonstrate that Campbell actually investigated or became involved in the conduct at issue as all that has been shown is that the letter was forwarded on to others. *See Atkins v.. County of Orange,* 251 F.Supp.2d 1225, 1234 (S.D.N.Y.2003) ( "Personal involvement will be found, however, if an official acts on a prisoner's grievances or otherwise responds to them.") (citations omitted).

Finally, to the extent that Byng claims that Campbell instituted health policies, no evidence other than conclusory assertions have been proffered by Byng. Additionally, Campbell explained without contradiction that "all medical services ... have been outsourced to an independent corporate entity ..." since 2002 and that the contractor is responsible for all decisions involving medical treatment. Campbell Aff. (Docket No. 191-3) ¶ 2. Thus, Campbell had no power to create or institute any of the medical policies with which Byng disagrees. *Id.* ¶ 6. Moreover, there is no evidence that Campbell created a hiring or retention policy which allowed constitutional violations to continue or was grossly negligent in managing other defendants.

Accordingly, the County defendants' motion on this ground should be granted as to Campbell.

### 2. CMS

CMS moves for summary judgment based on their lack of personal involvement. CMS Defs. Mem. of Law (Docket No. 112-24) at 9. "Private employers are not liable under § 1983 for the constitutional torts of their employees unless the plaintiff proves that action pursuant to official policy of some nature caused a constitutional tort." *Rojas v. Alexander's Dep't Store, Inc.,* 924 F.2d 406, 408 (2d Cir.1990) (internal quotation marks and citations omitted). "Such a claim cannot be based on the theory of respondeat superior [and] ... there must be proof of such a custom or policy in order to permit recovery on claims against individual ... employees ...." *Perez v. County of Westchester,* 83 F.Supp.2d 435, 438 (S.D.N.Y.2000) (citations omitted). Byng asserts that there was a CMS policy in effect denying inmates hepatitis drug therapy because of its cost. As this was a medical decision over which CMS had exclusive jurisdiction, Byng's evidence suffices to raise a question of fact on the personal involvement of CMS. Moreover, Drs. Salzman and Rabinowitz relied upon CMS policies regarding Byng's ineligibility for drug therapy in denying and delaying that therapy for Byng. This evidence provides and additional question of fact as to CMS' personal involvement.

**\*13** Accordingly, CMS' motion for summary judgment on this ground should be denied.

### E. Fourteenth Amendment

Byng asserts various of his claims under the Eighth Amendment which explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Byng was held at the ACCF as a pretrial detainee from January to June, 2007 when he was transferred to state custody following his criminal conviction. Second Am. Compl. ¶ 2. The Eighth Amendment protections apply to those who have been convicted of a crime, sentenced, and are thus suffering the "punishment" contemplated by the Cruel and Unusual Punishment Clause. *Benjamin v. Fraser,* 343 F.3d 35, 49-50 (2d Cir.2003) (citing cases). Claims concerning the conditions of confinement brought by a pretrial detainee, such as Byng here, must be analyzed under the Fourteenth Amendment Due Process Clause. *Id.*

The standards under the Eighth and Fourteenth Amendments are not identical but are strikingly similar. For example, claims under the Eighth Amendment require proof of both serious injury to the plaintiff and deliberate indifference to a known danger by the prison official. *See Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994). Claims under the Fourteenth Amendment require proof of actual or imminent harm to the plaintiff and deliberate indifference by the prison official. *See Benjamin,* 343 F.3d at 50-51 & n. 17; *see also Shane v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being ... [including] food, clothing, shelter, medical care, and reasonable safety ...."). Accordingly, cases analyzed under the Eighth Amendment may provide guidance in analyzing cases, as here, considered under the Fourteenth Amendment.

### 1. Medical Care

The Fourteenth Amendment prohibition extends to the provision of medical care. *Shane,* 489 U.S. at 199-200. The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer,* 511 U.S. at 834; *Benjamin,* 343 F.3d at 51 n. 17. Second, the prisoner must show that the prison official demonstrated deliberate indifference by knowing of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)); *see also Benjamin,* 343 F.3d at 51 n. 17. Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158,

162-63 (2d Cir.2003) *(citing Chance,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*14** Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

### i. Hepatitis C

Defendants do not contest that Hepatitis constitutes a serious medical condition. CMS Defs. Mem. of Law (Docket No. 112-24) at 5. However, defendants do contend that they were not deliberately indifferent to Byng's medical condition.

Byng alleges that the CMS defendants were deliberately indifferent to his medical needs by failing to provide him with drug therapy for his hepatitis. However, Byng's complaints essentially boil down to a difference of opinion over treatment and such disagreements are insufficient to maintain a constitutional claim. *Sonds,* 151 F.Supp.2d at 312. Medical records demonstrate that alcohol and substance abuse diminished the efficacy of treatment, that a six-months of abstinence and sobriety should first be achieved before treatment, and the drug therapy included serious posible side effects such as neutropenia. Rabinowitz Aff. ¶¶ 26-36, 59; CMS Policy at 17-18, 20, 26, 28-30; Docket No. 173 at SE56-85D.

It is undisputed that immediately prior to entering ACCF, Byng relapsed, began using drugs and alcohol, and also had a documented case of neutropenia. Docket No. 112, Ex. E at 73; Docket No. 173 at 56-9B. Moreover, blood tests on February 22, 2007 indicated that Byng's white blood cell counts were low, a condition which would

be exacerbated by the drug therapy and leave Byng at risk due to a compromised immune system. Docket Nos. 173 at 56-12 A & C; SE56-85 A & B; Byng Dep. at 35. Dr. Rabinowitz evaluated Byng on two occasions in two months, and based upon the aforementioned, determined that pain relief was appropriate but retreatment was not. This decision was based on multiple visits and examinations of Byng as well as a detailed review of Byng's records. Such extensive involvement refutes any claims of indifference or delay. Moreover, Byng had already received treatment, relapsed, and no recommended course for retreatment existed, and newer and more effective medication was expected to be available soon. Mendell Aff. ¶ 10; CMS Policy at 17. Thus, CMS policy and recommendations from a state commissioner also supported Dr. Rabinowitz's treatment decisions. Docket No. 173, at 56-77 B-C.

**\*15** To the extent that Byng contends that his current medical treatment discredits that rendered by the CMS defendants, such contentions are misplaced. First, the physicians from St. Luke's Hospital, Byng's current treating sources, recognize the importance of sobriety prior to drug therapy to achieve the best possible outcome. Docket No. 173, at SE56-85G. In 2007, Byng had an admitted relapse with drugs and alcohol, and according to all medical advice, his sobriety was essential prior to reconsidering any drug therapy. Deferring such treatment for six months was consistent with policies and opinions on treatment in Byng's circumstances and reasonable given all relevant factors bearing on the decision. No question of fact has been raised to demonstrate deliberate indifference or delay by any defendant. Additionally, any differences in treatment between the physicians at St. Luke's Hospital and the CMS defendants do not indicate a constitutional violation but rather, at most, a reasoned difference of opinion. *Chance,* 143 F.3d at 703. As previously discussed, the CMS defendants provided reasonable and adequate treatment to Byng and based on the medical evidence and policies in effect at the time Byng was incarcerated at ACCF.

Accordingly, the CMS defendants' motion for summary judgment as to Byng's Fourteenth Amendment claims of deliberate indifference should be granted as to all such claims and defendants.

### ii. Chronic Pain

Byng also contends that the CMS defendants were deliberately indifferent to his chronic right, upper quadrant pain. Defendants do not challenge that such pain constituted a serious medical need. Without deciding that issue, based on the medical evidence submitted, it is clear that the CMS defendants were not deliberately indifferent to Byng's pain.

Byng was examined by Dr. Salzman on multiple occasions for a variety of medical conditions. Based on Byng's history of hepatitis and neuropenia, Dr. Salzman referred Byng to an ID specialist. Docket No. 173 at 56-3 H; Salzman Aff. ¶ 12. In addition, Dr. Salzman attempted to alleviate Byng's pain by prescribing pain relievers on multiple occasions. Docket No. 112, Ex. E at 38, 44, 85-90; Docket No. 173 at 56-4 B-C. To the extent that Byng complains that these pain relievers were ineffective and should have been stronger, such statements represent a difference of opinion as to the appropriate medications which is insufficient to prove a deliberate indifference claim. *Sonds,* 151 F.Supp.2d at 312.

Moreover, to the extent that Byng claims that the CMS defendants were deliberately indifferent in failing to diagnose his hernia sooner, such complaints at worst assert negligence which is insufficient to state a constitutional claim. Byng's specific pain was inconsistent with the hepatitis, but the complaints of generalized pain were consistent with the progression of the disease. Moreover, Byng did not report a lump in his abdomen, the best indication of a hernia, until August 2007 and exhibited no signs of a hernia until December 2007. Docket No. 112, Ex. F at 7, 11; Docket No. 173 at 56-71 D. The absence of specific symptoms until the Fall of 2007 supports defendants' decision to treat the unspecified pain with pain relievers. If further diagnostic tests should, or could, have been ordered, such an omission would support a claim of malpractice at worst. *See Estelle,* 429 U.S. at 107 ("[W]hether an X-ray ... is indicated is a classic example of a matter for medical decision. A medical decision not to order an X-ray ... does not represent cruel and unusual punishment. At most it is medical malpractice ...."). This is still insufficient to sustain a claim for deliberate indifference. *Id.* at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")

**\*16** Accordingly, the motion of the CMS defendants on this ground should be granted in all respects. [18]

### 2. Excessive Force [19]

To sustain a claim of excessive force, a pretrial detainee must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999); *see also United States v. Walsh,* 194 F.3d 37, 47-48 (2d Cir.1999) (holding that an excessive force claim by a pretrial detainee must be analyzed under the Fourth rather than the Eighth Amendment, but the standards under the two amendments are identical). The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant [constitutional] protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims,* 230 F.3d at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7).

Byng has sufficiently raised a question of fact as to whether he was the victim of excessive force. Construing the facts in the light most favorable to him, Byng has offered evidence that Delong struck him without good reason. Docket No. 173 at 56-110A. Additionally, Byng offers evidence that he was separated at all times from the medical staff by a locked gate, that he could not have contact with the medical staff or the corrections officer escort due to the locked gate, and that there was no danger or reasonable need to exert any type of force given the absence of any threat to staff or any inmate. Docket No. 187-3, ¶ 57, 59(2)-(3); Docket No. 187-7 at 65, ¶ 4. Thus, if proven, the actions of Delong and Rose in opening the gate and entering solely to inflict harm on Byng represent the type of malicious behavior and bad faith against which the Constitution seeks to protect. Viewing the facts in the light most favorable to Byng, then, he has raised a question of fact as to what occurred on the evening of May 23.

Accordingly, the County defendants' motion for summary judgment on these claims should be denied.

### 3. Disclosure of Medical Records

Byng claims that his Fourteenth Amendment right to privacy was violated when the CMS defendants released his medical records to counsel for both the CMS and the County defendants in this case without his prior consent or written authorization.

Claims surrounding disclosure of confidential medical information are analyzed under both the Eighth and Fourteenth Amendments. *See generally Rodriguez v. Ames,* 287 F.Supp.2d 213, 218-21 (S.D.N.Y.2003). However, "[a] plaintiff's privacy right in his medical records is neither fundamental nor absolute." *Barnes v. Glennon,* No. 05-CV-153 (LEK/RFT), 2006 WL 2811821, at *3 (N.D.N.Y. Sept. 28, 2006) (citations omitted); *see also Doe v. Marsh,* 918 F.Supp. 580, 585 (N.D.N.Y.1996) ("[I]t also was clear that the privacy right, at least as it applied to medical information, was not absolute."); *Jarvis v. Wellman,* 52 F.3d 125, 126 (6th Cir.1995) ("[T]he court approved the release of medical records ... based upon the legitimate nature of the requests for information. The district court inferred from this approach that a non-legitimate release of confidential medical information would violate a constitutional right ....") (internal quotation marks and citations omitted). Accordingly, "[w]hen an inmate files suit against prison officials, subsequent release of 'medical records in defense of litigation does not violate any right of the inmate [.]' " *Barnes,* 2006 WL 2811821, at *3 *(citing Woods v. Goord,* No. 01-CV-3255 (SAS), 2002 WL 731691, at *11). Waiver of privacy rights occurs when one places his or her medical condition at issue in a lawsuit. *Id.* (citations omitted); *Doe,* 918 F.Supp. at 585 ("A plaintiff may waive the privilege when his medical condition is at issue in a lawsuit.").

**\*17** Moreover, such privacy rights can be outweighed by a strong government interest, such as investigation into policies and procedures and marshaling a defense to constitutional claims. *Doe,* 918 F.Supp. at 585 ("The right to privacy in one's medical history is a conditional right that may be overcome by the government's interest in having or using the information.") (citations omitted). Such governmental uses must "advance a substantial state interest" while using the most "narrowly

tailored [amount of confidential information] to meet the legitimate interest." *Id.* (citations omitted); *see also Rodriguez,* 287 F.Supp.2d at 219-20 (upholding Fourteenth Amendment protection where the prisoner "has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence," or where the information "spread through 'humor or gossip.' ") (quotations omitted); *Webb v. Goldstein,* 117 F.Supp.2d 289, 298-99 (E.D.N.Y.2000) (dismissing a Fourteenth Amendment claim because the prisoner "has not alleged that his prison records contained the sort of sensitive medical information at issue in ... *Powell.*" ).

In this case, it is clear that Byng's claims directly relate to his medical conditions. As such, he affirmatively placed the conditions at issue and waived his right to object to any subsequent release of his records. *See Midalgo v. McLaughlin,* No. 9:06-CV-330, 2009 WL 880544, at *2 n. 5 (N.D.N.Y. Mar. 3, 2009). Additionally, to the extent a privacy interest may still exist, the nature of the lawsuit, which alleges that the State failed to provide necessary medical treatment for a person in its custody, represents the type of strong and legitimate penological interest contemplated by the disclosure exceptions. Moreover, the medical information was released only to necessary parties, the attorneys defending the respective individual defendants. The information was not widely disseminated, and as such, no unnecessary third parties became privy to the material.

Accordingly, the motion of the CMS defendants as to this claim should be granted.

### F. ADA and RA Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of ... a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II applies to state inmates. Docket No. 34; *Giraldi v. Bd. of Parole,* No. 04-CV-877 (FJS/DRH), 2008 WL 907321, at *5 (N.D.N.Y. Mar. 31, 2008). To state a claim under the ADA, an inmate must demonstrate that

(1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity.

**\*18** *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995); 42 U.S.C. § 12132.

Similarly, the RA protects any "qualified individual with a disability ... [from] be[ing] excluded from the participation in, ... [or] denied the benefits of," any federally funded program "solely by reason of his or her disability ...." 29 U.S.C. § 794(a); *see also Clarkson,* 898 F.Supp. at 1037-38 ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act"); *Robinson v. Burlington County Bd. of Soc. Servs.,* No. 07-CV-2717 (NLH), 2008 WL 4371765, at \*6 (D.N.J. Sept. 18, 2008) ("Given the similar language in the ADA and RA statutes, the analysis under the ADA is the same as the analysis under the RA.") (citations omitted).

First, individual defendants cannot be held liable under the ADA or RA. *See Lee v. City of Syracuse,* 603 F.Supp.2d 417, 448 (N.D.N.Y.2009) (holding that an individual cannot be held liable under the ADA); *Lane v. Maryhaven Ctr. of Hope,* 944 F.Supp. 158, 165 (E.D.N.Y.1996) (dismissing ADA and RA claims against individual defendant). Therefore, the action cannot be maintained against Drs. Salzman and Rabinowitz or Cooper.

Additionally, Byng has failed to identify any programs from which he was excluded during his incarceration at ACCF. Instead, he contends that he was prevented from enrolling in a program to receive hepatitis drug therapy. Such complaints concerning medical treatment are insufficient to state a claim under the ADA or RA. *See United States v. Univ. Hosp.,* 729 F.2d 144, 156-60 (2d Cir.1984).

Accordingly, the motion of the CMS defendants as to these claims should be granted in their entirety.

### G. Other Claims

Byng makes additional claims under various provisions of federal and state law. Byng claims that his Ninth Amendment rights were violated by the CMS defendants' conduct. However, "[n]o independent constitutional protection is recognized which derives from the Ninth Amendment and which may support a § 1983 cause of action." *Rini v. Zwirn,* 886 F.Supp. 270, 289-90 (E.D.N.Y.1995) (citing cases). Additionally, § 4504 of the New York Civil Practice Law and Rules does not confer a private right of action upon an individual. *Doe v. Community Health Plan-Kaiser Corp.,* 268 A.D.2d 183, 187 (3d Dep't 2000). The same is true for § 6509 of the New York Education Law. *MacDonald v. Clinger,* 84 A.D.2d 482, 482 (4th Dep't 1982) (holding that CPLR § 4504 and Education Law § 6509 are important evidence of the public policy of New York State "but that there is a more appropriate theory of recovery than one rooted in public policy.").

Furthermore, § 6530 of the New York Education Law sets forth the definitions for professional misconduct and any prosecution based on such definitions is accomplished by the New York State Department of Health. N.Y. Educ. Law § 6530; N.Y. Pub. Health Law § 230-a. Similarly, the Public Health Law specifies that the New York Attorney General is vested with the power to bring an action for violations of § 12. N.Y. Pub. Health Law § 12(5). Lastly, identical reasoning holds true for violations of the New York Mental Hygiene Law. *McWilliams v. Catholic Diocese of Rochester,* 145 A .D.2d 904, 904-905 (4th Dep't 1988) ("The Mental Hygiene Law is a regulatory statute by which the Commission of the Office of Mental Retardation and Developmental Disabilities is empowered to plan and provide comprehensive services to the State's mentally retarded citizens. No private cause of action is authorized for violations of the Mental Hygiene Law.")

**\*19** Accordingly, there is no private right of action for any of these remaining claims and the motion of the CMS defendants should be granted as to all such claims.

### III. Motion to Strike

Byng filed a separate motion pursuant to Fed.R.Civ.P. 12(f) seeking to strike three affidavits, submitted by the County defendants in reply to Byng's response to their motion. Docket No. 194. Under Fed.R.Civ.P. 12(f), a court may strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." However, motions to strike portions of affidavits or evidence of support thereof are not consistent with the purpose of Rule 12(f). *See Dragon v. I.C. Sys ., Inc.,* 241 F.R.D. 424, 425-26 (D.Conn.2007). Such materials are not technically pleadings but "courts have been willing to view motions to strike as calling the propriety of affidavits into question." *Id.* (citations omitted).

In this case, the three affidavits in question were submitted in support of the County defendants' reply. These affidavits were based on personal knowledge and are probative. In Byng's response, he repeatedly referenced the County defendants' failure to adhere to their own protocol in providing inmates with the facility rules, which justified Byng's failure to exhaust his administrative remedies. Given the relevance of the affidavits and their supporting documents to the issues raised by Byng is his pleadings, the County defendants did not improperly submit the supporting papers.

Accordingly, Byng's motion to strike is denied.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. The motion of the CMS defendants for summary judgment (Docket No. 112) be **GRANTED** as to all defendants and all claims and that this action be terminated as to all CMS defendants; and

2. The motion of the County defendants for summary judgment (Docket No. 125) be:

   A. **DENIED** as to Byng's claim of excessive force against defendants Delong and Rose; and

   B. **GRANTED** in all other respects and that defendants Campbell, and the Albany County Sheriff's Department be terminated from this action; and

**IT IS ORDERED** that Byng's motion to strike (Docket No. 194) is **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 681374

Footnotes

1    Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

2    29 U.S.C. § 794.

3    The Clerk is directed to append the R & R to this decision, and familiarity therewith is presumed.

4    The court incorporates the factual recitations contained in Judge Homer's R & R. (*See* R & R at 3-14, Dkt. No. 199.)

5    In response to Byng's continued opposition to the kind of treatment he received, the court reiterates that "[m]ere disagreement over proper treatment does not create a constitutional claim ... [s]o long as the treatment is adequate ...." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) (citation omitted); *see also Sonds v. St. Barnabas Hosp. Corr. Health* Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) ( "[D]isagreements over medications, diagnostic techniques ..., forms of treatment, or the need for specialists ... are not adequate grounds for a Section 1983 claim.").

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    Byng has requested that defendants Rich, Debbie, and Harrington, three CMS employees, be withdrawn as defendants. Docket No. 173 at 2-16, ¶ 2. The CMS defendants deem this to be a dismissal with prejudice while Byng seeks dismissal without prejudice. Under Fed.R.Civ.P. 41(a)(1)(A)(ii), a plaintiff may dismiss an action against a defendant where, as

2010 WL 681374

here, that defendant has answered, only by stipulation of that defendant. None of the three defendants have stipulated to dismissal without prejudice and Byng has not agreed to dismissal with prejudice. Accordingly, Byng's purported withdrawal of the action as to these three defendants is ineffective and affords no basis to dismiss the action as to those defendants. Dismissal on this ground should be denied.

3    In the reply of the CMS defendants, they assert that because Byng exceeded the total number of pages allowed for his memorandum of law, the additional pages which were submitted should be disregarded. Docket No. 174-2 at 7-8. Given Byng's *pro se* status, the failure to comply with the page limitation in the local rules is excused in this instance only.

4    Byng's addiction to drugs and alcohol was regularly noted in his psychiatric records as well, which identifies polysubstance abuse as one of his major diagnoses and addiction as a basis for treatment. *See* Docket No. 173, SE 56-97 (progress notes outlining diagnosis); Docket No. 112, Ex. F at 170-74, 181-85 (admission screening records for state incarceration outlining multiple diagnoses, including addiction); Docket No. 187-8 at 33 (letter outlining mental health treatment Byng had received since May 12, 2009, including that for addiction); Docket No. 187-8 at 36 (same).

5    Neutropenia occurs when blood marrow is suppressed and can result in a marked decreased in the body's immunities and ability to fight against infection. Rabinowitz Aff. (Docket No. 112-13) ¶ ¶ 30, 32.

6    Byng was regularly provided both Tylenol and Ibuprofen throughout his incarceration at ACCF. Docket No. 112, Ex. E at 85-90; Docket No. 173 at 56-4 B-C.

7    This defendant's name is spelled "Robnowitz" in the caption as it is spelled in the original complaint. Compl. (Docket No. 1). The name is spelled "Robinowitz" in the Second Amended Complaint. The correct spelling is "Rabinowitz." *See* Rabinowitz Aff. (Docket No. 112-13) 1. The correct spelling will be utilized herein.

8    "A six-month abstinence (at least) from alcohol and drug use is imperative in patients with a substance abuse history prior to starting therapy." Rabinowitz Aff. ¶ 29. Byng acknowledged that immediately prior to his incarceration, he used both alcohol and cocaine. *Id.* ¶ 56. "Alcohol intake, even in small quantities, will typically render ... therapy useless." Mendell Aff. (Docket No. 112-12) ¶ 11; *see also* CMS Chronic Hepatitis Pathway (Docket No. 112-19) at 17-18, 20, 29-30 (hereinafter "CMS Policy") (instructing patients that they are prohibited from drinking alcohol for the remainder of their life as high levels of alcohol consumption expedite the disease progression and stating that abstinence must be achieved prior to treatment to optimize its effectiveness); Docket No. 173 at SE56-85D (citing National Institute of Health Consensus Statement which provides that "treatment of patients who are drinking significant amounts of alcohol or who are actively using illicit drugs should be delayed until these habits are discontinued for at least 6 months .... Treatment for addiction should be provided prior to treatment for hepatitis C.").

9    "In 2005, the standard for treatment [of Hepatitis C] was the use of combination therapy using two medications, Ribavirin ... and Peginterferon ...." Rabinowitz Aff. ¶ 21. Such therapy carries serious side effects, including mental health illnesses, suppressed bone marrow and decreased white blood cell and platelet production, organ failure, and death; therefore, "[t]herapy is ... used with caution." *Id.* ¶ ¶ 26-28, 30-36; *see also* CMS Policy at 26, 28-30 (outlining side effects of treatment). Additionally, medical evidence indicates that "[i]f therapy fails or the virus returns (relapses), it is very unlikely to respond to another round of treatment. In addition, there is no generally accepted treatment for relapse, nor is there an ... approved therapy." Mendell Aff. ¶ 10; *see also* CMS Policy at 17 (explaining that "[c]urrent drug treatment options for chronic hepatitis C are moderately effective. Newer medications should be available in the future that will improve treatment options.")

10    Byng contends that the fall was a result of migraine headaches and dizziness which occurred sporadically and for which he never received treatment. Byng Dep. at 85-86.

11    Byng was seen by medical staff on March 25, 2007 regarding his sneaker request. Salzman Aff. ¶ 40. Additionally, pain relievers were provided to Byng, by Salzman, to alleviate the pain he was allegedly experiencing in his feet and ankles. *Id.* ¶ 41.

12    Byng continually asserts that the pain relievers he was provided were ineffective and that he disagreed with the physicians' judgment in prescribing them, suggesting that he should have received a narcotic or other more potent medication. Byng Dep. at 41.

13    Byng claims that he was denied treatment due to an unconstitutional policy of saving money, about which he was advised by five ACCF employees who remain anonymous. *See e.g.* Docket No. 187-2 ¶ 28; Docket No. 187-3 ¶ ¶ 43(b), 44(b).

14    Byng has not named any individuals as defendants in the present litigation who provided him medical treatment while he was at Downstate.

15    Byng's mental health medications were delivered in a crushed form because of a prior instance in which he hid his medication in his cheek, refusing to take it. Docket No. 173 at SE56-86 B; Byng Dep. at 75-79 (admitting that on one occasion Byng hid his medication in his mouth to avoid taking it)

**16**    According to facility procedure, the gate was locked when medication was being dispensed and inmates reached through the bars to take their cups of medication from a cart located on the other side of the locked gate. Docket No. 187-7 at 65, ¶ 4; Harris Aff. ¶¶ 5-6. Accordingly, the inmates were prevented from having any physical contact with the medical staff or corrections officers who escorted them.

**17**    According to Delong, no altercation occurred. Delong escorted medical staff on rounds during the night in question. Delong Aff. (Docket No. 125-3) ¶ 4. Byng was loud, aggressive, vulgar, and belligerent, berating the nurse for providing the wrong medication in the wrong form. *Id.* ¶ 5. Delong "stepped between [ ] Byng and the nurse, and told him to consume his meds as they had been given to him ... He became irate, waving his arms and shouting and calling [Delong] names." *Id.* ¶ 7. Delong was unable to restore order, so he called Sgt. Frambach to the tier to escort Byng elsewhere. *Id.* ¶¶ 9-10. Delong's version of the evening was corroborated by the inmates in adjoining cells who claimed that they never heard or saw anything resembling a physical altercation (Docket No. 125-2 at 8-12; Docket No. 187-7 at 46-49) and the nurse who attested to Byng's noncompliance, anger, and aggressiveness, and the lack of any violence (Docket No. 125-2 at 14; Docket No. 187-7 at 50). Rose supported Delong's assertions that Byng became belligerent and that no one assaulted Byng. Rose Aff. (Docket No. 125-5).

**18**    If it is construed that Byng claims deliberate indifference as to his weight, scraped nose, blurred vision, or sore feet, such contentions fail to meet the deliberate indifference prong. Despite Byng's contentions, his weight increased during his incarceration at ACCF, so additional dietary supplements were not indicated. Docket No. 112, Ex. E at 66; Docket No. 173 at 56-3F, 56-13 C1. Despite the objective medical evidence indicating a weight problem, Dr. Salzman still ordered that Byng's weight be monitored. Salzman Aff. ¶ 34. Other action sought by Byng only represented a difference of opinion over treatment which is insufficient to state a constitutional claim. *Sonds,* 151 F.Supp.2d at 312. Byng testified that the medical department was good in responding to and treating his nose after he fell. Byng Dep. at 36. The following day, antibiotics and cream were given to Byng. Docket No. 112, Ex. E at 62. This evidence conclusively contradict any allegations of indifference or delay. Byng also made multiple trips to the optometrist and received multiple bifocal prescriptions. Additionally, when Byng complained that his right lens was blurry, another examination and lens were provided. Docket No. 112, Ex. E at 67, 70-71, 79-80; Byng Dep. at 31-32. Lastly, Byng was also examined and provided pain medication for his complaints of sore feet. Salzman Aff. ¶¶ 40-41. Although Byng was not provided with the sneakers he requested, such a request was deemed unnecessary by medical staff and constitutes a mere difference of opinion over treatment. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

**19**    To the extent that Byng claims constitutional violations based on alleged verbal harassment by Delong and Rose, such claims must fail. See *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (holding that verbal harassment was insufficient to state a cognizable constitutional claim).

---

**End of Document**        © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.     17

Case 9:17-cv-00031-BKS-TWD    Document 21    Filed 10/19/17    Page 26 of 88
Williams v. Perlman, Not Reported in F.Supp.2d (2009)
2009 WL 1652193

2009 WL 1652193
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Timothy WILLIAMS, Plaintiff,

v.

Kenneth PERLMAN, et al., Defendants.

Civil Action No. 9:06–CV–00936 (GLS/DEP).
|
Feb. 5, 2009.

West KeySummary

1    **Federal Civil Procedure**
     🔑 Civil Rights Cases in General
     Genuine issues of material fact existed as to
     whether a prison nurse retaliated against an
     inmate by filing allegedly false disciplinary
     reports against the inmate. Thus, summary
     judgment was precluded in an inmate's § 1983
     action that alleged retaliation by the prison
     nurse for the inmate's attempts to seek medical
     attention for his ankle and foot condition. The
     inmate alleged that after he filed a grievance
     for not receiving the correct size shoes, the
     nurse authored a misbehavior report charging
     the inmate with prison rule violations. 42
     U.S.C.A. § 1983.

     Cases that cite this headnote

**Attorneys and Law Firms**

Timothy Williams, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, Senta B. Siuda, Esq., Assistant Attorney
General, of Counsel, Syracuse, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Timothy Williams, a former New York
State prison inmate who is proceeding *pro se* and *in
forma pauperis,* has commenced this civil rights action
pursuant to 42 U.S.C. § 1983 against various defendants
alleging that while incarcerated he was subjected to
constitutional deprivations as well as violations of federal
law. In his complaint the plaintiff, who suffers from both
physical and mental impairments, asserts an array of
claims related to defendants' treatment of him, including
their failure to provide him with proper footwear and
orthopedic inserts and forcing him to perform manual
labor despite his ankle and foot condition; the issuance of
a misbehavior report, allegedly in retaliation for exercising
his constitutional right to file grievances; and treatment
received generally at the facility, including in the mental
health unit. In his complaint, *inter alia,* plaintiff seeks
recovery of compensatory damages in the amount of
$765,000.

Following the close of discovery, defendants have moved
seeking the entry of judgment on the pleadings dismissing
plaintiff's complaint in its entirety. Defendants' motion is
predicated upon several grounds, including their alleged
entitlement to qualified immunity from suit. Having
carefully considered plaintiff's allegations in the light of
arguments raised in defendants' motion, which plaintiff
has not opposed, I find that with one exception, he
has failed to set forth a cognizable civil rights claim,
and therefore recommend that defendants' motion for
judgment on the pleadings be granted and all of plaintiff's
claims except his retaliation cause of action against
defendant Brodt be dismissed.

I. *BACKGROUND* [1]

Plaintiff, a veteran of the United States Military Service,
suffers from a foot, ankle and arch condition of an
undisclosed nature; degenerative disc disease; and manic
depression, or bipolar disorder. Complaint (Dkt. No. 1)
¶¶ 14, 16–17, 28, 39. At the times relevant to his claims
in this action, Williams was a prison inmate entrusted to
the custody of the New York Department of Correctional
Services ("DOCS"), and was designated to the Mid–State
Correctional Facility ("Mid–State"), located in Marcy,
New York. *Id.* ¶¶ 2–3, 25.

Among the claims asserted by the plaintiff are those
related to the alleged failure of prison officials to provide
him with proper footwear with orthopedic inserts while at

Mid–State. Complaint (Dkt. No. 1) ¶¶ 28–38. Plaintiff also maintains that he was forced by prison officials, including defendant Zagby, a corrections officer, to perform manual labor despite experiencing pain caused by his foot and ankle condition. *Id.* ¶¶ 36, 43.

Plaintiff's efforts at Mid–State to secure proper footwear commenced shortly after his transfer in December of 2005 into the facility from the Oneida Correctional Facility. *See* Complaint (Dkt. No. 1) ¶ 25. Following that transfer, in response to his complaints that he had not been provided footwear, plaintiff was told by prison officials to have his feet measured by the state shop. *Id* ¶ 26. On December 30, 2005 plaintiff met with Ms. Renninger, the state shop supervisor, who measured plaintiff's feet and recorded his left foot as size 13.5 AA and his right foot as size 13 AA. *Id.* ¶ 26 and Exh. 9. Since footwear in those sizes was not readily available, plaintiff was temporarily provided with size 14EE boots which, not surprisingly, did not fit quite properly. *Id.* ¶¶ 26–27 and Exh. 10. As a result, plaintiff was required to choose between walking in slightly oversized boots or barefoot, and was unable to participate in certain prison programs and activities, including sports and recreation. *Id.* ¶¶ 27–30.

 **\*2** In addition to receiving boots that did not fit, plaintiff additionally requested but was denied new orthopedic inserts for his shoes. Complaint (Dkt. No. 1) ¶ 29 and Exh. 10. Plaintiff's need for orthopedic inserts was the result of his having undergone left lateral ankle stabilization surgery in January of 1996, requiring such devices to alleviate his foot, ankle and arch pain. *Id.* Exh. 12. While plaintiff apparently was fitted with orthopedic inserts, they were ineffective when used in conjunction with his size 14EE boots. *Id.* Exh. 10.

Plaintiff alleges that both defendant Kenneth Perlman, as the superintendent at Mid–State, and defendant Brodt, a nurse at the facility, were aware of his foot, ankle and arch conditions and the failure of prison officials to provide him with proper footwear. *See, e.g.* Complaint (Dkt. No. 1) ¶ 35. Plaintiff wrote to Superintendent Perlman concerning the issue on January 5, 2006; in response, defendant Perlman wrote to the plaintiff advising that he would look into the matter. *Id.* ¶ 33 and Exhs. 10, 11. A memorandum was issued on January 10, 2006 from Rosemary Reed, the Head Account Clerk at Mid–State, advising plaintiff that in response to his letter to the superintendent an investigation had been conducted,

and a decision was made to issue him a pair of special order boots, and the order for those boots was then being processed. *Id.* Exh. 11.

On May 18, 2006, not having received either the special order boots or having been fitted for boots and sneakers with custom orthopedics for his feet, plaintiff again wrote to Superintendent Perlman complaining of the matter. Complaint (Dkt. No. 1) Exh. 10. That letter was augmented by correspondence dated March 23, 2006, from one of plaintiff's treating physicians, Dr. Frank Caruso, to Deputy DOCS Commissioner Dr. Lester N. Wright, describing the surgery performed on plaintiff's ankle in January, 1996 and emphasizing the necessity for custom orthopedic devices in order to avoid aggravation of plaintiff's ankle and foot condition. [2] *Id.* Exh. 12.

Nurse Brodt encountered the plaintiff on April 13, 2006, when he reported to sick call complaining of left ankle pain caused by a fall the previous day. Complaint (Dkt. No. 1) ¶ 41 and Exh. 13. Plaintiff described the incident as having occurred while he was leaving the second floor of his housing unit, at which time while descending the stairs his ankle "gave way and his arches stretched, straining his lower back." *Id.* ¶ 40. According to plaintiff, defendant Brodt responded by warning Williams that if he "[kept] on coming to sick call about the same foot problems, [she] would write [him] up for 'misuse of the sick call process.' " *Id* . ¶ 35.

Plaintiff was in fact subsequently issued an inmate misbehavior report, dated April 13, 2006, prepared by Nurse Brodt and accusing him of failing to report an injury promptly (Disciplinary Rule 118.23), creating a disturbance with loud talking in the hallway (Disciplinary Rule 104.13), making threats (Disciplinary Rule 102.10), and providing misleading information (Disciplinary Rule 107 .20). Complaint (Dkt. No. 1) ¶ 45 and Exh. 13. In the misbehavior report, defendant Brodt noted that while plaintiff reported to sick call on the morning of April 13, 2006, complaining of ankle pain, Williams failed to report the injury to appropriate corrections officials. *Id.*

 **\*3** A disciplinary hearing was subsequently held on April 16, 2006 to address the misbehavior report. Complaint (Dkt. No. 1) ¶ 46 and Exh. 14. At the hearing, plaintiff was found guilty of creating a disturbance, but exonerated on the remaining three charges set forth in the misbehavior report. *Id.* Though somewhat difficult to

discern from the complaint and exhibits, it appears that a penalty consisting principally of thirty days of keeplock confinement in the facility's special housing unit ("SHU") was imposed, although deferred for a period of ninety days, as a result of the hearing officer's finding of guilt. [3] *Id.*

Another aspect of plaintiff's complaint concerns actions of defendant Tina Procopio, a counselor assigned to assist inmates including those who like the plaintiff have been designated to a therapeutic residential program for veterans. *See* Complaint (Dkt. No. 1) ¶¶ 11, 47–51. Plaintiff alleges that defendant Procopio, who also oversees use of video conferencing facilities at Mid–State, overheard and later disclosed confidential information exchanged between the plaintiff and his attorney, and that she, acting in concert with other employees and inmates, has engaged in a campaign to force the plaintiff out of the unit. *Id.* ¶¶ 47–62. Plaintiff's complaints regarding Procopio were the subject of both a grievance filed on April 11, 2006, and pursued to completion through the available, internal DOCS grievance process, and a letter sent on April 17, 2006 by the plaintiff to then-DOCS Commissioner Glenn Goord. Complaint (Dkt. No. 1) ¶¶ 59–61 and Exh. 19.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on August 2, 2006. Dkt. No. 1. As defendants, plaintiff's complaint named Mid–State Superintendent Perlman; Mid–State Assistant Deputy Superintendent McDaniels; Senior Corrections Counselor Joslyn; Corrections Officer Zagby; J. Morgan, described as the unit chief of the Mid–State mental health unit ("MHU"); Nurse Practitioner Sergio; Social Worker Johnson; Registered Nurse Brodt; and Corrections Counselor Procopio. [4] In his complaint plaintiff asserts a variety of claims, including under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as well as claiming that he was subjected to deliberate indifference and cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution, and unlawful retaliation, in contravention of the First Amendment. Typical of plaintiff's claims against the various individuals are assertions of "failure to train", "conspiracy", "breach of fiduciary duty", "negligent supervision", "negligent hiring" and "respondeat superior". *See*

*generally* Complaint (Dkt. No. 1) ¶¶ 85–95. The defendants remaining in the case have filed answers to plaintiff's complaint generally denying its material allegations and interposing various defenses. Dkt. Nos. 36, 45.

**\*4** On March 14, 2008 defendants moved seeking the entry of judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, urging dismissal of plaintiff's complaint on a variety of bases, contending that 1) plaintiff's negligence claims are not cognizable under section 1983; 2) plaintiff's allegations, even if proven, are insufficient to sustain a claim of deliberate indifference toward plaintiff's serious medical needs; 3) plaintiff's allegations regarding conspiracy are unduly vague and fail to support a cognizable claim; 4) plaintiff's privacy claims do not arise to a level of constitutional significance; 5) plaintiff's claims under the ADA and Rehabilitation Act are legally insufficient, since no individual liability lies under those sections; 6) plaintiff's false misbehavior reports do not support a constitutional claim; 7) plaintiff's retaliation claims have been insufficiently pleaded; 8) plaintiff's cruel and unusual punishment and unconstitutional customs and policies claims are facially lacking in merit; and 9) in any event defendants are entitled to qualified immunity from suit. Defendants' motion, to which plaintiff has failed to respond, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

A. *Legal Significance of Plaintiff's Failure to Respond*
While defendants have sought dismissal of plaintiff's complaint on a variety of grounds, plaintiff has not provided the court with the benefit of any argument as to why that motion should not be granted. As a threshold matter I first address the significance of this shortcoming, and specifically whether it automatically entitles the defendants to the dismissal which they now seek.

At the outset, it should be noted that the fact that plaintiff has failed to oppose defendants' motion for judgment on the pleadings does not preclude the court from deciding the motion without the benefit of his submission. *See,*

*e.g., White v. Mitchell,* No. 99–CV–8519, 2001 WL 64756, at *1 (E.D.N.Y. Jan.18, 2001). Like motions to dismiss, a motion for judgment on the pleadings tests only the legal sufficiency of the plaintiff's complaint; accordingly, while a party faced with such a motion should be given reasonable opportunity to respond to such a motion, the court is fully capable of determining the issue of legal sufficiency of the plaintiff's claims as a matter of law based on its own reading of the complaint and knowledge of the relevant case law. *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000).

Under this court's local rules, a party's failure to respond to a properly filed motion is regarded as the functional equivalent of consent to the granting of the motion; before such an unopposed motion may be granted, however, the court must first make a threshold finding that the moving party has met its burden of facially demonstrating entitlement to the relief requested. N.D.N.Y .L.R. 7.1(b)(3); *see also McCall,* 232 F.3d at 322–23 (holding that plaintiff's failure to respond to a motion to dismiss in and of itself could not constitute basis for dismissal if plaintiff's complaint stated a claim for relief); *White,* 2001 WL 64756, at n .2 (citing *McCall* ).

## B. *Standard of Review*

**\*5** Defendants' motion is brought pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, which governs the entry of judgment on the pleadings. [5] When analyzing a Rule 12(c) motion, a court must apply the same standard as that applicable to a motion under Rule 12(b)(6). *See, e.g., Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994); *Wynn v. Uhler,* 941 F.Supp. 28, 29 (N.D.N.Y.1996) (Pooler, J.).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion "is not whether [the] plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted). Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim. *See Twombly,* 127 S.Ct. at 1969, 1974; *see also Patane v. Clark,* 508 F.3d 106, 111–12 (2d Cir.2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' ") (quoting *Twombly,* 127 S.Ct. at 1974). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1974).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976)) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' ") (internal quotations omitted); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) ("The court should freely give leave [to amend] when justice so requires.").

## C. *Deliberate Indifference to Serious Medical Need*

**\*6** Plaintiff's complaint centers principally upon the failure of prison officials at Mid–State to provide him with adequate footwear to meet his medical condition. In their motion, defendants challenge plaintiff's ability to demonstrate that his foot and ankle condition constitutes a serious need sufficient to invoke Eighth Amendment protection.

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must satisfy the lynchpin requirement of alleging a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991)), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136–37 (2d Cir.2000) (quoting, *inter alia, Chance* ).

To prove the existence of such a serious medical need a plaintiff need not establish that he is facing imminent death, but must establish more than a "condition[ ] which many people suffer from and function despite on a daily basis." *Davidson v. Scully,* 914 F.Supp. 1011, 1015 (S.D.N.Y.1996). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2–*3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.).

Plaintiff's deliberate indifference claims in this action surround the alleged exacerbation of a pre-existing foot, ankle and arch condition, which required surgery in January of 1996. Following the surgery, plaintiff was issued custom-made orthopedic devices, designed to alleviate his pain when walking. *See* Complaint (Dkt. No. 1) Exh. 12. Plaintiff contends that the effectiveness of his orthopedic devices was seriously undermined, following his transfer into Mid–State, since he was issued excessively large footwear. *Id.* Exh. 10. According to Williams, wearing the wrong sized shoes created "intense pain on [his] toes and arches", and caused him to develop painful calluses which needed to be "lanced from [his] feet." *Id.*

*7 Despite these allegations, there is nothing in plaintiff's complaint to suggest that his foot, ankle and arch condition presented a question of urgency resulting in degeneration or extreme pain. Accordingly, based upon a survey of plaintiff's complaint and the attached materials, I conclude that plaintiff has not alleged the existence of a constitutionally cognizable serious medical need. *See Veloz v. New York,* 35 F.Supp.2d 305, 309, 312 (S.D.N.Y.1999) (prisoner's foot condition, which involved increasing pain and required surgery, was not sufficiently serious); *Alston v. Howard,* 925 F.Supp. 1034, 1040 (S.D.N.Y.1996) (prisoner's ankle condition and resulting foot pain requiring the use of special footwear was not sufficiently serious); *see also Gill v. Frawley,* No. 9:02–CV–1380 (TJM/GHL), 2006 WL 1742738, at *7 n. 32 (N.D.N.Y. June 22, 2006 (collecting cases).

Because plaintiff's complaint fails to disclose a plausible basis to find the existence of a serious medical condition for Eighth Amendment purposes, I recommend that plaintiff's medical indifference claim be dismissed, though with leave to replead in light of his *pro se* status. *See Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991).

### D. *Cruel and Unusual Punishment*

In broad and general terms, plaintiff alleges that the conduct of defendants Perlman, Morgan, Johnson and Zagby constituted cruel and unusual punishment. *See generally* Complaint (Dkt. No. 1) ¶¶ 85, 89, 92–93. In their motion for judgment on the pleadings, those defendants also challenge the legal sufficiency of plaintiff's claims of cruel and unusual punishment against them, asserting that plaintiff's non-specific statements are insufficient to state a claim under section 1983.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S.

825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)
(citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct.
2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the
Eighth Amendment must satisfy both an objective
and subjective requirement—the conditions must be
"sufficiently serious" from an objective point of view, and
the plaintiff must demonstrate that prison officials acted
subjectively with "deliberate indifference." *See Leach v.
Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn,
J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321,
115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97–CV–
1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998)
(Kahn, J. and Homer, M .J.); *see also, generally, Wilson,*
501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate
indifference exists if an official "knows of and disregards
an excessive risk to inmate health or safety; the official
must both be aware of facts from which the inference
could be drawn that a substantial risk of serious harm
exists, and he must also draw the inference." *Farmer,* 511
U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546
(citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

**\*8** As the Second Circuit has noted, "to state a civil
rights claim under § 1983, a complaint must contain
specific allegations of fact which indicate a deprivation
of constitutional rights; allegations which are nothing
more than broad, simple, and conclusory statements are
insufficient to state a claim under § 1983." *Alfaro Motors,
Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987). In this
instance, aside from the conclusory allegations of cruel
and unusual punishment, plaintiff's complaint is devoid of
any specifics or factual recitations describing conditions
which could support a plausible claim of cruel and unusual
punishment. The only reference in plaintiff's complaint
to a specific condition which, he contends, was tantamount
to cruel and unusual punishment, concerns defendant
Zagby's directive that he perform three hours of work
requiring him to remain on his feet despite the pain which
he was experiencing in his ankles and feet. *See* Complaint
(Dkt. No. 1) ¶ 36. Such a modest allegation is insufficient
to support a claim of cruel and unusual punishment.
Compare *Gaston v. Coughlin,* 249 F.3d 156, 164–65 (2d
Cir.2001) (finding that prisoner's allegations that he had
been exposed to freezing and sub-zero temperatures in his
cellblock during the winter months, and was exposed to
unsanitary conditions including mice, human feces, urine,

and sewage water, were sufficient to support his claim of
cruel and unusual punishment).

Given plaintiff's failure to allege facts to support a
plausible claim of cruel and unusual punishment, I
recommend dismissal of this cause of action as well, again
with leave to replead.

### E. *Conspiracy*

In his complaint, plaintiff includes bald allegations
of "conspiracy" against defendants McDaniels, Joslyn,
Morgan, Procopio, Johnson and Zagby. Complaint (Dkt.
No. 1) ¶¶ 87–89, 91–93. Aside from identifying the
participants in the conspiracy, however, plaintiff makes
no further assertions in support of the claim, and
specifically fails to allege any facts which would reflect a
meeting of the minds, or details regarding its objective.

To sustain a conspiracy claim under § 42 U.S.C.1983,
a plaintiff must demonstrate that a defendant "acted
in a wilful manner, culminating in an agreement,
understanding or meeting of the minds, that violated the
plaintiff's rights ... secured by the Constitution or the
federal courts." *Malsh v. Austin,* 901 F.Supp. 757, 763
(S.D.N.Y.1995) (citations and internal quotation marks
omitted). Conclusory, vague or general allegations of a
conspiracy to deprive a person of constitutional rights do
not state a claim for relief under section 1983. *See Sommer
v. Dixon,* 709 F.2d 173, 175 (2d Cir.), *cert. denied,* 464 U.S.
857, 104 S.Ct. 177, 78 L.Ed.2d 158 (1983).

When measured against this standard, it is readily
apparent that plaintiff's conspiracy claims are sufficiently
lacking in detail as to warrant dismissal. *Warren v. Fischl,*
33 F.Supp.2d 171, 177 (E.D.N.Y.1999). Accordingly, I
also recommend that the portion of defendants' motion
addressing plaintiff's conspiracy claims be granted, with
leave to replead. [6]

### F. *Retaliation*

**\*9** Embedded within plaintiff's complaint is a cause
of action against defendant McDaniels for retaliation.
Complaint (Dkt. No. 1) ¶ 87. The complaint also intimates
that plaintiff claims to have experienced retaliation on the
part of defendant Brodt, based upon her issuance of the
April 13, 2006 misbehavior report, although the summary
portion of his complaint outlining the causes of action
plaintiff, while referring to that defendant's "falsifying

disciplinary records", does not specifically reference the term retaliation. *See* Complaint (Dkt. No. 1) ¶¶ 45, 90. In their motion defendants maintain that such a retaliation claim, which is particularly prone to abuse by prison inmates, does not lie against defendant McDaniels, given the allegations set forth in plaintiff's complaint, but do not address the potential retaliation cause of action stated against defendant Brodt.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

*10 A careful review of plaintiff's complaint fails to review any specifics regarding the retaliation claim, which is set forth in wholly conclusory fashion against defendant McDaniels. While there are several references in plaintiff's complaint to the filing of grievances, Williams does not identify which among them, if any, represent the protected activity that purportedly triggered retaliatory measures taken against him. Similarly, plaintiff's complaint does not disclose what adverse action was taken which, he maintains, is attributable to his protected activity, nor does he provide any specifics regarding the nexus between the two. Under the circumstances, plaintiff's claim of retaliation against defendant McDaniels is impermissibly vague and does not disclose the existence of a plausible cause of action for retaliation. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). I therefore recommend dismissal of this claim as well, again with leave to replead. *See Flaherty,* 713 F.2d at 13.

The same cannot be said with respect to plaintiff's potential retaliation claim against defendant Brodt. In his complaint, plaintiff alleges that in response to the filing of a grievance, defendant Brodt authored a misbehavior report charging Williams with four prison rule violations. Complaint (Dkt. No. 1) ¶¶ 44–46. While the factual reiterations in plaintiff's complaint do not pointedly assert that the misbehavior report was false, his contention to that effect can reasonably be inferred from his statement in the claims portion of the complaint accusing Nurse Brodt of "falsifying disciplinary reports." *Id.* ¶ 90. Since the filing of a false misbehavior report in retaliation for engaging in protected activity could represent unlawful retaliation in violation of the First Amendment, plaintiff's complaint states a plausible cause of action for retaliation as against defendant Brodt. *Franco,* 854 F.2d at 589. I therefore recommend against dismissal of that claim.

### G. *Plaintiff's Privacy Claim*

In a similarly summary fashion, plaintiff alleges that defendants McDaniels and Procopio abridged his right to privacy, including under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Pub.L. 104–191, 110 Stat.1936. Complaint (Dkt. No. 1) ¶¶ 87, 91. Though this is far from clear, it appears that at least with regard to defendant Procopio, the claim relates to her having informed other corrections workers and inmates of plaintiff's psychiatric condition and treatment. [7] *Id.* ¶ 49.

1. *Right of Privacy Generally*

In *Doe v. City of New York,* the Second Circuit recognized a right of privacy enshrouding information to the effect that a person has been infected with the human immunodeficiency virus ("HIV"). 15 F.3d 264, 267 (2d Cir.1994). In recognition of the inherently private nature of certain conditions, including HIV positive status, and the attendant risk of embarrassment and ridicule for a person whose intimately private condition becomes known, the court in *Doe* "constitutionalized" a right of privacy with respect to such information under the umbrella of the due process clause of the Fourteenth Amendment. *Id.; see Powell v. Shriver,* 175 F.3d 107, 112 (2d Cir.1999).

**\*11** While prison inmates are divested of many significant constitutional rights as a result of their status, the limited right of privacy recognized in *Doe* has been extended to cover medical information regarding prison inmates, and in particular that which discloses certain types of medical conditions. *See Powell,* 175 F.3d at 112–13 (citing *Doe* ). Under the protections afforded by this limited right, "a prisoner's interest in keeping a medical condition private varies with the condition." *Rodriguez v. Ames,* 287 F.Supp.2d 213, 220 (W.D.N.Y.2003) (citing *Powell,* 175 F.3d at 111). This narrow constitutional right applies in the case of an unusual medical condition which, if disclosed unnecessarily, would likely expose an inmate to ridicule, discrimination, or even potentially violence, particularly when the word of the condition is likely to spread through "humor or gossip[ .]" *Powell,* 175 F.3d at 112; *Rodriguez,* 287 F.Supp.2d at 220; *see also Leon v. Johnson,* 96 F.Supp.2d 244, 252 (W.D.N.Y.2000). Conditions found sufficient to have triggered this qualified right of privacy include HIV positive status, as well as transexualism. *Powell,* 175 F.3d at 112–13 (transexualism); *Doe,* 15 F.3d at 266–67 (HIV positive).

*Powell* and the relative few cases in this circuit which have addressed the issue of disclosure of a prison inmate's medical information disclose the relatively narrow confines of the cause of action of which plaintiff now seeks to avail himself. The cases in which the unauthorized disclosure of prison medical information has been found to give rise to liability involve inmates with unknown conditions which, if publicized, would subject the inmate to harassment, shame or ridicule.

*Powell,* 175 F.3d at 112–13; *contrast Rodriguez,* 287 F.Supp.2d at 220–21; *Leon,* 96 F.Supp.2d at 252. Those cases also reveal that the liability inquiry is informed by whether legitimate penological interests are at stake when the disclosure is made. *See Powell,* 175 F.3d at 112–13; *Rodriguez,* 287 F.Supp.2d at 220–21; *Leon,* 96 F.Supp.2d at 252. Thus, for example, the disclosure by prison officials of an inmate's medical information to law enforcement for purposes of an ongoing investigation does not give rise to liability. *Webb v. Goldstein,* 117 F.Supp.2d 289, 298–99 (E.D.N.Y.2000); *contrast Powell,* 175 F.3d at 112 ("[G]ratuitous disclosure of an inmate's confidential medical information as humor or gossip ... is *not* reasonably related to a legitimate penological interest, and it therefore violates the inmates constitutional right to privacy.") (emphasis in original; footnote omitted).

In this instance plaintiff's complaint, even under the most generous construction, fails to allege the existence of any condition of such a magnitude or nature as to place it on par with HIV positive status or transexualism which was disclosed indiscriminately to non-medical personnel. Under the circumstances, plaintiff's right to privacy claims under the due process clause of the Fourteenth Amendment are subject to dismissal.

2. *HIPAA*

**\*12** The HIPAA was enacted by Congress in order to protect against unwarranted disclosure of health records and information, authorizing the Secretary of Health and Human Services "to make final regulations concerning the privacy of individually identifiable health information." *Barnes v. Glennon,* No. 05–CV–0153, 2006 WL 2811831, at \*5 (Sept. 28, 2006) (citing and quoting *Nat'l Abortion Fed'n v. Ashcroft,* No. 03 Civ. 8695, 2004 WL 555701, at \*2 (S.D.N.Y. Mar. 19, 2004) and 42 U.S.C. §§ 1320d through 1320d–8). Courts which have addressed claims similar to those now raised have determined that in light of the availability of monetary and criminal penalties to be assessed by the Secretary of Health and Human Services or the State, *see* 42 U.S.C. § 1320d–6(b), the statute does not confer an independent private right of action. *See Barnes,* 2006 WL 2811821, at \*5–6; *Cassidy v. Nicolo,* No. 03–CV–6603, 2005 WL 3334523, at \*5–6 (W.D.N.Y. Dec.7, 2005); *see also Pecou v. Forensic Committee Personnel,* No. 06–CV–3714, 2007 WL 1490450, at \*2 (E.D.N.Y. Jan. 5, 2007).

Under the circumstances presented, plaintiff has failed to demonstrate the existence of a private right of action under HIPAA. Similarly, plaintiff does not allege the disclosure of such inherently private and potentially embarrassing information as was involved in *Doe* and its progeny sufficient to invoke substantive due process protections. I therefore recommend dismissal of plaintiff's right to privacy and HIPAA claims.

### H. *Plaintiff's ADA and Rehabilitation Act Claims*

In their motion, defendants also seek dismissal of plaintiff's claims under the ADA and section 504 of the Rehabilitation Act. In support of this portion of their motion, defendants assert that no claim for liability against an individual defendant lies under either provision.

In 1990 Congress enacted the ADA pursuant to the Commerce Clause of the United States Constitution, as well as under section five of the Fourteenth Amendment. *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn,* 280 F.3d 98, 108 (2d Cir.2001); *Alsbrook v. City of Maumelle,* 184 F.3d 999, 1006 (8th Cir.1999) (en banc) (citing 42 U.S.C. § 12101(b)(4)); *see also Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 212, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998). Title II of the Act prohibits exclusion of a qualified individual with a disability "from participation in or [denial of the] benefits of the services, programs, or activities of a public entity, of from discrimination by any such entity", and extends its coverage to prisons operated by the states. *Yeskey,* 524 U.S. at 209–210, 118 S.Ct. at 1955 (citing 42 U.S.C. § 12132). The rights afforded to disabled individuals under Title II of the Act apply to some degree, and subject to legitimate countervailing penological concerns, to prison inmates. *Yeskey,* 524 U.S. at 210, 118 S.Ct. at 1955.

In this instance plaintiff has asserted damage claims against the various defendants, including those named in his ADA and Rehabilitation Act claims, apparently in their capacities as individuals. Neither the ADA nor section 504 of the Rehabilitation Act, however, provides for individual capacity suits against state officials. *Garcia,* 280 F.3d at 107; *Alsbrook,* 184 F.3d at 1005 n. 8; *Shariff v. Coombe,* No. 96 Civ. 3001, 2002 WL 1392164, at *2 (S.D.N.Y. June 26, 2002). I therefore recommend that plaintiff's ADA and Rehabilitation Act claims be dismissed.

### I. *Negligence*

**\*13** The remainder of plaintiff's claims in this action are couched in such terms as negligence in hiring and supervision, breach of fiduciary duty, and *respondeat superior.* It is well-established, however, that such claims are not cognizable under section 1983. *Champion v. Artuz,* 76 F.3d 483, 487 (2d Cir.1996) (noting that *respondeat superior* liability is not cognizable under section 1983); *Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991) ( "Proof of mere negligence will not give rise to a constitutional violation."); *Edmond v. Babcock,* No. 91–3091–S, 1991 WL 49671, at *1 (D.Kan. Mar.28, 1991) (indicating that plaintiff's claims for breach of contract and fiduciary duties were not cognizable under section 1983). Accordingly, defendants are entitled to judgment on the pleadings dismissing those claims as well.

### J. *Qualified Immunity*

In their motion, defendants advance qualified immunity as an alternative basis for dismissal of plaintiff's claims. Because I have recommended that one of plaintiff's claims survives the pending motion on the merits, I will address this additional argument.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007); *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007). The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162–63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

[q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Until recently, it was generally agreed that a proper qualified immunity analysis entailed a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter a court considering the issue was charged with first determining whether, based upon the facts alleged, the plaintiff had facially established a constitutional violation. *Id.; Gilles v. Repicky,* 511 F.3d 239, 243–44 (2d Cir.2007). If the answer to this inquiry was in the affirmative, then the focus turned to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132–33 (2d Cir.2002). Finally, upon determining that the plaintiff had a clearly established, constitutionally protected right which was violated, the court next considered whether it was nonetheless objectively reasonable for the defendant to believe that his or her action did not abridge that established right. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

 **\*14** The United States Supreme Court recently had the opportunity to reconsider the analysis prescribed by *Saucier,* holding that while the sequence of the inquiry set forth in that case is often appropriate, it should no longer be regarded as compulsory. *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 172 L.Ed.2d 565, 2009 WL 128768, at \*9 (Jan. 21, 2009). In *Pearson,* the Court reasoned that while the *Saucier* protocol promotes the development of constitutional precedent and is "especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable," the rigidity of the rule comes with a price. *Id.* at \*10. The inquiry often wastes both scarce judicial

and party resources on challenging questions that have no bearing on the outcome of the case. *Id.* Given that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Court opined that the algorithm prescribed by *Saucier* may serve to defeat this goal by requiring the parties "to endure additional burdens of suit—such as the cost of litigating constitutional questions and delays attributable to resolving them—when the suit otherwise could be disposed of more readily." *Id.* (quotations and citations omitted).

As a result of its reflection on the matter, the *Pearson* Court concluded that because the judges of the district courts and courts of appeals "are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.* at \*9.

Since I have already concluded that plaintiff's complaint does not state plausible constitutional claims, with the exception of a retaliation cause of action alleged against defendant Brodt, it is unnecessary to continue further with the qualified immunity analysis with regard to those claims. Turning to the retaliation cause of action I note, having already found that a plausible constitutional violation has been alleged, that the First Amendment right in issue to be free from retaliation, in return for having engaged in protected activity, was clearly established at the time of the alleged violation in April of 2006. *Rivera v. Senkowski,* 62 F.3d 80, 85 (2d Cir.1995) (citing *Franco,* 854 F.2d at 589–90). From the limited record now before the court, I discern no basis to conclude that defendant Brodt would have been reasonable in her belief that the issuance of an allegedly false misbehavior report, in retaliation for Williams having engaged in protected activity in the form of filing grievances, did not violate plaintiff's First Amendment rights. Accordingly, I recommend a finding that defendant Brodt is not entitled to qualified immunity from suit. *See id.* at 85–86.

## IV. *SUMMARY AND RECOMMENDATION*

 **\*15** Plaintiff's complaint, the substance of which defendants now challenge as failing to set forth a plausible constitutional or federal statutory claim, recites various

2009 WL 1652193

offending conduct in largely conclusory fashion, and asserts a broad array of claims against the several defendants named. Plaintiff's primary claim, which relates to the alleged failure of the defendants to accommodate his medical needs, is legally deficient in that he has failed to allege the plausible existence of a sufficiently serious medical condition of constitutional proportions. With the exception of a retaliation cause of action against defendant Brodt, which I find has been sufficiently alleged, the balance of plaintiff's claims are deficient on a variety of grounds, including the fact that there is no private right of action under the ADA, section 504 of the Rehabilitation Act, and the HIPAA, several of the provisions cited by the plaintiff as forming a basis for his claims, and further in light of the fact that no claims lie under section 1983 for negligence, breach of fiduciary duty, or under a *respondeat superior* theory. Based upon these deficiencies, I recommend that all of plaintiff's claims with the exception of his retaliation claim against defendant Brodt be dismissed, though with leave to replead in deference to his *pro se* status. Based upon the foregoing it is hereby respectfully

RECOMMENDED, that defendants' motion for judgment on the pleadings (Dkt. No. 63) be GRANTED, in part, and that all of the claims set forth in plaintiff's complaint (Dkt. No. 1), with the exception of plaintiff's retaliation cause of action against defendant Brodt, be DISMISSED, with leave to replead,

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1652193

Footnotes

1    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). Portions of the background description which follow have been derived from the exhibits attached to plaintiff's complaint, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *see also Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

2    There is no indication from the record now before the court as to whether, and if so when, plaintiff received either his specially ordered boots or custom orthotics fitted to his size 14EE boots.

3    Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95–CV–1765, 1997 WL 160124, at *2 n. 2 (N .D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams and counseling, and can have cell study, books and periodicals, *Id.* The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

4    Also originally named as defendants in plaintiff's complaint were the Mid–State Correctional Facility and the Central New York Psychiatric Center. Dkt. No. 1 ¶¶ 3–4. Those entities, however, were dismissed from the case by order issued by the court, *sua sponte,* on August 5, 2006. Dkt. No. 8.

5    Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Rule 12(d) further mandates that:

2009 WL 1652193

> [i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.
>
> Fed.R.Civ.P. 12(d).

6    Even had the plaintiff properly alleged a plausible claim of conspiracy, under the circumstances now presented it would In all likelihood be precluded by the intra-agency conspiracy doctrine. *See, e.g., Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75–76 (E.D.N.Y.2002); *Griffin–Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at *10–11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.); *see also Little v. City of New York,* 487 F.Supp.2d 426, 441–442 (S.D.N.Y.2007).

7    Plaintiff's privacy claim against defendant McDaniels appears to be derivative of his claim against defendant Procopio, and based upon the contention that by virtue of his position as Assistant Deputy Superintendent for the programs, defendant McDaniels "had constructive knowledge" regarding defendant Procopio's behavior. *See, e.g.,* Complaint (Dkt. No. 1) ¶ 53.

---

**End of Document**                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00031-BKS-TWD   Document 21   Filed 10/19/17   Page 38 of 88
Khalfani v. Secretary, Dept. of Veterans Affairs, Not Reported in F.Supp.2d (1999)
1999 WL 138247

1999 WL 138247
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Rashidi KHALFANI, Plaintiff,
v.
SECRETARY, DEPARTMENT OF
VETERANS AFFAIRS, Defendant.

No. 94–CV–5720 (JG).
|
March 10, 1999.

**Attorneys and Law Firms**

Rashidi Khalfani, Brunswick, GA, for Plaintiff Pro Se.

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, By Sarah J. Lum, Assistant United States Attorney.

MEMORANDUM AND ORDER

GLEESON, District J.

 *1  This dispute stems from the decision of the defendant Department of Veterans Affairs (the "VA") to terminate the employment of plaintiff *pro se* Rashidi Khalfani, whom the VA had employed as a social worker. Following his termination, Khalfani filed three separate judicial complaints. In his first complaint, Khalfani alleged that the VA had discriminated against him on the basis of his race or color, religion, sex, and handicapped status, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) ("Title VII"). Khalfani's second complaint again alleged that the VA, in violation of Title VII, discriminated against him on the basis of race or color, religion, sex, and handicapped status. In his third complaint, Khalfani asserted that VA officials released his medical records without his authorization; restricted his access to a VA facility; forged his name on Social Work Annual Reassessment forms; restricted his access to the VA Extended Care Center in St. Albans, New York; and wrote adverse "Reports of Contact" about him without his permission. Khalfani alleged that the foregoing constituted violations of both Title VII and, construing the third complaint liberally, 42 U.S.C. § 1983.

In two prior opinions, familiarity with which is assumed, I granted the VA's motions for summary judgment in part, thereby dismissing the first and second complaints, as well as the Title VII claim set forth in the third complaint. *See Khalfani v. Secretary, Dep't of Veterans Affairs,* 93–CV–5374 *et al.,* 1998 WL 817654 (E.D.N.Y. Mar. 2, 1998); *Khalfani v. Secretary, Dep't of Veterans Affairs,* 93–CV–5374 *et al.,* 1998 WL 765128 (E.D.N.Y. July 21, 1998).

In the second of those two opinions, I also construed Khalfani's § 1983 claim as a claim brought against the employees of a federal agency pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971). The VA had argued that, even if so construed, the third complaint failed to state a claim because it did not allege that any federal officials intentionally or recklessly violated the plaintiff's constitutional rights. In rejecting this argument, I noted that citizens have a due process right to privacy which, under certain circumstances, can be violated when the government discloses medical information without authorization. *See, e.g., Roe v. Sherry,* 91 F.3d 1270, 1274 (9th Cir.1996). Accordingly, with respect to the third complaint, I denied the government's motion for summary judgment without prejudice to renewal if the VA chose to address the legal and factual merits of Khalfani's allegations. *Khalfani,* 1998 WL 765128, at *7.

The VA has renewed its motion and now seeks summary judgment on the *Bivens* claim in Khalfani's third complaint. For the reasons set forth below, the motion is granted.

DISCUSSION

A. *The Summary Judgment Standard*
Summary judgment must be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether material facts are in dispute, all ambiguities must be resolved and all inferences drawn in favor of the non-moving party. *Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998).

**\*2** The initial burden is upon the moving party to demonstrate the absence of any genuine issues of material fact. *Adams v. Department of Juvenile Justice,* 143 F.3d 61, 65 (2d Cir.1998). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (citations omitted). The non-moving party cannot survive a properly supported motion for summary judgment by resting on his pleadings "without offering 'any significant probative evidence tending to support the complaint.' " *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)).

B. *Bivens Actions*

In order to state a claim under *Bivens,* a plaintiff must allege facts showing that defendants acted under color of federal law to deprive the plaintiff of a constitutional right. *Bivens,* 403 U.S. at 397. Thus, the first step in any assessment of a claim under *Bivens* is whether the plaintiff has alleged the deprivation of a constitutional right at all. *See Stuto v. Fleishman,* 164 F.3d 820, 1999 WL 22659, at \*4 (2d Cir. Jan. 21, 1999) (citing *County of Sacramento v. Lewis,* 118 S.Ct. 1708, 1714 n. 5 (1998)). Then, if a defendant asserts a qualified immunity defense, a court must assess "whether the right allegedly implicated was clearly established at the time of the events in question." *County of Sacramento,* 118 S.Ct. at 1714 n. 5. Under the qualified immunity defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

The Supreme Court has also identified two circumstances in which courts will not infer the existence of an action under *Bivens.* As the Supreme Court stated in *Carlson v. Green,* 446 U.S. 14 (1980),

[A] [*Bivens* ] cause of action may be defeated ... in two situations. The first is when defendants demonstrate "special factors counselling hesitation in the absence of affirmative action by Congress." The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed equally as effective.

*Id.* at 18–19 (citations omitted) (quoting *Bivens,* 403 U.S. at 396). As the Supreme Court subsequently stated in *Schweiker v. Chilicky,* 487 U.S. 412 (1988),

the concept of "special factors counselling hesitation in the absence of affirmative action by Congress" has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent.

**\*3** *Id.* at 423. In other words, courts will not create additional *Bivens* remedies "[w]hen the design of a government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration." *Id.*

Moreover, a *Bivens* action, like an action under § 1983, cannot be premised on the doctrine of *respondeat superior. See, e.g., Ellis v. Blum,* 643 F.2d 68, 85 (2d Cir.1981) ("[R]espondeat superior generally does not apply in § 1983 and consequently in *Bivens*-type actions"); *Shannon v. United States Parole Comm'n,* 97–CV–6420, 1998 WL 557584, at \*2 (S.D.N.Y. Sept. 2, 1998) ("That the defendants may have had supervisory authority over those who violated the plaintiff's rights is not sufficient to make out a *Bivens* claim.") Instead, to be liable under *Bivens,* a defendant must either be personally involved in the violation of plaintiff's rights, must have created or acquiesced in a policy or practice of poor training or supervision, or must have otherwise acted recklessly in managing his or her subordinates. *See Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied sub nom. Barbera v. Schlessinger,* 489 U.S. 1065 (1989); *see also Cronn v. Buffington,* 150 F.3d 538, 544 (5th Cir.1998) (holding that supervisory officials may be liable under *Bivens* only if they were personally involved in the acts causing the deprivation of a person's constitutional rights, or if they "implement[ed] a policy so deficient that the policy itself acts as a deprivation of constitutional rights"); *Shannon,* 1998 WL 557584, at \*2 ("To establish a *Bivens* claim, the plaintiff must allege that the individual defendants were personally involved in the violation of his constitutional rights.")

The VA asserts six arguments in support of its motion for summary judgment on Khalfani's *Bivens* claim: (1) that Khalfani's action should be dismissed as "frivolous" under the *in forma pauperis* statute, 28 U.S.C. § 1915(e); (2) that Khalfani failed to allege any personal involvement of the Secretary of the VA (the "Secretary") in the deprivation of Khalfani's constitutional rights; (3) that at the time of the events in question, it is "doubtful" that there was a clearly established right to privacy in medical records; (4) that the Privacy Act, 5 U.S.C. § 552a, provides the exclusive remedy for Khalfani's grievance regarding the unauthorized release of his medical records; (5) that even if Khalfani's complaint is construed as setting forth a claim under the Privacy Act, that claim fails as a matter of law; and (6) that the restriction of Khalfani's access to the VA's Extended Care Center in St. Albans, New York, the forgery of his name, and the writing of adverse Reports of Contact without his permission did not deprive him of constitutional rights that were clearly established when the actions took place.

## C. *The In Forma Pauperis Statute*
**\*4** Under 28 U.S.C. § 1915(a), a court may authorize a litigant to commence a suit without the prepayment of fees, provided the litigant has submitted an affidavit stating his assets and his inability to pay such fees. The same statute also provides that a court shall dismiss an *in forma pauperis* action at any time if the court determines either that the allegation of poverty is untrue, or that the action is "frivolous or malicious," fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2). The VA argues that Khalfani's claims are without legal or factual merit, and thus should be dismissed as "frivolous." (Defendant Secretary's Memorandum of Law in Support of a Renewed Motion for Summary Judgment ("Def.Mem.") at 12–13.)

"The federal *in forma pauperis* statute ... is designed to provide indigent litigants meaningful access to the federal courts." *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). However, "[m]indful of the fact that litigants who can file lawsuits free of cost will not have the same incentive as paying litigants to avoid filing meritless suits," Congress authorized courts to dismiss a complaint *in forma pauperis* if the action is frivolous. *Id.* As the Supreme Court stated, "the statute accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the

unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." *Neitzke v. Williams,* 490 U.S. 319, 327 (1989).

A district court's determination regarding the frivolousness of a suit is a discretionary one. *Denton v. Hernandez,* 504 U.S. 25, 33 (1992). Moreover, "a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible." *Id.* Here, the allegations set forth in Khalfani's third judicial complaint are neither irrational nor incredible. The complaint and the documents attached thereto indicate that VA officials released his medical records without his authorization, restricted his access to a VA facility, and signed his name to VA forms without his authorization. Regardless of whether Khalfani's claims can survive the present motion, I do not find them frivolous, and decline to dismiss the complaint under the *in forma pauperis* statute.

## D. *The Lack of Personal Involvement of the Secretary*
The VA states in its brief that "there is no factual merit" to Khalfani's *Bivens* claim because Khalfani has not alleged that the Secretary, as the named defendant, was involved in the deprivation of Khalfani's constitutional rights. As discussed above, it is well-settled that "[t]o establish a *Bivens* claim, the plaintiff must allege that the individual defendants were personally involved in the violation of his constitutional rights." *Shannon,* 1998 WL 557584, at *2. The VA is also correct that Khalfani has not alleged that the Secretary had any involvement in the violations alleged.

**\*5** Nonetheless, I decline to dismiss the complaint for failing to state a claim against the Secretary. The pleadings of a *pro se* plaintiff such as Khalfani are to be read liberally and interpreted "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Because the attachments to Khalfani's complaint plainly indicate the identity of those VA officials who he believes deprived him of his constitutional rights, I construe his action as one against those officials rather than the Secretary. *See, e.g., O'Neal v. County of Nassau,* 992 F.Supp. 524, 531 (E.D.N.Y.1997) (holding that where the caption in a § 1983 case did not name individual defendants but the complaint "alleges their direct, personal involvement in the alleged violation of [plaintiff's] constitutional rights," plaintiff had sufficiently

pled a cause of action against the individual defendants), *aff'd,* 133 F.3d 907 (2d Cir.1998); *Nationwide Mutual Ins. Co. v. Kaufman,* 896 F.Supp. 104, 109 (E.D.N.Y.1995) ( "[T]he caption itself ... is normally not determinative of the identity of the parties .... Where a party has actual notice of a suit and is correctly identified in the body of the complaint, courts have typically held that an error in the caption is a technical defect.") (citations omitted). Indeed, in its prior motion for summary judgment, the VA appeared to recognize that the Khalfani's § 1983 claim could be construed as a *Bivens* claim against individual VA employees. Although the VA now urges a considerably more cramped reading of the complaint, that is not the reading I choose to adopt.

### E. *The Merits of Khalfani's Bivens Claim*

1. *The Unauthorized Release of Medical Records*
Khalfani's allegation regarding the unauthorized release of his medical records appears to be based on a memorandum and accompanying report that Dr. Jonathan D. Owens, an orthopedist at the VA's Medical Center in Northport, New York, sent to the VA's Chief of Social Work Service in Brooklyn, New York. The memorandum, which is attached to Khalfani's complaint and is dated November 10, 1992, states that "written medical documentation for Khalfani, Kwesi" is enclosed. [1] Immediately following the memorandum is a single page report in which Dr. Owens described a "quadricep tendon avulsion" that Khalfani suffered in late July of 1992. Dr. Owens addressed Khalfani's range of motion and his course of treatment, and stated that Khalfani could begin to work provided that he not be required to walk one hundred feet or more for activities repeated several time during the day, not be required to stand for more than ten minutes when away from his desk, and be permitted to attend ongoing physical therapy.

a. *Qualified Immunity*
In his third complaint, Khalfani contends that by releasing his medical information without his permission or consent, the VA violated his right to privacy. (Compl.¶¶ 2, 5.) In its motion for summary judgment, the VA argues that, at the time the VA released Khalfani's medical records in 1992, it is "doubtful" whether "any constitutional right to privacy concerning the type of medical records at issue here was 'clearly established.' " (Def. Mem. at 6 n. 2.)

**\*6** Although the VA is less than forceful in pressing its argument, I find that as of 1992, the constitutional right to privacy with regard to medical records such as Khalfani's was far from "clearly established." In *Whalen v. Roe,* 429 U.S. 589 (1977), the Supreme Court upheld the New York State Controlled Substances Act on the ground that, while an individual may have a privacy interest with regard to the prescription medication he takes, that interest is outweighed by the legitimate public need to control the distribution of dangerous drugs. *Id.* at 598–99, 60304. Similarly, in *Strong v. Board of Education,* 902 F.2d 208 (2d Cir .), *cert. denied,* 498 U.S. 897 (1990), the Second Circuit found that an employer's insistence upon receiving an employee's medical records before allowing her to return to work did not violate the employee's constitutional rights because "[l]egitimate requests for medical information by those responsible for the health of the community do not rise to an impermissible invasion of privacy." *Id.* at 212. Even in *Doe v. City of New York,* 15 F.3d 264 (2d Cir.1994), in which the court of appeals held that individuals with the HIV virus "clearly possess a constitutional right to privacy regarding their condition," *id.* at 267, the court also stated that such a privacy right "is no more absolute than the right to control access to other types of personal information" and must be weighed against the city's interest in disseminating such information. *Id.* at 269.

As the foregoing cases show, "[t]he right to privacy in medical records or personal information is a conditional right that requires a determination of whether the state's interest in disclosing the records is sufficiently substantial to overcome the individual's interest in confidentiality." *Grosso v. Town of Clarkstown,* 94 Civ. 7722, 1998 WL 566814, at \*10 (S.D.N.Y. Sept. 3, 1998). The records at issue in this case contained rather mundane information regarding Khalfani's tendon avulsion, his physical therapy and limitations on his ability to work—not the type of deeply personal information that was at issue in prior cases. I cannot say that the reasonable person would have known that disclosing Khalfani's medical records under the circumstances of this case would violate clearly established constitutional rights. Accordingly, defendants are entitled to qualified immunity with respect to this portion of Khalfani's *Bivens* claim.

b. *The Privacy Act*

Even if VA officials were not entitled to qualified immunity, the Privacy Act provides an alternative basis for dismissing this aspect of Khalfani's *Bivens* claim. The Privacy Act consists of "extensive provisions ... governing disclosure of confidential information and access to agency records." *Williams v. Department of Veteran Affairs,* 879 F.Supp. 578, 585 (E.D.Va.1995). Specifically, § 552a(b) forbids an agency from disclosing information in an individual's record except in specified situations, and § 552a(g) sets forth various remedies that an aggrieved plaintiff may have from an agency that violates the Privacy Act's provisions. *See* 5 U.S.C. § 552a(b); *id.* § 552a(g).

**\*7** "Congress did not explicitly declare the Privacy Act to be a substitute for an action directly under the Constitution." *Williams,* 879 F.Supp. at 585. Nonetheless, in cases involving *Bivens* claims for the allegedly wrongful disclosure of government records, courts have viewed the Privacy Act's detailed provisions as a "special factor counselling hesitation in the absence of affirmative action by Congress," and have thus held that the Privacy Act bars claims under *Bivens. See, e.g., Williams,* 879 F.Supp. at 585 (claim against VA under *Bivens* for unauthorized release of veteran's medical records precluded by "comprehensive remedial structure of the Privacy Act"); *Mangino v. Department of Army,* No. Civ. A. 94–2067, 1994 WL 477260 (D.Kan. Aug. 24, 1994), at \*9 ("[A]ny *Bivens* claims that plaintiff might have had with respect to the disclosures [of plaintiff's military and security records] are barred by the Privacy Act"); *Mittleman v. United States Treasury,* 773 F.Supp. 442, 454 (D.D.C.1991) (*Bivens* action for false statements in government report and disclosure of that report were precluded by the Privacy Act); *Patterson v. FBI,* 705 F.Supp. 1033, 1045 n. 16 (D.N.J.1989) (*Bivens* action for damages as a result of FBI's maintenance of records on plaintiff was "apt to be foreclosed" by the alternative, adequate remedy of the Privacy Act). [2] The same result applies here.

The VA next argues that, even if this Court construes Khalfani's complaint as invoking the Privacy Act, Khalfani has failed to state a claim upon which relief can be granted. (Def. Mem. at 8.) Specifically, the VA contends that the release of Khalfani's medical information was permissible under 5 U.S.C. § 552a(b)(1), which provides that an agency may disclose an individual's records "to those officers and employees of the agency

which maintains the record who have a need for the record in the performance of their duties." According to the VA, because Khalfani had suffered a knee injury on July 27, 1992 and sought to take a medical leave, "[t]he information released to Khalfani's supervisor was needed to verify Khalfani's claim of illness." (Def. Mem. at 9.)

Based on the record before me, there is no genuine issue of material fact that would preclude the dismissal of Khalfani's claim under the Privacy Act. Khalfani attached to his complaint a memorandum dated October 28, 1992 that he sent to Zelda Foster, the Chief of Social Work Services and apparently Khalfani's supervisor. In this memorandum, Khalfani stated that he had undergone knee surgery in August of 1992, was continuing to have problems with his knee, and would need to take a leave of absence so that he could remain off of his feet for approximately four weeks. Foster responded in a memorandum of that same day, requesting that Khalfani provide additional information regarding his medical condition so that the VA could document the medical reasons underlying Khalfani's request for sick leave. Foster also requested in her memorandum that, when Khalfani met with his treating physician, Khalfani provide the physician with an attached directive entitled "standard of Medical Document." [3] Subsequently, on November 10, 1992, Dr. Owens sent a memorandum to the Chief, Social Work Service (Brooklyn)—an apparent reference to Foster—and included the report in which he discussed Khalfani's quadricep avulsion and the limitations on Khalfani's ability to work. Khalfani's complaint also includes a single page of a transcript from the deposition of Robert Siegfeld, the Assistant Chief of Social Work Service. In pertinent part, the deposition transcript reads as follows:

**\*8** Q: To get back to medical statements, did you obtain any on your own? Did you contact Northport?

A: No, I didn't.

Q: Did anybody contact Northport?

A: I believe the hospital director did to clarify a statement of what the nature of the disability is to warrant not reporting to work.

Q: The Director of the Brooklyn VA hospital, James Farsetta?

A: Yes, I believe so.

Q: His office?

A: I believe so.

Finally, in a memorandum dated November 30, 1992, Robert Siegfeld wrote to Khalfani to confirm that, in a prior discussion, Khalfani had been assigned to "light duty" as a result of his medically confirmed mobility restrictions.

Based on these documents in the record, no reasonable jury could rule in Khalfani's favor on a claim under the Privacy Act. As described in a Joint House and Senate Report, a primary purpose of 5 U.S.C. § 552a(b) was to

> prevent the office gossip, interoffice and interbureau leaks of information about persons of interest in the agency or community, or such actions as the publicizing of information of a sensational or salacious nature or of that detrimental to character or reputation.

*Pippinger v. Rubin,* 129 F.3d 519, 529 (10th Cir.1997) (quoting S.Rep. No. 93–1183, H.R.Rep. No. 93–1416, at 51 (1974), reprinted in 1974 U.S.C.C.A.N. 6916, 6966.) No "leak of information" occurred here, nor was there an exchange of information that was "sensational or salacious" in nature or that would harm Khalfani's reputation. Instead, the evidence leads to only one conclusion: that Khalfani's medical records were transmitted within the VA so that Foster could perform her duties as Khalfani's supervisor. Specifically, the records were released for the purpose of documenting Khalfani's request for medical leave and determining the level of work that Khalfani could perform given the injury to his knee. Accordingly, the VA's motion for summary judgment is granted with respect to this aspect of Khalfani's claim.

### 2. *The Restriction of Access to a VA Facility*

On July 7, 1993, Zelda Foster issued Khalfani a written notice informing him that his performance level was unacceptable and that his discharge had been proposed. On July 28, 1993, Acting Chief of Social Work Service Harriet Sherman sent Khalfani a letter in which she informed him of certain restrictions on his ability to enter the VA Extended Care Center at St. Albans, where Khalfani had worked. Specifically, Sherman's letter read as follows:

> Please note that while you are being carried in a paid non-duty status until further notice, you are not to report to the Veterans Administration Extended Care Center facility for any purpose unless you report to Security Service, and are escorted by a police officer.

On August 25, 1993, Khalfani received another notice informing him that the VA had decided to terminate his employment as of September 18, 1993.

Although Khalfani does not set forth the theory underlying his claim, his third complaint appears to allege that Sherman violated his constitutional rights by "[a]ttempting to restrict plaintiffs [sic] entrance into a Department of Veterans Affairs facility without given [sic] proper reason." (Compl.¶ 4.) The VA argues that there is no legal authority to support a *Bivens* action based on Khalfani's factual allegations, let alone the violation of a "clearly established" constitutional right. (Def. Mem. at 10.) I agree. Because Khalfani was an employee at the VA Extended Care Center at St. Albans rather than a patient, his only argument appears to be that he had a constitutional right of unrestricted access to his place of employment. This is an untenable claim. An employee, merely by his status as such, does not obtain an unrestricted right to enter the premises of his employer. Moreover, although Khalfani apparently believes otherwise, the fact that one served in the armed services does not give rise to a right to enter into a government building whenever and however one chooses. Accordingly, this aspect of Khalfani's *Bivens* claim is dismissed.

### 3. *The "Forgery" of Khalfani's Name*

**\*9** Also attached to Khalfani's complaint is a letter he wrote to Carol Bierut on April 29, 1993. In this letter, on which Khalfani wrote "SUBJECT: Forgery," Khalfani alleged that someone signed his name on four Social Work Annual Re–Assessment forms. [4] Bierut wrote back to Khalfani on May 5, 1993, informing him that his

allegations of forgery should be addressed on a "Service level," and that Zelda Foster should be notified of his claim. The record also includes an undated, typewritten statement that appears to be signed by Robert Siegfeld. In this statement, Siegfeld refers to a meeting in which Khalfani raised the issue of the alleged forgery. In pertinent part, Siegfeld's statement reads as follows:

> You then brought up whether it was correct for someone to sign someone else's name on a form. I asked what was being referred to. You noted that someone, possibly myself, signed your name on annual assessment forms in the chart about one year ago. I acknowledged that I did so, and it occurred after I reviewed every form in the patient package on the ward since Q.A. [Quality Assurance] was reviewing all charts due. When I reviewed charts on your units I noted several without signatures; I knew you had written them, as I had gone over them with you and I knew your handwriting. I did sign them using your name to remain in compliance. Actually, I should have signed my name for you, printing your name. Clearly there was no malicious intent, though I should not have done it this way nor will it be done again. In fact it is required that you sign your documentation in the folder as it was not done in those instances.

> In response to the present motion, Khalfani does not contest this version of events. Instead, Khalfani states only that "[f]alsification of government documents is a serious offense because it goes to an employee's reliability, veracity, trustworthiness, and ethical conduct." (Plaintiff Rashidi Khalfani's Response to Defendant Secretary's Memorandum of Law in Support of a Renewed Motion for Summary Judgment, at 5.)

Notwithstanding the undisputed fact that Siegfeld, a VA official, signed Khalfani's name to a government form without authorization, this aspect of Khalfani's *Bivens* claim still fails. There is no indication that Siegfeld's "forgery" of Khalfani's name deprived Khalfani of any rights or privileges protected by the United States Constitution. The Social Work Annual Re-assessment forms were not part of any process by which Khalfani's property, liberty, or due process rights were at stake. Instead, the forms apparently were mere administrative reports that VA social workers used to keep track of a patient's status. Even if the unauthorized signatures undermined the "reliability, veracity, trustworthiness, and ethical conduct" of Siegfeld, that has no bearing on

whether Khalfani's constitutional rights were violated. Given the lack of any indication that Khalfani was deprived of a constitutional right through Siegfeld's actions, this element of the *Bivens* claim is dismissed.

#### 4. *The Reports of Contact*

**\*10** The record reveals that VA officials completed no less than thirteen Reports of Contact with regard to Khalfani between September 25, 1992 and June 4, 1993. Based on the exhibits Khalfani attached to his complaint, "Reports of Contact" appear to be internal forms that VA employees complete upon observing or being subjected to unprofessional conduct by other VA employees. These reports were written by Siegfeld and another social worker, Doris Quijano, and include allegations that Khalfani failed to comply with VA personnel policies, called his supervisor a "fucking racist bastard," went on grand jury duty without informing his co-workers, accused Siegfeld of harassing him, and otherwise acted in an "erratic, unpredicatable and unstable" manner. According to Khalfani, VA officials violated his rights when they completed such Reports of Contact without his permission, without his consent, and without first speaking to him. (Compl.¶ 3.)

Khalfani's claim regarding the Reports of Contact, like the other aspects of his *Bivens* claim, is meritless. The record is devoid of any indication that the adverse Reports of Contact were the result of discriminatory animus, were written in retaliation for protected speech, or were motivated by any other improper purpose. Indeed, Khalfani's entire argument appears to be premised on the notion that he has a constitutional right to participate in or consent to adverse evaluations of his job performance. No such right exists.

#### CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted. The Clerk of the Court is advised that this order closes the case.

So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 138247

1999 WL 138247

Footnotes

1    In a letter to Carol L. Bierut, the Privacy Act Officer at the Department of Veterans Affairs in Brooklyn, Khalfani stated
     that although he commonly refers to himself as Rashidi J. Khalfani, his legal name is Kwesi Rashidi J. Khalfani and he
     was known to the doctors at the Northport Medical Center by the name Kwesi Khalfani.

2    One court in this circuit has held that the Privacy Act does not preclude a *Bivens* action. *See Doe v. United States Civil
     Serv. Comm'n,* 483 F.Supp. 539, 564 (S.D.N.Y.1980). However, as the *Williams* court noted, some of the plaintiff's claims
     addressed in *Doe* related to events that occurred before the effective date of the Privacy Act, and the *Doe* court did not
     have the benefit of the Supreme Court's decisions in *Schweiker v. Chilicky,* 487 U.S. 412 (1988) and *Bush v. Lucas,*
     462 U.S. 367 (1983), which directly addressed whether an elaborate statutory scheme constituted a "special factor" that
     might preclude a *Bivens* action. *Williams,* 879 F.Supp. at 587 n. 16.

3    The "standard of Medical Document" directive, which appears to be an exhibit to Khalfani's complaint, provides a treating
     physician with a general description of the type of medical information that the VA seeks "in connection with a medical
     determination related to employability."

4    The four Social Work Annual Re–Assessment forms to which Khalfani refers were attached to his letter to Bierut, and
     are included in his complaint. The forms apparently are used by social workers at the VA to comment upon the "Present
     Biopsychosocial Situation" and "Social Work Treatment Plan" of a given patient.

---

**End of Document**                          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4265844
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ervin CUMMINGS, Plaintiff,
v.
CLINTON COUNTY
LEGISLATURE, et al., Defendants.

No. 9:14–CV–281 (DNH/ATB).
|
Signed Aug. 26, 2014.
|
Filed Aug. 27, 2014.

**Attorneys and Law Firms**

Ervin Cummings, pro se.

### DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Pro se plaintiff Ervin Cummings brought this civil rights action. On July 22, 2014, the Honorable Andrew T. Baxter, United States Magistrate Judge, advised by ReportRecommendation that plaintiff's complaint be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) (i)-(iii). No objections to the Report–Recommendation were filed.

Based upon a careful review of the entire file and the recommendations of the Magistrate Judge, the Report–Recommendation is accepted in whole. *See* 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Plaintiff's complaint is DISMISSED WITH PREJUDICE as to all claims against defendants Clinton County Legislature; Commission of Correction; Clinton County Jail; and Clinton County Medical Department;

2. Plaintiff's complaint is DISMISSED WITHOUT PREJUDICE to plaintiff filing an amended complaint with respect to medical care claims against defendant

Favro/and or others as stated in the Report–Recommendation within sixty (60) days of the date of this Decision and Order; and

3. The Clerk is directed to serve a copy of this Decision and Order upon plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

### ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

The Clerk has sent to the Court a civil rights complaint, transferred from the Southern District of New York, filed by pro se plaintiff Ervin Cummings. (Dkt. Nos.2, 3). Plaintiff has also filed an application to proceed in forma pauperis ("IFP").[1] (Dkt. No. 6). For the following reasons, this court will grant plaintiff's IFP application, but will recommend dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

### I. *IFP Application*

A review of plaintiff's IFP application shows that he declares he is unable to pay the filing fee. (Dkt. No. 2). This court agrees, and finds that plaintiff is financially eligible for IFP status.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327; *Harkins v. Eldridge,* 505 F.2d 802, 804 (8th Cir.1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering

*sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.,* 221 F.3d 362, 363 (2d Cir.2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

**\*2** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

## II. *Complaint*

In a very confusing complaint, plaintiff appears to allege that he was denied proper medical care on October 10, 2013, when he was incarcerated at the Clinton County Jail ("CCJ"). (Compl.¶ III(A)—III(C)). He also appears to allege that, in various ways, the Clinton County Jail staff violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d–6.

Plaintiff states generally, that he has a variety of injuries, resulting from a tractor trailer crash. (Compl.¶ III(C)). He states that he is in a great deal of pain, has trouble sleeping, and suffers from "emotional distress." (*Id.*) Plaintiff states that when he informed "medical" of his ulcers, pain, and inability to sleep, he was given "psyche meds to sleep, trasithon [sic],[2] for pain." (*Id.*) In a paragraph, labeled "Injuries," plaintiff states that he received "lower back and knee surgery, special shoes, [and] proper medication," but then states that he received "nothing, but over the counter med. no infirmary refuse to be taken to hospital." (Compl.¶ IV).

Attached as a separate page to the complaint is, what plaintiff entitles: "HIPPA [sic] Law Confidentiality Privacy Act (Law)" violations, although not all of these alleged violations are related to HIPAA or privacy. (Compl. at CM/ECF p. 5). This list contains eight general

statements about CCJ, including that (1) inmates are denied outside medical attention for pain and severe illness; (2) there is no medical infirmary for inmates at CCJ; (3) there is no 24–hour nurse or medical staff available; (4) inmates are prescribed over-the-counter pain medicines, and they are distributed by corrections officers, rather than medical staff, in violation of HIPAA; (5) inmates who attempt suicide are left in general population "for the rest of the inmate's [sic] to know the personal behavior of person(s) under severe stress, causing them further anxiety or depression"; (6) when inmates contact their attorneys to inform them of these violations, HIPAA is violated because the conversations are monitored; (7) there are "call spending limits"; and (7) when plaintiff sent his personal and/or papers to be photocopied, they were read and "scrutinized" by "random staff" in violation of HIPAA. (*Id.*) Plaintiff claims that the Clinton County Legislature and the Sheriff of Clinton County should be "held accountable" for the conduct that occurs at the CCJ. (*Id.*) Plaintiff seeks only monetary relief. (Compl.¶ V).

## III. *HIPAA*

### A. Legal Standards

**\*3** "Courts have overwhelmingly concluded that there is no private right of action under HIPAA." *Coon v. Burkly,* No. 1:13–CV–1306, 2014 WL 1976669, at \*8 (N.D.N.Y. May 15, 2014) (citing *Wilkerson v. Shinseki,* 606 F.3d 1256, 1267 n. 4 (10th Cir.2010); *Miller v. Nichols,* 586 F.3d 53, 59 (1st Cir.2009); *Acara v. Banks,* 470 F.3d 569, 572 (5th Cir.2006); *Rosado v. Herard,* No. 12 Civ. 8943(PGG) (FM), 2013 WL 6170631, at \*3, 2013 (S.D.N.Y. Nov. 25, 2013), *report and rec. adopted in part and modified in part on other grounds,* 2014 WL 1303513 (S.D.N.Y. Mar. 24, 2014); *Mascetti v. Zozulin,* No. 3:09 Civ. 963(PCD), 2010 WL 1644572, at \*4 (D.Conn. Apr. 20, 2010); *Cassidy v. Nicolo,* No. 03 Civ. 6603(CJS), 2005 WL 3334523, at \*5 (W.D.N.Y. Dec. 7, 2005) (collecting cases)). Enforcement of HIPAA is reserved exclusively to the Secretary of Heath and Human Services. *Rzayeva v. United States,* 492 F.Supp.2d 60, 83 (D.Conn.2007).

### B. Application

Plaintiff alleges various HIPAA violations by all defendants. However, it is clear that plaintiff may not bring an action based upon alleged HIPAA violations, regardless of who, or what entity, plaintiff names. Any

claims based upon HIPAA may be dismissed with prejudice.

### IV. *Constitutional Right to Privacy*

**A. Legal Standards**

The Fourteenth Amendment Due Process Clause protects an inmate from the unwanted disclosure of personal health information. *Myers v. Dolac,* No. 09–CV6642P, 2013 WL 5175588, at *6 (W.D.N.Y. Sept. 12, 2013) (citing *Davidson v. Desai,* 817 F.Supp.2d 166, 191 (W.D.N.Y.2011)). Whether an inmate is entitled to constitutional protection against the disclosure of a particular medical condition is determined on a case-by-case basis. *Id.* (citing *Matson v. Bd. of Educ. of City Sch. Dist. of New York,* 631 F.3d 57, 66 (2d Cir.2011)). In order to merit constitutional protection against disclosure, the medical condition must be both serious in nature, and of the type that is "excruciatingly private and intimate in nature," likely to provoke "an intense desire to preserve one's medical confidentiality" *Id.* (citations omitted).

When determining whether a particular condition justifies constitutional protection, courts examine whether the disease is contagious, or attributed to "socially repugnant" conduct, and whether society as a whole views the disease as "directly associated with any disease which might conceivably be characterized as loathsome." *Id.* In the prison context in particular, the constitutional right to confidentiality in a medical condition applies only to " 'unusual medical condition[s] which, if disclosed unnecessarily, would likely expose an inmate to ridicule, discrimination, or even potentially violence, particularly when word of the conditions is likely to spread through humor or gossip.' " *Id.* (citation omitted).

In this circuit, courts have accorded constitutional privacy protection only to a handful of medical conditions, including HIV, transsexualism, and sickle cell anemia. *Id.* (citations omitted). Courts have declined to recognize constitutional protection for many other medical conditions, including fibromyalgia, arthritis, sleep apnea, participation in mandated alcohol and drug rehabilitation, and Hepatitis A. *Id.* (citing *Matson,* 631 F.3d at 68 (fibromyalgia); *Barnes v. Abdullah,* No. 11 Civ. 8168, 2013 WL 3816586, at *8 (S.D.N.Y. July 22, 2013) (arthritis); *Ross v. Westchester Cnty. Jail,* No. 10 Civ. 3937, 2012 WL 86467, at *9 (S.D.N.Y. Jan. 11, 2012) (sleep apnea). *See also Hamilton v. Smith,*

No. 9:06–CV–805, 2009 WL 3199531, at *15 & n. 18 (N.D.N.Y. Jan. 13, 2009) (rejecting plaintiff's Eighth and Fourteenth Amendment claims for disclosure of Hepatitis A condition, finding Hepatitis A was not "serious medical need" and disclosures were "necessary to investigate ... pending grievances"), *report and rec. adopted as modified by,* 2009 WL 3199520 (N.D.N.Y. Sept. 30, 2009); *Wilson v. Brock,* No. 9:06–CV–528, 2008 WL 4239564, at *5 (N.D.N.Y. Sept. 11, 2008) (no constitutionally protected confidentiality in parolee's participation in mandated drug or alcohol rehabilitation program).

**\*4** In this case, plaintiff alleges that corrections officers are allowed to distribute medication and "over-the-counter" pain medicine. [3] (Compl. at 5). Plaintiff states that he has injuries resulting from a tractor-trailer crash, including back pain and a torn meniscus. (*Id.* ¶ III(c)). He states that he takes "mental sleeping meds," but that he only received over-the-counter medications. None of these conditions warrants constitutional privacy protection under the case law cited above. Plaintiff receiving over-the-counter pain medication from corrections officers is not the type of "disclosure" that would likely result in ridicule, discrimination, or violence.

Plaintiff vaguely claims in his attached "list," that inmates' telephone calls are "monitored" and his papers were read by "random staff" when the papers were "sent" for photocopying at some unknown time. There is no statement of what highly confidential information might have been disclosed, and these claims are so conclusory that no constitutional privacy claim is stated. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (conslusory allegations insufficient to state a constitutional claim).

Thus, based upon the facts in this complaint, plaintiff has failed to state a constitutional privacy claim as against any of the defendants, and to the extent that the complaint may be interpreted as raising constitutional right to privacy claims in addition to the HIPAA claim, it may be dismissed.

### V. *Agency Defendants, Clinton County, and County Legislature*

**A. Legal Standards**

**1. Clinton County Jail/Medical Department**

2014 WL 4265844

Departments that are merely administrative arms of a municipality do not have a legal identity separate from the municipality and may not sue or be sued. *Rose v. County of Nassau,* 904 F.Supp.2d 244, 247 (E.D.N.Y. Nov. 9, 2012) (citing *Hall v. City of White Plains,* 185 F.Supp.2d 293, 303 (S.D.N.Y.2002) (dismissing claim against the police department); *Polite v. Town of Clarkstown,* 60 F.Supp.2d 214, 216 (S.D.N.Y.1999) (same); *Umhey v. County of Orange,* 957 F.Supp. 525, 530–31 (S.D.N.Y.1997) (dismissing case against the County Board of Ethics); *Wilson v. City of New York,* 800 F.Supp. 1098, 1101 (E.D.N.Y.1992) (dismissing against police department). Therefore, claims asserted under 42 U.S.C. § 1983 will be dismissed against an administrative department or sub-division of a municipality or county. *Id. See also Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999) (because the county sheriff's office was an administrative arm of the county, it was not the appropriate party in a section 1983 action)).

#### 2. Sheriff Dave Favro/Clinton County

A municipality itself, however, may be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.,* 436 U .S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Id.* at 694. To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Id.; Dominguez v. Beame,* 603 F.2d 337, 341 (2d Cir.1979).

**\*5** The Sheriff may be sued in his individual capacity or in his official capacity. A section 1983 action against municipal officers in their official capacities is treated as an action against the municipality itself. *Coon v. Town of Springfield,* 404 F.3d 683, 687 (2d Cir.2005) (citing *Brandon v. Holt,* 469 U.S. 464, 471–73 (1985)).

#### B. Application

In this case, plaintiff names the CCJ and the CCJ Medical Department. (Compl.¶ I(B)). Plaintiff may not sue either one of these entities, and the complaint may be dismissed in its entirety with prejudice as against CCJ and CCJ Medical Department. Plaintiff also names Sheriff Dave Favro as a defendant. To the extent that he names Sheriff

Favro in his "official capacity," [4] as stated above, plaintiff is essentially suing the County, and he would have to show that a County policy caused the violation of his civil rights. *Monell, supra.*

In the page attached to plaintiff's form-complaint, he makes some general allegations that could conceivably related to "policy," not involving the HIPAA claims, which were discussed above. He claims that inmates *in general* are denied outside medical attention for pain and severe illness; there is no infirmary at CCJ, there is no 24–hour medical staff on duty, and inmates who attempt suicide are left in general population. (Compl. at 5). Plaintiff has not related any of these allegations to specific instances of harm to him, other than vague references to being given only over-thecounter medications and vague references to the lack of an infirmary. Such conclusory allegations are insufficient to state a claim under section 1983. *Barr v. Abrams,* 810 F.2d at 363.

### VI. *Medical Care*

#### A. Legal Standards

In order to state a claim for cruel and unusual punishment under the Eighth Amendment, based on constitutionally inadequate medical treatment, a sentenced prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

Constitutional medical care claims by pretrial detainees must be analyzed under the Due Process Clause of the Fourteenth Amendment because the Eighth Amendment's cruel and unusual "punishment" clause is not directly applicable to prisoners who have not been convicted. *Mayo v. County of Albany,* 357 F. App'x 339, 341 (2d Cir.2009). In 2009, the Second Circuit held that the Eighth Amendment "deliberate indifference" standard, as articulated in the Supreme Court's decision in *Farmer v. Brennan,* 511 U.S. 825 (1994) [5], should be applied to constitutional medical care claims of pretrial detainees

under the Due Process clause. *Caiozzo v. Koreman,* 581 F.3d 63, 66, 72 (2d Cir.2009) ("[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment"). *Caiozzo,* following the position taken by several other circuit courts, reversed prior Second Circuit precedent which had applied a strictly objective standard in evaluating medical claims by pretrial detainees under the Due Process clause. *Mayo,* 357 F. App'x at 341; *Caiozzo v. Koreman,* 581 F.3d at 71 & n. 4. [6]

**B. Application**

**\*6** It is unclear from plaintiff's complaint whether he was a pre-trial detainee or a convicted prisoner when the conduct alleged in the complaint occurred. Regardless of plaintiff's status, as stated above, the constitutional analysis is the same. The complaint may be interpreted as alleging that plaintiff did not receive adequate medical care because he did not receive anything but over-the-counter medications for his pain. He also claims that his rights were violated because the CCJ has no "infirmary" and either he refused to go to the hospital or CCJ officials refused to take plaintiff to the hospital. The fact that the County Jail does not have an infirmary in the jail or does not have medical personnel on duty 24–hours per day does not necessarily state any claim for relief. Plaintiff also makes the conclusory allegation, without any factual support whatsoever, that "inmates" are denied outside medical attention for pain and severe illness.

Even if read extremely liberally and this court found that plaintiff stated a claim, based upon his conclusory allegations of the denial of medical care, as stated above, plaintiff has failed to name anyone who has denied him proper medical care. To the extent that plaintiff has included allegations of the alleged denial of medical care to other inmates, plaintiff may not raise such a claim. *See Murray v. Palmer,* No. 9:03–CV–1010, 2008 WL 2522324, at *8 (N.D.N.Y. June 20, 2008) (court noting that plaintiff may not assert the rights of other inmates because the suit was not a "class action"). Thus, this court will recommend dismissing plaintiff's medical care claim without prejudice to plaintiff filing an amended complaint naming a proper defendant or defendants or at least making more specific allegations about the alleged denial of medical care so that discovery could allow him to identify proper defendants.

**VII.** *County Legislature*

**A. Legal Standards**

While departments that are administrative arms of the municipality may not be sued separately from the county itself, it has been held that the County Legislature is a legislative body, not an administrative arm of the County, and thus is a "suable entity." *Nassau County Employee "L" v. Nassau County,* 345 F.Supp.2d 293, 298 (E.D.N.Y.2004) (citations omitted); *Fishman v. County of Nassau,* No. 10–CV–3231, 2013 WL 1339466, at *14 (E.D.N.Y. April 1, 2014) (citations omitted). However, in order to name the Legislature, plaintiff would have to cite some unconstitutional action taken by the Legislature as a whole. *Id.*

**B. Application**

Plaintiff in this case cites absolutely no conduct taken by the Legislature as a whole, or even by individual members of the Legislature. Plaintiff is seeking only money damages in this case, and there is no indication that any of plaintiff's alleged violations were the responsibility of the Clinton County Legislature. Thus, the complaint may be dismissed in its entirety with prejudice as against the Clinton County Legislature.

**VIII.** *Commission of Correction*

**A. Legal Standards**

**\*7** The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n. 3.

**B. Application**

The New York State Commission of Correction is an executive agency of New York State. *Smith v. Donaher,* No. 12–CV–6035, 2013 WL 2531750, at *4–5 (W.D.N.Y. June 10, 2013). As such, a suit against the Commission itself is tantamount to a suit against New York State and would be precluded by the Eleventh Amendment. *Id.* Thus, any claim as against the Commission of Correction may be dismissed with prejudice.

## IX. *Opportunity to Amend*

### A. Legal Standard

Generally, when the court dismisses a pro se complaint *sua sponte,* the court should afford the plaintiff the opportunity to amend at least once, however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993).

### B. Application

In this case, amendment would be futile with respect to any HIPAA claims or privacy claims. Amendment would also be futile with respect to any claims against the Clinton County Legislature, the Commission of Correction, the Clinton County Jail, and the Clinton County Medical Department. Thus, the court will recommend dismissal with prejudice as to these claims and these defendants.

Plaintiff has also failed to state a claim as against defendant Favro either his individual capacity as Sheriff of Clinton County or in his "official capacity" as representative of Clinton County itself. However, it is conceivable that plaintiff could submit an amended complaint that would properly allege a denial of proper medical care. In order to do so as against defendant Favro in his individual capacity, plaintiff would have to allege that the Sheriff was "personally involved" in the constitutional denial of medical care as relates to plaintiff himself. In order to state a claim as agasint defendant Favro in his "official capacity," or against Clinton County, plaintiff would have to allege facts showing that the constitutional medical care claims he asserts were caused by a policy or custom of the County. Plaintiff may also state a constitutional claim as against other individual defendants who may have denied him proper medical care. Thus, the court will recommend dismissing plaintiff's medical care claim without prejudice to plaintiff submitting a proposed [7] amended complaint for this court's review. **WHEREFORE,** based on the findings above, it is

**ORDERED,** that plaintiff's application to proceed IFP (Dkt. No. 6) is **GRANTED,** and it is

**RECOMMENDED,** that the complaint be **DISMISSED WITH PREJUDICE** as to all claims against defendants **CLINTON COUNTY LEGISLATURE, COMMISSION OF CORRECTION, CLINTON COUNTY JAIL,** and **CLINTON COUNTY MEDICAL DEPARTMENT,** and it is

**\*8 RECOMMENDED,** that the complaint be dismissed **WITHOUT PREJUDICE TO PLAINTIFF FILING AN AMENDED COMPLAINT** with respect to Medical Care claims as against **DEFENDANT FAVRO/and or OTHERS** as stated above, **WITHIN SIXTY (60) DAYS OF A DECISION APPROVING THIS REPORT,** and it is

**RECOMMENDED,** that if the District Court approves this Report, and plaintiff thereafter timely files a proposed amended complaint, the Clerk send the proposed amended complaint to me for review, and it is

**ORDERED,** that the Clerk serve a copy of this Order and ReportRecommendation on plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Filed July 22, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4265844

---

Footnotes

1   Plaintiff's original application to proceed IFP was incomplete, based upon his failure to file an Inmate Authorization Form, and on March 14, 2014, District Court Judge David N. Hurd ordered plaintiff to file a properly completed form. (Dkt. No. 5). Plaintiff filed a new form, together with his Inmate Authorization Form. (Dkt.Nos.6, 7). Although plaintiff has still failed

Case 9:17-cv-00031-BKS-TWD    Document 21    Filed 10/19/17    Page 52 of 88
Cummings v. Clinton County Legislature, Not Reported in F.Supp.3d (2014)
2014 WL 4265844

to properly complete the application, the court is able to determine that he meets the financial eligibility requirements, and the case is now before me for review of the complaint.

2    It is clear that plaintiff has misspelled the medication that he states he was given. "Trasithon" is not a pain or sleep medication, however, the actual medication is irrelevant to this order.

3    The court notes that plaintiff alleges that the defendants' conduct took place on October 10, 2013. (Compl.¶ III(B)). Plaintiff has not specified what this one incident was or who was involved in this incident. His complaint is filled with generalities about how officers are allowed to distribute medications and how inmates' telephone calls are monitored. It is almost impossible to determine what plaintiff is actually challenging or when much of the alleged conduct actually occurred.

4    Plaintiff does not allege whether he is suing the Sheriff in his individual or official capacity. To the extent that plaintiff is attempting to sue the Sheriff in his individual capacity, any such claim must be dismissed because plaintiff alleges absolutely no personal involvement by Sheriff Favro in any of the claims asserted. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

5    Farmer included a subjective element in the Eighth Amendment standard for deliberate indifference, requiring evidence that the defendant "disregard[ed] a risk of harm of which he [was] aware." *Caiozzo,* 581 F.3d at 65 (quoting *Farmer,* 511 U.S. at 837).

6    As the Second Circuit in *Caiozzo* elaborated: "[D]espite the distinct constitutional sources of the rights of pretrial detainees and convicted inmates, state jail and prison officials owe the same duty to provide the same quantum of basic human needs and humane conditions of confinement to both groups.... That pretrial detainees may have more protections or rights in general ... does not mean that they are entitled to greater protection of rights shared in common with convicted inmates.' " 581 F.3d at 71–72 (quoting *Hare v. City of Corinth, Mississippi,* 74 F.3d 633, 649 (5th Cir.1996) (en banc)).

7    Plaintiff's proposed amended complaint would be subject to initial review and would not automatically be served.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 417084
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Vincent BARROW, Plaintiff,
v.
Diane Van BUREN, Deputy Commissioner;
Brian Fischer, Commissioner; Bryan Hilton,
Superintendent of Programs; Charles Kelly, Jr.,
Superintendent, Marcy Correctional Facility; Dr.
Farago, Psychiatrist; Anthony Devitto, Executive
Director of Special Programing; BOB Lewis,
OMH Therapist; Lisa Kalies, Unit Chief, OMH,
Residential Mental Health Unit; Joseph Bellnier,
Deputy Commissioner of Program Service; Lucien
Lechaire, Assistant Commissioner; Maureen
E. Boll, Deputy Commissioner and Counsel; E.
Lindquist, Assistant Commissioner; Karen Ballamy,
Director, Inmate Grievance Program; Jeff McKoy,
Deputy Commissioner; Maureen Bossco, Executive
Director, Central New York Psychiatric Center,
Office of Mental Health; B. McArdle, Deputy
Superintendent of Marcy Correctional Facility;
Donald Selskey, Deputy Commissioner, Captain
Harper, Lieutenant Cory; Holanchuck, Defendants.

No. 9:12–cv–01268 (MAD/CFH).
|
Signed Jan. 30, 2015.

**Attorneys and Law Firms**

Vincent Barrow, Romulus, NY, pro se.

Office of the New York State Attorney General, Gregory
J. Rodriguez, AAG, of Counsel, Albany, NY, for
Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

**\*1** Plaintiff *pro se* Vincent Barrow, an inmate in
the custody of the New York State Department of
Corrections and Community Supervision ("DOCCS"),
brought this action pursuant to 42 U.S.C. § 1983,
alleging violations of his constitutional rights under
the First, Eighth and Fourteenth Amendment, as well
as under Title II of the American with Disabilities
Act ("ADA"), 42 U.S.C. § 12101 et seq. and section
504 of the Rehabilitation Act ("RA"), 29 U.S.C. §
794. *See* Dkt. No. 50. Defendants, twenty DOCCS
employees, have moved to dismiss Plaintiff's Second
Amended Complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6). *See* Dkt. No. 67. Defendants have
also moved to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(1). *Id.* In a Report–Recommendation
and Order dated September 25, 2014, Magistrate Judge
Hummel recommended that the Court grant in part and
deny in part Defendants' 12(b)(6) motion and deny the
Defendants' 12(b)(1) motion. *See* Dkt. No. 70.

Currently before the Court are Plaintiff's objections to
Magistrate Judge Hummel's September 25, 2014 Report–
Recommendation and Order. *See* Dkt. No. 73.

**II. BACKGROUND**

The following facts are not in dispute. At all relevant
times, Plaintiff was incarcerated at Marcy Correctional
Facility ("Marcy"). Dkt. No. 50 at ¶ 2. During this time,
the Residential Mental Health Unit ("RMHU") at Marcy
implemented "The Lewd Conduct Program" for inmates
who engage in lustful and inappropriate behaviors. Dkt.
No. 50 at ¶ 25. Inmates subject to the program are required
to wear a control suit, which consists of a neon-green
jumpsuit that has its only opening along the back, is laced
with a heavy string, and is fastened with a padlock at the
neck. *Id.* Another component of the program requires that
a fiberglass sign displaying the word "Exposer" be hung
above the inmate's cell door at all times. Dkt. No. 50 at
¶¶ 26, 30.

Plaintiff was required to wear the jumpsuit on several
occasions following the issuance of numerous misbehavior
reports for lewd conduct. *See id.* at ¶¶ 29–31. Plaintiff
alleges that several inmates and staff have verbally
insulted and ridiculed him for wearing the jumpsuit. *See
id.* at ¶¶ 32–33. As a result, Plaintiff has refused to wear
the jumpsuit out of his cell and has thus been unable to

2015 WL 417084

attend programs and medical appointments. *See id.* at ¶ 36. Contrary to Defendants' contentions that the lewd conduction program has been implemented for security measures, Plaintiff argues that the program is specifically targeted to humiliate and lower the self esteem of inmates at Marcy. *See id.* at ¶¶ 34–35, 43.

Plaintiff commenced this civil rights action on August 13, 2012. *See* Dkt. No. 1. Upon leave of court, Plaintiff filed an Amended Complaint to include a description of new events that had taken place since the complaint's initial filing. *See* Dkt. No. 11, 12. On April 1, 2014, Plaintiff was permitted to submit a Second Amended Complaint for review. *See* Dkt. No. 50. In response, Defendants moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 67. Plaintiff subsequently opposed the motion. *See* Dkt. No. 69.

**\*2** On September 25, 2014, Magistrate Judge Hummel filed a Report–Recommendation and Order recommending that Defendants' Motion to Dismiss be granted in part and denied in part. *See* Dkt. No. 70 at 40. Plaintiff filed written objections on October 10, 2014, objecting to Magistrate Judge Hummel's recommendations in full. *See* Dkt. No. 73 at 7.

### III. DISCUSSION

**A. Standard of Review**

When objections to a magistrate judge's report-recommendation and order are made, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). If, however a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the magistrate judge's recommendations are reviewed for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). The court will "ordinarily refuse to consider argument[s] that could have been, but [were] not, presented to the magistrate judge in the first instance." *Mosley v. Superintendent of Collins Corr. Facility,* No. 9:11–CV–1416, 2015 U.S. Dist. LEXIS 6985, \*5, 2015 WL 277133 (N.D.N.Y. Jan. 22, 2015) (citations omitted). Upon review, "the court may accept, reject, or modify, in

whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. Analysis**

### 1. Misapplication of Case Law

Plaintiff contends that the cases cited in Magistrate Judge Hummel's Report–Recommendation and Order "could have been used in favor of Plaintiff" and "should be used in his favor." *Id.* Upon careful review, the Court finds that Magistrate Judge Hummel applied the appropriate legal standards, accurately recited the facts as presented by Plaintiff, and correctly applied the law to those facts.

Accordingly, Plaintiff's objection regarding the misapplication of case law is rejected.

### 2. Misapplication of Rule 12(b)(6)

Plaintiff further contends that Rule 12(b)(6) "should have been used in his favor" and that "legal conclusions," in these circumstances, should be sufficient to survive a motion to dismiss. *See* Dkt. No. 73 at 1. When a defendant files a 12(b)(6) motion to dismiss, the court must "accept all factual allegations as true and draw every reasonable inference from those facts in plaintiff's favor." *La. Wholesale Drug Co. v. Shire LLC,* 754 F.3d 128, 133 (2d Cir.2014) (internal quotation marks and citations omitted). Nevertheless, "this indulgence does not relieve the plaintiff from alleging 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Plaintiff admits that "the complaint is not without error," and that he "did his best to inform the court" of the alleged violations despite having been denied counsel. *See* Dkt. No. 73 at 6–7. The Second Circuit has stated, however, that *"pro se* status does not exempt a party from compliance with relevant rules of procedure and substantive law." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (internal quotation marks and citations omitted). Upon review, the Court finds that Magistrate Judge Hummel correctly applied Rule 12(b)(6) and surrounding case law to the facts presented. In his thorough and well-reasoned Report–Recommendation and Order, Magistrate Judge Hummel correctly determined that the allegations in the Second Amended Complaint were insufficient to plausibly

suggest the personal involvement of Defendants Bossco, Fischer, Harper, McArdle, VanBuren, Holanchuck, Perlman, LeClaire, Boll, McKoy, Bellamy, and Lindquist. Additionally, Magistrate Judge Hummel also correctly determined that the Court should grant Defendants' motion as to Plaintiff's First Amendment claims because some of the speech was not constitutionally protected and, even when it was, Plaintiff's allegations regarding the alleged retaliation are entirely conclusory.

 **\*3** As to Plaintiff's Eighth Amendment conditions of confinement claim, Magistrate Judge Hummel correctly determined that the alleged deprivations were not sufficiently serious to amount to an " 'excessive risk' to his safety and health.' " Dkt. No. 70 at 24 (citing *Farmer,* 511 U.S. at 837; *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012)). The report also properly determined that Plaintiff has failed to plausibly allege claims of deliberate medical indifference regarding the denial of treatment for his foot arches and exhibitionism.

The Court has reviewed Plaintiff's remaining claims and finds them to be without merit; and, therefore, Magistrate Judge Hummel's September 25, 2014 Report–Recommendation and Order is adopted in its entirety.

### 3. Deliberate Indifference

Lastly, Plaintiff reiterates his concerns regarding the denial of necessary medical and mental health care. Dkt. No. 73 at 5. In this respect, the Court wholly agrees with Magistrate Judge Hummel's analysis governing Plaintiff's Eighth Amendment claim for medical indifference related solely to the denial of treatment for depression. *See* Dkt. No. 70 at 29. In order to have a valid claim under the Eighth Amendment for cruel and unusual punishment arising out of a claim for medical indifference, a plaintiff must show "that his medical condition is objectively a serious one" and that "[each] defendant acted with deliberate indifference to [the plaintiff's] medical needs." *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citations omitted). A finding of deliberate indifference requires the plaintiff "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Plaintiff states that at the time he was admitted to RMHU he was diagnosed with "Major Depression Disorder." Dkt. No. 50 at ¶ 46. The Court is mindful that depression, in some circumstances, has been objectively deemed a serious medical need. *See Zimmerman v. Burge,* No. 06–CV–0176, 2009 U.S. Dist. LEXIS 88344, \*34–35, 2009 WL 9054936 (N.D.N.Y. Apr.20, 2009) (finding that depression is a "sufficiently serious" medical condition when it is not self-diagnosed). In light of these facts, the Court is satisfied that Plaintiff has met its burden under the first prong.

In or around May 2011, Plaintiff states that Defendant Farago stopped providing Plaintiff with depression medication and was instead "pretending" to treat him. Dkt. No. 50 at ¶¶ 47–48. Plaintiff had been taking this medication to treat his depression for over fifteen years. Dkt. No. 50 at ¶ 47. In his objections, Plaintiff attempts to substantiate his need for the medication by alleging "many 'crisis' situations,' " including two "attempted suicides" and a single occasion of hospitalization. Dkt. No. 73 at 4. Plaintiff does not, however, provide any specific dates or documentation regarding these events. Nevertheless, the Court agrees that "a complete ... cessation of medication that [Plaintiff] had been taking for fifteen years could pose a risk of serious harm to his mental well-being." Dkt. No. 70 at 29 (citing *Brock,* 315 F.3d at 162–63).

 **\*4** Accordingly, the Court finds that Magistrate Judge Hummel correctly determined that the Court should deny Defendants' motion to dismiss as to this claim.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the September 25, 2014 Report–Recommendation and Order by Magistrate Judge Hummel is **ADOPTED** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's Second Amended Complaint for lack of subject matter jurisdiction is **DENIED;** and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's Second Amended Complaint for failure to state a claim is **GRANTED** in part and **DENIED** in part; and the Court further

**ORDERS** that Plaintiff's following claims are **DISMISSED**; (1) all First Amendment claims; (2) all Eighth Amendment claims insofar as they allege inadequate prison conditions, inadequate treatment, and deliberate indifference to Plaintiff's exhibitionism and foot condition; (3) all Fourteenth Amendment claims; (4) the ADA claim; and (5) the RA claim; and the Court further

**ORDERS** that Defendants' motion to dismiss is **DENIED** with respect to Plaintiff's Eighth Amendment claim insofar as it alleges deliberate indifference to Plaintiff's depression; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**

**REPORT–RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff pro se Vincent Barrow ("Barrow"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, twenty DOCCS employees, violated his rights under the First, Eighth and Fourteenth Amendments as well as Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. and section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794. Second Am. Compl. (Dkt. No. 50), at 1–16. Presently pending is defendants' motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) and FED. R. CIV. P. 12(b)(1). Dkt. No. 67. Barrow opposed. Dkt. No. 69. For the following reasons, it is recommended that (1) defendants' motion to dismiss under FED. R. CIV. P. 12(b)(6) be granted in part and denied in part and (2) defendants' motion to dismiss under FED. R. CIV. P. 12(b)(1) be dismissed.

### I. Background

The facts are related herein in the light most favorable to Barrow as the non-moving party. *See* subsection II(A) infra. At all relevant times, Barrow was an inmate at the Marcy Correctional Facility ("Marcy").

#### A. Lewd Conduct Program

**\*5** At Marcy, the Residential Mental Health Unit ("RMHU") had implemented "The Lewd Conduct Program" for inmates who had engaged in lewd behaviors. Second Am. Compl. ¶ 25. The program included use of a control suit, a neon-green jumpsuit that is laced up the back—its only opening—with heavy string and secured with a padlock at the neck. *Id.* Another component of the program is the placement of a sign that says "Exposer" above the inmate's cell door. *Id.* ¶¶ 26, 30.

Although Barrow was advised by defendants Joseph Bellnier, Deputy Commissioner of Program Service; Lieutenant Cory; Captain Harper; Bryan Hilton, Superintendent of Programs; Lisa Kalies, Unit Chief, Office of Mental Health, Residential Mental Health Unit; and B. McArdle, Deputy Superintendent of Marcy, that the lewd conduct program was imposed for security reasons, Barrow contends that he was discriminated against because other inmates who had smuggled in contraband by concealing it in their groin area were not placed into the program. Second Am. Compl. ¶¶ 27–28. Barrow has informed Bellnier; Hilton; and Bob Lewis, OMH Therapist of this claim. *Id.* ¶ 35. Barrow further alleges that the program participants are disproportionately minority inmates. *Id.* at 15. Hilton advised Barrow that the lock prevents him from ripping off the jumpsuit, but also serves to humiliate and "change" his "cognizence [sic]." *Id.* ¶¶ 42–43. Barrow argues that a lock at one's neck is a symbol of hate and oppression of minorities harkening back to times of slavery and racial segregation. *Id.* ¶ 42. Thus, Barrow states that the lewd conduct program is imposed not for security purposes, but to humiliate inmates and deter future exhibitionist conduct. *Id.* ¶¶ 34–35, 43.

On March 28, 2011, Barrow was made to the wear the jumpsuit after being issued a misbehavior report for lewd conduct. Second Am. Compl. ¶ 29. A disciplinary hearing was not held in connection with that report. *Id.* On or about November 10, 2011, Barrow was again ordered to wear the jumpsuit and have the exposer sign hang on his door for thirty days. *Id.* ¶ 30. A disciplinary hearing was held regarding this alleged violation. *Id.* More recently,

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Barrow was ordered to wear the jumpsuit in January 2013 and from July 17, 2013 to August 17, 2013. *Id.* ¶¶ 31, 71.

In December, 2011, Barrow notified RMHU staff that he had not had a hearing for the March 28, 2011 lewd conduct allegations. Second Am. Compl. ¶ 38. After submitting this complaint, Barrow began to receive more misbehavior reports for lewd conduct. *Id.* ¶ 39. Between September 2008 and May 2011, Barrow had received eighteen misbehavior reports for lewd conduct. Dkt. No. 50, at 23 (CORC Grievance Denial), 26 (same). Barrow also contends that he was issued misbehavior reports for repeatedly requesting a prison transfer and filing sexual harassment charges against staff members. Second Am. Compl. ¶ 41.

**\*6** Barrow complained to defendants Anthony Devitto, Executive Director of Special Programming; Hilton; Michael Hoagan, Deputy Commissioner, Office of Mental Health, DOCCS; Kalies; Charles Kelly, Jr., Superintendent of Marcy; and Lewis that the lewd conduct program violated his rights under the Eighth Amendment and the ADA. [2] Second Am. Compl. ¶ 33. Barrow contends his condition, which he claims to be exhibitionism, is confidential, and only inmates being treated for this condition should be privy to this information. *Id.* He suggests that the sign and jumpsuit deprive him of confidentiality. *Id.*

Barrow is also upset that other inmates and staff ridicule and use racial epithets against him when he is in the jumpsuit. Second Am. Compl. ¶¶ 32–33. Barrow alleged that, on one occasion, in Hilton and Bellnier's presence, several inmates verbally insulted him regarding the jumpsuit, but neither defendant intervened. *Id.* ¶ 32.

Barrow alleges that the lewd conduct program, as applied to him, is over broad because he is required to wear the jumpsuit even when there are no females present, despite the fact that he has no history of lewd conduct toward male employees. Second Am. Compl. ¶ 34. Because Barrow is made to wear the jumpsuit when no females are present, Barrow claims that the jumpsuit is not a security measure. *Id.*

Because he is embarrassed by the jumpsuit, Barrow refused to wear it out of his cell. Second Am. Compl. ¶¶ 39, 42. Barrow is concerned that his absence from programming has adversely affected his parole release

date. Second Am. Compl. ¶ 39. He informed defendant Kenneth S. Perlman, Deputy Commissioner of Program Services, of his parole concerns. *Id.* ¶ 59. Due to his refusal to leave his cell in the jumpsuit, Barrow was unable to attend programs or his medical appointments. *Id.* ¶ 36; *see* Dkt. No. 50 at 17–26 (prison documents pertaining to grievances filed and rulings on them). Barrow also contends that because he lacks arches in his feet, he requires the use of a lift in his right shoe, "otherwise [he] is in severe pain up and down the right side of his back." Reply (Dkt. No. 69), at 2. Barrow has been unable to receive medical treatment for his foot because he would not go to his appointments while wearing the jumpsuit. *Id.*

**B. Mental Diagnoses and Treatment**

Barrow first arrived at RMHU with diagnoses of major depression and anti-social disorder and has since been diagnosed with poly-substance abuse. Second Am. Compl. ¶ 46. Three of Barrow's urine tests came back positive for cannabis, but he has never tested positive for any other substance; thus, he does not believe that poly-substance abuse is an accurate diagnosis. *Id.* Barrow contends that defendant Dr. Farago, his psychiatrist, attempts to "intellectually badger" him into wearing the jumpsuit; thus, he "only wished to talk about issues related to his profession" during their sessions. *Id.* ¶ 47. Shortly after telling Dr. Farago that he did not wish to discuss the lewd conduct program, Barrow's depression medication, which has been administered to him for approximately fifteen years, was terminated. *Id.* Barrow has since been "begging" for medication. *Id.* ¶ 48.

**\*7** In or around May or June of 2011, Barrow filed a complaint against Dr. Farago to Kalies, stating that Dr. Farago was conducting meetings outside of his cell in violation of his right to privacy. *Id.* ¶ 49. [3] Although Barrow was told that in the future Dr. Farago would hold meetings in private, Dr. Farago would arrive at Barrow's cell, wait for him to get up, then walk away. *Id.* ¶ 50. Kalies indicated that the log book indicates that Barrow was seen by Dr. Farago; however, she did not permit Barrow review of the videotapes of those meetings. *Id.* ¶ 51. Barrow contends that, rather than treat him, Dr. Farago would turn away from the camera and make comical faces at him when he asked for his depression medication. *Id.* ¶ 52. Barrow alleges that defendants Devitto, Hoagan, Kalies, and Lewis were aware of his concerns regarding

Dr. Farago because he wrote to them and spoke with them. *Id.* ¶¶ 53–56.

Barrow alleges that the remaining defendants were involved in the alleged constitutional violations in various ways. Bellnier and Hilton initiated the Lewd Conduct Program at Marcy. Second Am. Compl. ¶ 57. Brian Fisher, Commissioner; Holanchuck; and Perlman were aware of Barrow's situation because he sent them letters and spoke with them. *Id.* ¶¶ 58–59, 71. Boll and LeClaire were aware of Barrow's concerns because he talked with them about the lewd conduct program. *Id.* ¶¶ 60, 61. E. Lindquist, Assistant Commissioner in charge of the programs at RMHU, knew about the program. *Id.* ¶ 62. Bellamy affirmed grievance determinations. *Id.* ¶ 63. Maureen Bossco, Executive Director of Central New York Psychiatric Center, and Jeff McKoy, Deputy Commissioner, were aware of the alleged constitutional violations because they spoke with him about the sign. *Id.* ¶ 64. Diane VanBuren, Deputy Commissioner, knew of Barrow's issues at RMHU because of her supervisory status. *Id.* ¶ 70.

Most of the misbehavior reports issued against Barrow were written for exhibitionism, but Barrow was refused treatment for such. Second Am. Compl. ¶¶ 66–68. RMHU had demanded that Barrow attend a sex offender program, but Barrow thinks it is inappropriate for his disorder because the sex offender program focuses on pedophiles and rapists—conduct of which he was never convicted. *Id.* ¶ 69.

Barrow seeks both compensatory damages and injunctive relief. Second Am. Compl. at 16.

## II. Discussion [4]

Barrow contends that defendants violated his: (1) First Amendment rights by retaliating against him for his expression of protected speech; (2) Eighth Amendment rights by (a) subjecting him to cruel and unusual punishment, and (b) denying him medical treatment; (3) Fourteenth Amendment rights by (a) failing to provide him due process prior to imposing the lewd conduct program, (b) treating him differently from similarly-situated inmates, and (c) violating his right to privacy regarding his exhibitionism. Barrow also argues that

defendants have violated the ADA and section 504 of the Rehabilitation Act. [5]

### A. Legal Standard

**\*8** Under FED. R. CIV. P. 12(b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 664, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face." *Iqbal,* 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct] .")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (internal citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 680.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit stated,

> [t]here are many cases in which we
> have said that a pro se litigant is
> entitled to special solicitude, that a
> pro se litigant's submissions must be
> construed liberally, and that such
> submissions must be read to raise

the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

*Id.* (internal quotation marks, citations, and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' (internal citations omitted)).

### B. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

 **\*9** (1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [6] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

### 1. Bossco and Fischer

Here, Barrow alleged in a conclusory fashion that Bossco and Fischer were (1) aware at all times of his issues at Marcy and (2) that he spoke to them and sent several letters to them about such issues. Second Am. Compl. ¶¶ 58, 65. The gravamen of Barrow's complaints against these defendants is that they were in a position of power, thus, they were involved with all aspects of his incarceration. Nevertheless, attempts to establish personal involvement based upon the supervisory role that these defendants occupied is inappropriate. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003), quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim.").

To the extent that Barrow seeks to establish defendants' knowledge of his complaints through letters, such an attempt must also fail. Until recently, a plaintiff's claim that he or she sent a letter or grievance to a defendant, where the defendant did not take action on the letter or respond, was generally insufficient at the pleading stage to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ( "Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."; *but see Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."). However, the Second Circuit recently concluded that,

> [a]t the pleading state, even if [plaintiff] had no knowledge or information as to what became

of his Letter after he sent it, he would be entitled to have the court draw the reasonable inference—if his amended complaint contained factual allegations indicating that the Letter was sent to the Warden at an appropriate address and by appropriate means—that the [defendant] in fact received the Letter, read it, and thereby became aware of the alleged conditions of which [plaintiff] complained

**\*10** *Grullon v. City of New Haven,* 720 F.3d 133, 131 (2d Cir.2013); *see also Toliver v. City of New York,* 530 F. Appx. 90, 93 (2d Cir.2013) (citing *Grullon,* 720 F.3d at 141–42); *Ferrer v. Fischer,* No. 9:13–CV–0031, 2014 WL 1763383 (N.D.N.Y. May 1, 2014). Barrow does not provide sufficient factual detail to support his claim that the letters establish personal involvement. He does not allege that he sent the letters to the proper addresses by appropriate means or that defendants received the letters and read them. Thus, he has not established personal involvement through the sending of letters. *Grullon,* 720 F.3d 133 at 141–42.

Further, although Barrow alleged that he had spoken with the defendants, Barrow does not state when these conversations took place. *Eldridge v. Kenney,* No. 11–CV–6459, 2014 WL 2717982, at \*3 (W.D.N.Y. June 16, 2014) ("While Plaintiff's Response ... contains references to the ... *Colon* factors, they suffer from the same fatal flaw: they contain nothing more than conclusory statements and formulaic recitations of the *Colon* factors and are wholly unsupported by facts."). Moreover, Barrow presents no factual allegations to support a claim that defendants created a policy or custom under which unconstitutional practices occurred, were grossly negligent in their supervision of subordinates, or exhibited deliberate indifference to Barrow's rights. *Colon,* 58 F.3d at 873. Thus, Barrow has failed to plausibly allege that Bossco or Fischer had personal knowledge of the alleged constitutional violations.

Accordingly, defendants' motion on this ground should be granted.

### 2. Harper, McArdle, and VanBuren

Barrow has also failed to establish personal involvement of Harper, McArdle, and VanBuren in the alleged constitutional violations. Barrow states that VanBuren was aware of the violations because she "was at all times aware of the actions and functions ... at the RMHU." Second Am. Comp. ¶ 70. Similarly, Barrow alleged that Harper knew about all programs at RMHU and, during a conversation, Harper told him that the lewd conduct program was implemented as a security measure. *Id.* ¶¶ 23, 27. Barrow contends that McArdle, as a "higher-up," advised him that the jumpsuit was imposed for security and failed to issue him a review notice for the lewd conduct program. *Id.* ¶¶ 27, 44.

With respect to the alleged conversations with Harper and McArdle, Barrow fails to provide details such as the date and manner of such conversations, rendering his claim insufficient to establish the requisite knowledge for personal involvement. *See Eldridge,* 2014 WL 2717982, at \*3 (conclusory allegations are insufficient). Instead, Barrow merely contends that the lewd conduct program was discussed. *See Barnes v. Prack,* No. 11–CV–857, 2012 WL 7761905, at \*5 (N.D.N.Y. Sept. 7, 2012) (same). To the extent that Barrow's complaint may suggest that Harper, McArdle, and VanBuren allowed for the continuance of a unconstitutional policy or custom, he does not demonstrate that defendants had investigated the program, were aware of his specific concerns and complaints regarding the jumpsuit and sign, or that they otherwise participated in decision making, policy making, or had any input relating to the alleged constitutional violations.

**\*11** Furthermore, as noted, personal involvement cannot be established solely upon a defendant's supervisory role. *Wright,* 21 F.3d at 501. As such, Barrow has failed to plausibly allege the personal involvement of either Harper, McArdle, or VanBuren. Accordingly, defendants' motion on this ground should be granted.

### 3. Holanchuck, Perlman, LeClaire, Boll, and McKoy

Barrow has similarly failed to demonstrate the personal involvement of Holanchuck, Perlman, LeClaire, Boll, and McKoy. Barrow essentially argues that these defendants

had personal knowledge of the alleged constitutional violations because (1) he spoke with them about the lewd conduct program and/or its negative effect on him and (2) they held supervisory positions at Marcy yet failed to address his concerns. Specifically, Barrow argues that Holanchuck had personal knowledge of the alleged violations because Barrow "had many talks with Defendant about the violation of plaintiff['s] rights, all to no avail." *Id.* ¶ 71. In response, Holanchuck told him that the lewd conduct program "was being done in other states." *Id.* Barrow also indicates that Holanchuck, as Deputy Commissioner, "was aware of all actions and functions here at the RMHU," and, thus, responsible due to his supervisory position. *Id.*

Barrow contends that LeClaire knew of the alleged violations because "Plaintiff talked to him about the "outright shocking racist presentment of this Lewd Conduct Program." Second Am. Compl. ¶¶ 22, 60. However, Barrow's reference to a conversation with LeClaire wherein he expressed his belief that the lewd conduct program was implemented in a racially-discriminatory manner does not demonstrate that LeClaire was aware of the personal affect the program had on Barrow.

Barrow states that Perlman "knew at all times [about the] situation" as he spoke to Perlman of "the need of programs to gain parole" and, in response, Perlman told him that "he should program in spite of the Control suit." Second Am. Compl. at 59. Barrow also argues that he spoke with Boll "upon visiting the RMHU" and that, as Deputy Commissioner, she "was in [a] position to stop and had the duty to stop the violation of plaintiff['s] 14th and 8th Amendments [sic]" *Id.* ¶ 61. Barrow additionally alleges that he spoke with McKoy about the "exposer" sign, yet McKoy allowed the sign to remain. *Id.* ¶ 64.

Barrow's passing references to conversations he alleges to have had with Holanchuck, Perlman, LeClaire, Boll, and McKoy are insufficient to establish their personal involvement. Barrow fails to specify when he had such discussions with defendants. Further, Barrow's attempts to establish personal involvement based upon the supervisory role the defendants occupied must fail. *Wright,* 21 F.3d at 501.

Accordingly, defendants' motion on this ground should be granted.

### 4. Bellamy

Barrow argues that Bellamy, as Director of the Inmate Grievance Program, violated and was "in gross deliberate indifference to [his] 8th and 14th Amendments [sic]." Second Am. Compl. ¶ 63. He contends that defendant Bellamy was aware of these alleged violations because he "appealed many grievances" to her, which she affirmed. *Id.* Merely affirming the denial of a defendant's grievance is insufficient to establish personal involvement, without more. See *Thomas v. Calero,* 824 F.Supp.2d 488, 505–11 (S.D.N.Y.2011) (concluding that affirming *and modifying* the penalty imposed in an allegedly constitutionally infirm disciplinary proceeding can satisfy the second Colon factor). Moreover, insofar as Barrow appears to claim personal involvement based on defendant's status as a director, this does not establish that she was personally involved with the alleged Eigth Amendment violations. *Wright,* 21 F.3d at 501.

 *12 Accordingly, defendant's motion on this ground should be granted.

### 5. Lindquist

Barrow argues that Lindquist, due to his supervisory role as Assistant Commissioner, was aware of the Lewd Conduct Program and "the grave harm it was doing" to him. Second Am. Compl. ¶ 62. Inasmuch as Barrow suggests that Lindquist was aware of the alleged violations because of his supervisory position, as noted, attempts to establish personal involvement based upon the supervisory role defendant occupied is inappropriate. *Wright,* 21 F.3d at 501. Barrow further argues that the fourth *Colon* factor is implicated. He contends that Lindquist "was grossly negligent in that he did not adequately supervise the subordinates who violated Plaintiff['s] 14th and 8th Amendment [rights]." Second Am. Comp. ¶ 62. However, Barrow does not provide any support for his claim that Lindquist negligently supervised his subordinates. Such a conclusory reference to a *Colon* factor is insufficient to support a claim of personal involvement. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that the complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor]

acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights." (internal citations omitted)). Inasmuch as Barrow suggests that defendant was aware of the alleged violations because of his supervisory position, as noted, an attempt to establish personal involvement based upon the supervisory role defendant occupied is inappropriate. *Wright,* 21 F.3d at 501.

Accordingly, defendant's motion on this ground should be granted.

### C. Eleventh Amendment

Barrow brings all claims against all defendants in their official and individual capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473

U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Insofar as Barrow demands money damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCCS, these claims are barred by the Eleventh Amendment. *Id.* at 169.

**\*13** Accordingly, Barrow's claims for money damages pursuant to section 1983 against all defendants in their official capacities should be dismissed.

### D. First Amendment

Barrow argues that expressing his concern over the lewd conduct program, requesting prison transfers, and filing sexual harassment charges against staff members is protected speech, and defendants filed false misbehavior reports against him in retaliation for his exercise of this speech.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St. LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). However, a retaliation claim may survive a defendant's motion to dismiss if a plaintiff alleges facts tending to establish that "(1) the speech or conduct that led to the allegedly retaliatory conduct is the sort of speech or conduct that is protected by the Constitution; (2) defendant(s) took adverse action against the plaintiff; and (3) there is a causal connection between the protected speech or activity and the adverse action." *See Jones v. Harris,* 665 F.Supp.2d 384, 398 (S.D.N.Y.2009). Adverse action has been defined objectively as retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). Further, an inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). Thus, to the extent that a plaintiff seeks damages because "he was subjected to an accusation that turned out to not stand up under scrutiny," such would not be an actionable claim under

section 1983. *Jones v. Harris,* 665 F.Supp.2d 384, 400 (S.D.N.Y.2009).

Thus, Barrow fails to present a prima facie claim for a violation of his First Amendment rights.

First, it does not appear that Barrow's transfer requests were constitutionally-protected speech as an inmate has no constitutional right to be housed in a facility of his choosing. *See generally, McMahon v. Fischer,* 446 Fed. Appx. 354 (2d Cir.2011) ("A prisoner has no right to housing in a particular facility"). Although complaining about the lewd conduct program and filing good-faith sexual harassment charges are constitutionally-protected activities (*Carl v. Dirie,* No. 9:09–CV–724, 2010 WL 3338566 at *5 (N.D.N.Y. Mar.29, 2010) (quoting *United Mine Workers of Am., Dist. 12 v. Illinois Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) ("The Supreme Court has noted that the right to petition government for redress of grievances is 'among the most precious of the liberties safeguarded by the Bill of Rights' ")), Barrow's claim is wholly conclusory. He does not state which of the named defendants filed misbehavior reports against him, when most of these alleged misbehavior reports were filed, the temporal proximity between the constitutionally-protected behaviors and the misbehavior reports, the prison rule violations with which he was charged, or whether any action was taken as a result of the misbehavior reports filed against him. Second Am. Compl. ¶41; *cf. Shaheen v. McIntyre,* No. 9:05–CV–0173, 2007 WL 3274835 at *9 (N.D.N.Y. Nov.5, 2007) (plaintiff demonstrated adverse action was taken by contending misbehavior reports were filed against him in retaliation of his exercise of speech, resulting in several days of keeplock confinement); *see also Mateo v. Fischer,* 682 F.Supp.2d 423, 435 (S.D.N.Y.2010) (filing of misbehavior report one day after prisoner filed sexual harassment grievance against corrections officer was sufficiently close in time to support causation element in retaliation claim). Furthermore, because Barrow does not specify which charges were filed against him in the misbehavior reports, he fails to demonstrate that the issuance of misbehavior reports was causally connected to his protected speech rather than an actual violation of prison rules. [7] *See Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (When it is undisputed that an inmate committed the prohibited conduct, no retaliatory discipline claim can be sustained)).

*14 Although Barrow contends that, "[w]hen and if [he] gets his day in Court, records of inmates misbehavior reports can easily inform the Courts of any information it may need," his conclusory claims as presented in his complaint are insufficient to withstand a motion to dismiss. Reply, at 3; *DeLeon v. Wright,* No. 10–CV–863, 2012 WL 3264932, at *7 (N.D.N.Y. July 5, 2012) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone")).

Accordingly, defendants' motion on this ground should be granted.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. AMEND. VIII. The prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A viable Eighth Amendment claim is twofold; the plaintiff must demonstrate both objective and subjective components. The objective question asks whether the deprivation of which the inmate complains was sufficiently serious. *Farmer,* 511 U.S. at 834. This component "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. Thus, the prisoner must show that "the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). The subjective component requires the inmate to show that the defendant demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Farmer,* 511 U.S. at 834. [8] Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

The Supreme Court has held that "[p]rison administrators ... be accorded wide-ranging deference in

the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security ." *Whitley v. Albers,* 475 U.S. 312, 321–22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (internal quotation marks and citation omitted). However, although "the determination of what punishment is effective and fair considering the nature of the offense and the character of the offender ordinarily should be left to the informed judgment of prison authorities ... [d]isciplinary measures that violate civilized standards of human decency are proscribed." *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972).

### 1. Conditions of Confinement

**\*15** Addressing the objective component of the analysis, the alleged deprivation Barrow raises appears to raise is his denial of right to be free from humiliation, shaming, and verbal harassment from other inmates and staff. Barrow argues that he was subjected to cruel and unusual punishment because defendants forced him to wear the jumpsuit and have the exposer sign positioned above his cell door as a means to humiliate him and to perpetuate racism, rather than for genuine security concerns. Second Am. Compl. ¶¶ 34, 43, at 15. Barrow also contends that the jumpsuit makes him a target for verbal assaults and racially-fueled remarks from other inmates and staff. *Id.* at 15; Reply at 4. Barrow appears to argue that because the lock symbolizes oppression of African–Americans, being forced to wear it causes him grave harm, such as stress, reduced self-esteem, and "depression brought on top of [the] normal depression Plaintiff suffers from." Second Am. Compl. ¶ 40. Finally, Barrow states that the weight of the lock on the back of the jumpsuit requires him to continuously adjust the collar of the jumpsuit to "keep from being slowly choked." Reply at 1–2.

Barrow does not provide the names of any staff members who have verbally assaulted him while he was in the jumpsuit. Although Barrow states that defendants Bellnier and Hilton failed to intervene on one occasion where he was being harassed by inmates in their presence (Second Am. Compl. ¶ 32), there is no constitutional right to be free from verbal assault. *Lunney v. Brureton,* No. 04–Civ.–2438, 2005 WL 121720, at \*11 (S.D.N.Y. Jan.21, 2005) ("general allegations of threats and harassment are insufficient to state a claim because comments that are merely insulting or disrespectful do not give rise

to a constitutional violation") (internal citations and quotation marks omitted); *see also Cuoco v. Mortisugu,* 222 F.3d 99, 109 (2d Cir.2000). Thus, although infliction of mental anguish may sometimes rise to the level of cruel and unusual punishment (*see e.g. Hudson v. McMillian,* 503 U.S. 1, 16, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (Blackmun, J., concurring)), it appears that the racially-fueled harassment Barrow has faced from fellow inmates and some staff while wearing the jumpsuit—even if it impacts his depression and lowers his self-esteem—does not amount to a disregard of an "excessive risk" to his safety and health. *Farmer,* 511 U.S. at 837; *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012).

Further, the physical discomfort of the lock pulling on the collar of the jumpsuit appears to be little more than an annoyance that is easily alleviated by adjusting the collar. There is no evidence that the padlock poses an excessive risk of serious injury. A *de minimus* discomfort is not a violation of an inmate's Eighth Amendment rights. *See e.g. Kearney v. N.Y.S. D.O.C.S.,* No. 9:11–CV–1281, 2013 WL 5437372, at \*12–13 (N.D.N.Y. Sept.27, 2013) (a long walk to recreational yard, which caused discomfort for mobility-impaired inmate, along with bathroom facilities that required the plaintiff to lean in uncomfortable manner while using them, were not sufficient to rise to Eighth Amendment violations).

**\*16** Accordingly, defendants' motion to dismiss on this ground should be granted.

### 2. Medical Indifference

Next, Barrow appears to contend that he was denied access to adequate medical care because (1) he was denied treatment for exhibitionism, (2) Dr. Farago refused to provide him with treatment for depression, (3) he was refused his depression medication, and (4) he was unable to attend medical appointments for a foot condition.

The Eighth Amendment extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117

L.Ed.2d 156 (1992)). What constitutes a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain. *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185. In claims for inadequate medical care, to satisfy the subjective component, the plaintiff must prove that defendant acted with deliberate indifference. Deliberate indifference requires the plaintiff "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703.

### a. Denial of treatment for Exhibitionism

Barrow contends that, despite the fact that most of the misbehavior reports filed against him are for exhibitionism, defendants have "refused to treat Plaintiff for the disorder." Second Am. Comp. ¶ 67. Assuming Barrow can establish that he suffers from exhibitionism, he must demonstrate that "a reasonable doctor or patient would find it important and worthy of comment," that the condition significantly affects his daily activities, or the condition causes him chronic and substantial pain. *Chance,* 143 F.3d at 702 (internal quotation marks and brackets omitted). Although Barrow alleges that being made to wear the jumpsuit significantly impacts his daily activities, he does not demonstrate that the condition of exhibitionism itself significantly affects his daily activities or causes him chronic and substantial pain. *Id.* Although Barrow suggests that exhibitionism is "a living hell," he alleges that he was able to attend medical appointments without having any incidents of exposure; does not display exhibitionist tendencies toward males, and notes that there are often no females near him; and that he functions in the prison community

for months at a time without lewd conduct infractions. Second Am. Compl. ¶¶ 34, 41–42; Dkt. No. 50, at 17; *Id.* at 25. Moreover, Barrow does not contend what harm, if any, the alleged inadequacy in treatment has caused or will likely cause him, beyond noting that a lack of programming has negatively impacted his parole date.[9] *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (in determining whether a condition is sufficiently serious, a court is to examine how the omission in medical treatment has caused, or will likely cause, harm to inmate).

**\*17** Even assuming exhibitionism is a sufficiently serious medical condition, Barrow fails to demonstrate that defendants acted with deliberate indifference to his exhibitionism. Although Barrow contends that he was intentionally denied programming and treatment for exhibitionism, as he was only offered sex offender programming, he did not demonstrate that the programming offered had no relevance to his alleged conditions. Further, insofar as could be discerned, at some point, defendant Farago attempted to discuss the jumpsuit and lewd conduct program with Barrow, but Barrow refused to discuss it. *Id.* ¶ 47. Disagreement over the appropriate programming is an insufficient basis for a section 1983 claim, so long as the treatment offered is adequate. *Chance,* 143 F.3d 698 at 703. Moreover, to the extent that Barrow contends that he was denied access to all programming at Marcy, Barrow refused to leave his cell because of the jumpsuit. Second Am. Compl. ¶ 39, 42. Thus, any denial of programming was a direct result of his refusal to leave his cell.

Accordingly, defendants motion, insofar as it seeks to dismiss the claim of medical indifference to Barrow's exhibitionism should be granted.

### b. Denial of treatment for depression

Barrow also contends that he was denied treatment for depression in violation of the Eighth Amendment. Little case law exists discussing whether depression is a sufficiently serious medical condition for Eighth Amendment purposes; however, it appears that mental disorders are considered serious medical needs. *See generally Zimmerman v. Burge,* No. 06–CV–80, 2009 WL 9054936, at *6 (N.D.N.Y. Apr. 20, 2009), "treatment of mental disorders of mentally disturbed inmates is ... a serious medical need"; *Hamilton v. Smith,* No. 06–

CV–805, 2009 WL 3199531, at *14 (N.D.N .Y. Jan. 13, 2009) (same). Although Barrow provides little insight into the severity of his depression and how it impacts his daily activities, he contends that he received treatment and was medicated to alleviate these mental health symptoms for fifteen years. Second Am. Compl. ¶ 47. Taking these allegations as true, Barrow has alleged a sufficiently serious medical need as it necessitated medical and pharmacological intervention for a sustained and continuous period of time. Such a condition was clearly "perceived by a reasonable physician as important and worthy of comment ...." *Randle v. Alexander,* 940 F. Supp 2d 457, 481 (S.D.N.Y.2013) (internal quotation marks and citation omitted). Thus, Barrow has satisfied the first prong of the Eighth Amendment analysis.

Next, Barrow must demonstrate defendants' deliberate indifference to his depression. Barrow states that he was denied therapy because defendant Farago pretended to treat him cell-side. Farago would "come to [Barrow's] cell, wait for [him] to get up to come to the gate and then walk away." Second Am. Compl. ¶¶ 50–51. Further, Barrow states that Farago "changed" his diagnosis of Major Depressive disorder and Anti-social disorder to poly-substance abuse, despite having only three positive urinalysis tests for cannabis in the past 15 years. *Id.* at 46. Farago also stopped providing Barrow's depression medication, which he had been taking for over 15 years. *Id.* ¶ 46. When Barrow "begged" for his medication, Farago would make "comical faces" at him while facing away from the camera. *Id.* ¶ 52. Assuming Barrow has a current diagnosis of depression and that the allegations against Farago are true, a complete denial of therapy and sudden cessation of medication that he had been taking for fifteen years could pose a risk of serious harm to his mental well-being. *Brock,* 315 F.3d at 162–63.

**\*18** Accordingly, defendants' motion to dismiss the medical indifference claim relating to the denial of treatment for depression, should be denied.

### 3. Denial of treatment for foot arches

Insofar as Barrow argues that defendants denied his access to medical treatment for his foot arches, this claim must fail. Even assuming Barrow's need for use of a shoe lift is a serious medical condition, Barrow was not denied medical treatment for his foot condition due to defendants'

deliberate indifference to the condition, but for his choice to remain in his cell, rather than attend his appointment in the jumpsuit. *See generally Hardy v. Diaz,* No. 9:08–CV–1352, 2010 WL 1633379, at *6 n. 12 (N.D.N.Y. Mar.30, 2010) (noting that skipping medical appointments and failing to comply with treatment directions can undermine an Eighth Amendment medical indifference claim).

Accordingly, any claim against defendants for a denial of treatment for Barrow's foot condition should be dismissed.

### F. Fourteenth Amendment

#### 1. Procedural Due Process Claim

Barrow argues that he was denied procedural due process because he was required to wear the jumpsuit after a lewd conduct misbehavior report was filed against him, but before a disciplinary hearing was held. Insofar as can be ascertained from his complaint, although a disciplinary hearing was held on at least one of the misbehavior reports, the lewd conduct program was never discussed as a part of his punishment. Second Am. Comp. ¶ 30.

To prevail on a procedural due process claim, "a plaintiff must demonstrate that he possessed a protected liberty or property interest, and that he was deprived of that interest without due process." *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). However, the Supreme Court has held that such liberty interests protected by the Fourteenth Amendment "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Marino v. Klages,* 973 F.Supp. 275 (N.D.N.Y.1997).

Here, Barrow fails to demonstrate that he was deprived of a cognizable liberty interest. Although Barrow states that he was held in his cell for a collective period of at least three months, he concedes that he independently made the conscious decision to refuse to leave his cell even though defendants permitted him to leave his cell in the jumpsuit. Barrow does not allege that he was otherwise restrained while wearing the jumpsuit. Similarly, defendants did not prevent him from attending programs while he was wearing the jumpsuit. In his grievance, which is

incorporated by reference, Barrow states that he was offered the option of being "bonded to the restart chair, in 4 points" as an alternative to attending programming in the jumpsuit; however, he rejected this option as a "baric [sic] medieval form of bondage and sadism." Dkt. No. 50, at 25. Any lack of access to programming or services was self-imposed. [10] Thus, although Barrow was embarrassed by the jumpsuit and faced verbal harassment when he wore it, defendants were not physically restraining or otherwise limiting Barrow's movement. Therefore, Barrow failed to demonstrate that the jumpsuit imposed an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin,* 585 U.S. at 484.

**\*19** Additionally, although Barrow may not have been granted a hearing before the imposition of the lewd conduct program, it appears that the jumpsuit and sign were implemented as a necessary security measure. Here, defendants are charged with the responsibility of ensuring the safety of the prison staff, personnel, visitors, and inmates. "A prison regulation that inadvertently impinges on prisoners' constitutional rights is valid " 'if it is reasonably related to legitimate penological interests,' such as 'deterrence of crime, rehabilitation of prisoners, and institutional security' " *Davis v. City of New York,* 142 F.Supp.2d 461, 463 (S.D.N.Y.2001) (quoting *Turner v. Safley,* 482 U.S. 78, 79, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). Because the jumpsuit and sign serve to prevent inmates with a history of exposure and public masturbation from committing such acts, and Barrow has an extensive history of such conduct, Barrow fails to create an issue of fact as to whether defendants were deliberately indifferent to a serious risk of harm when requiring his participation in the lewd conduct program. *Whitley,* 475 U.S. at 319. Barrow admitted that he has exposed himself repeatedly, and that this is a "compulsive [sic] habit." Dkt. No. 50, at 25. Thus, even assuming that Barrow had a protected liberty interest, legitimate security concerns outweigh this interest. *Id.; Turner,* 482 U.S. at 79.

Accordingly, defendants motion to dismiss the complaint on these grounds should be granted.

## 2. Right to Privacy

Finally, Barrow argues that defendants violated his right to privacy. The basis for Barrow's claim on this ground is that the jumpsuit and sign expose his medical condition to other inmates, visitors, and prison personnel. It is not clear whether he raises this claim under the Eighth or Fourteenth Amendment. Second Am. Compl. ¶ 33; Reply, at 4. Generally, the right to privacy is based on the "Fourteenth Amendment's concept of personal liberty and restrictions upon state action," (*Whalen v. Roe,* 429 U.S. 586, 598 n. 23 (1977); *Nolley v. County of Erie,* 776 F.Supp. 715, 729 (W.D.N.Y.1991)); however, claims relating to the disclosure of confidential medical information have also been reviewed under the Eighth Amendment. [11] *See generally Rodriguez v. Ames,* 287 F.Supp.2d 213, 218–21 (S.D.N.Y.2003). The Supreme Court has recognized "that there exists in the United States Constitution a right to privacy protecting 'the individual interest in avoiding disclosure of personal matters,' " including " 'the right to protection regarding information about the state of one's health.' " *Powell v. Schriver,* 175 F.3d 107, 111 (2d Cir.1999) (quoting *Whalen,* 429 U.S. at 599). An inmate may prove a constitutional entitlement to protection from needless disclosure of a private medical condition if he demonstrates that (1) he suffers from an unusual or sensitive medical condition; and (2) if such condition were disclosed unnecessarily, he could be subjected to discrimination, intolerance, or violence. *Id.* at 111. The interest an inmate has in the privacy of his or her medical condition varies, depending on the condition. *Williams v. Perlman,* No. 9:06–CV–00936, 2009 WL 1652193, at \*10–11 (N.D.N.Y. Feb.5, 2009) (citing *Rodriguez,* 287 F.Supp.2d at 229 (holding no qualified right to privacy in inmate's psychiatric condition and treatment)). Although disclosure of such a medical condition may, in some circumstances, be viewed as reasonably related to legitimate penological concerns, gratuitous disclosure may be a violation of privacy. *Id.* at 111–12 (discussing that disclosure of private medical condition for purpose of humor and gossip serves no legitimate penological interest and violates inmate's constitutional right to privacy).

### a. Fourteenth Amendment Right to Privacy

**\*20** Here, assuming Barrow can prove that he has been diagnosed with exhibitionism, he fails to demonstrate that exhibitionism is a condition on-par with HIV or transsexualism—conditions that other courts have found sufficient to trigger a constitutional right to privacy. *Compare Powell,* 175 F.2d at 112–13 (transsexualism protected); *Doe v. City of New York,* 15 F.3d 264,

266–67 (2d Cir.1994) (HIV-positive status protected); *Fleming v. State Univ. of New York,* 502 F.Supp.2d 324, 343 (E.D.N.Y.2007) (sickle cell amenia protected), *with Hamilton v. Smith,* No. 9:06–CV–805, 2009 WL 3199531, at *15 (N.D.N.Y. Jan.13, 2009), *adopted as modified by* 2009 WL 3199520 (N.D.N.Y. Sept.30, 2009) (Hepatitis A not protected), *and Wilson v. Brock,* No. 9:06–CV– 528, 2008 WL 4239564, at *5 (participation in drug or alcohol rehabilitation not protected). Further, Barrow has not plausibly demonstrated that the prison community's knowledge of this condition could lead to discrimination, intolerance, or violence. *Powell,* 175 F.3d at 111. Although Barrow contends that he has suffered discrimination, harassment, and intolerance from fellow inmates, as noted, his complaint attributes this disparate treatment to the racist sentiment that the lock on the jumpsuit triggers, not the condition of exhibitionism itself. Second Am. Compl. at 15. Thus, although exhibitionism could arguably be considered sensitive medical information due to the nature of the condition, because Barrow has not demonstrated that he faced or would likely face harm as a direct result of public knowledge of his alleged condition, he has failed to plausibly argue that defendants violated a constitutional right by revealing this condition to others through use of the lewd conduct program. *Cf. Powell,* 175 F.3d at 112 (disclosure of inmate's status as transsexual and HIV positive could place inmate at risk "especially given that, in the sexually charged atmosphere of most prison settings, such disclosure might lead to inmate-on-inmate violence.").

Additionally, although the lewd conduct program reveals to the prison community the fact that the Barrow exposes himself, Barrow does not demonstrate that the program is needless. Defendants have demonstrated that there are significant penological interests in the sign and jumpsuit —to prevent Barrow from exposing himself and to warn others of his proclivity to do so, which, as Barrow stated, is a compulsive behavior. Dkt. No. 50, at 25. When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if reasonably related to legitimate penological interests. *Turner,* 482 at 89. *Turner* identified four factors to consider in making this determination:

> First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it .... Moreover, the governmental interest must be a

legitimate and neutral one .... A second factor ... is whether there are alternative means of exercising the right that remain open to prison inmates .... A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally .... Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation .... By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable ....

**\*21** 482 U.S. at 89–90 (quoting *Block,* 468 U.S. at 586).

Under the *Turner* analyis, it is clear that there is a valid and logical connection between mandating that offending inmates wear the jumpsuit—the inhibition and prevention of an inmate's ability to expose himself—and the prison's interest in maintaining institutional safety and security— preventing offending inmates from engaging in hostile, harassing, or sexually abusive behaviors in the prison community. *Id.* Next, there does not appear to be a less restrictive alternative to the jumpsuit. Absent the jumpsuit, in order to control compulsive acts of exposure and public masturbation, prisons would presumably have to resort to segregation or isolation of these inmates. *Id.* Segregation and isolation is not preferable to the lewd conduct program, which allows inmates to remain a part of the general prison population. In addition, the lewd conduct program as a *de minimus* impact on participating inmates. Although there exists a relatively minor discomfort for inmates, as discussed *supra,* the inmates are not restricted in their movement. Further, this ability to manage the conduct of inmates who demonstrate exhibitionist behavior, prison guards and other inmates would remain at risk of being subjected to this sexual misconduct. *Id.* Thus, for the reasons previously discussed, because the lewd conduct program is reasonable and there are no less restrictive "ready alternatives," the lewd conduct program is valid. *Id.* at 90.

Accordingly, defendants' motion to dismiss under the due process clause of the Fourteenth Amendment should be granted.

**b. Eighth Amendment Right to Privacy**

Barrow also appears to argue that he was denied his right to privacy of his exhibitionism under the Eighth Amendment. As noted, it does not appear that Barrow's claim of exhibitionism demonstrates a sufficiently serious medical need. However, even if this condition constituted a serious medical need, the disclosure of the fact that Barrow exposes himself does not constitute deliberate indifference. As these measures were put in place to restrict Barrow's ability to expose himself and warn and protect others from being victimized this conduct, the lewd conduct program was limited enough in scope and purpose. *See generally Hamilton,* 2009 WL 3199531, at *15 (disclosure of medical condition was not deliberate indifference where disclosures were limited in scope and purpose and were necessary to investigate a grievance).

Accordingly, defendants motion to dismiss should be granted on this ground.

**2. Equal Protection**

Barrow argues that he was denied equal protection because (1) inmates who have smuggled in drugs or weapons in their groin did not have to wear the jumpsuit, (2) inmates who kick or spit on staff are not made to wear relevant restrictive devices, and (3) a disproportionate number of minorities were made to participate in the lewd conduct program.

**\*22** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Barrow fails to demonstrate that similarly-situated inmates are treated differently. Despite Barrow's contention, inmates who have smuggled in drugs or weapons in their groin-area are not similarly situated to Barrow. Similarly, inmates who spit on or kick staff are also not similarly situated to him. Although inmates who smuggle in contraband by concealing it in their groin may pose a security risk, this risk differs from that presented by an inmate who compulsively exposes his genitals to staff, visitors, and other inmates. As such, those inmates do not necessarily require the same security measures to be taken. Because Barrow does not argue that other inmates who

have exposed themselves were excused from participation in the lewd conduct program, he has failed to state a claim for an equal protection violation. *See Id.*

Finally, Barrow fails to plausibly argue that the lewd conduct program is intentionally made up of a disproportionate number of minorities. Reading the facts in the light most favorable to him, Barrow presents no evidence to support his argument that racial minorities who have exposed themselves are being treated differently from Caucasian or other inmates who have committed the same lewd conduct infractions. *See Id.* at 129 (2d Cir.2005) ("[t]o prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional discrimination").

Accordingly, defendants' motion to dismiss on this ground should be granted.

**G. Americans with Disabilities Act and Rehabilitation Act**

Barrow argues that defendants violated the ADA and RA because the lewd conduct program improperly exposes his medical condition—exhibitionism—to members of the prison community. Second Am. Compl. ¶ 33. He contends that the lack of confidentiality regarding his exhibitionism has resulted in "scorn and ridicule and verbal assaults of all kind [sic]." *Id.* It appears that Barrow contends that the denial of programming or treatment for his exhibitionism also violates the ADA and RA.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of ... a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under Title II of the ADA, an inmate must demonstrate that:

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity

**\*23** *Byng v. Campbell,* No. 907–CV–471, 2010 WL 681374, at \* 17 (quoting *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995)); 42 U.S.C. § 12132. Similarly, the RA applies to any "qualified individual with a disability" and protects that individual from being "excluded from the participation in, ... [or] denied the benefits of," any federally-funded program "solely by reason of his or her disability ...." 29 U.S.C. § 794(a); *see also Clarkson,* 898 F.Supp. at 1037–38 ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act").

For multiple reasons, Barrow fails to plausibly state a claim. First, Barrow cannot satisfy the first prong of the analysis. Barrow contends that his disability is exhibitionism; however, Barrow presents no evidence that his exhibitionism is anything other than self-diagnosed. The complaint provides that his diagnosed conditions were major depressive disorder, anti-social disorder, and poly-substance abuse. Second Am. Compl. ¶ 46. Moreover, exhibitionism is specifically excluded from consideration as a disability under the ADA. 42 USC § 12211(b)(1). Thus, Barrow is not a qualified individual with a disability.

Further, Barrow does not establish the second prong— he does not allege that he was excluded from a service or program at Marcy due to his alleged exhibitionism or any of his diagnosed conditions. *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 443 (S.D.N.Y.2003). As noted, Barrow states that he was not denied access to programming and medical trips because of lewd conduct, but because he refused to leave his cell while wearing the jumpsuit. Second Amend. Compl. ¶ 39. [12] Barrow's choice not to participate in the programming and services made available to him cannot now be transformed into unlawful acts by defendants serving as a basis for liability.

Accordingly, defendants' motion to dismiss on these grounds should be granted.

### III. Conclusion

**WHEREFORE,** based on the findings set forth above, it is hereby:

1. **RECOMMENDED,** that Defendants' motion to dismiss for failure to state a cause of action (Dkt. No 67) be **GRANTED** as to plaintiff's:

a. First Amendment claims;

b. Eighth Amendment claim insofar as it alleged inadequate prison conditions;

c. Eighth Amendment claim insofar as it alleged inadequate treatment and deliberate indifference to plaintiff's exhibitionism and foot condition;

d. Fourteenth Amendment claims;

e. ADA claim;

f. RA claim; and

g. 11th Amendment claim;

2. Further **RECOMMENDED** that Defendants' motion to dismiss for failure to state a cause of action (Dkt. No. 7) be **DENIED** as to plaintiff's:

a. Eighth Amendment deliberate indifference claim, regarding the condition of depression;

3. Further **RECOMMENDED,** that Defendants' motion to dismiss for lack of subject matter jurisdiction (Dkt. No. 67) be dismissed as no arguments were made in support of this motion.

**\*24** **ORDERED,** that copies of this Report–Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**SO ORDERED.**

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Dated: September 25, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 417084

Footnotes

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   Barrow also alleges that his rights were violated under the Patients' Bill of Rights. Second Am. Compl. ¶ 33. However, a violation of state law does not implicate a federal right for purposes of a section 1983 action. *Hanrahan v. Menon*, No. 07–CV–610, 2010 WL 6427650, at *13 (N.D.N.Y. Dec.15, 2010) (citations omitted) (finding claim of a violation under the Patients' Bill of Rights is not cognizable in a section 1983 action).

3   To the extent that it can be inferred that Barrow asserts a violation of the physician-patient privilege, such a claim cannot be sustained. Because Barrow commenced this case as a section 1983 action, federal law applies. As federal law does not recognize the physician-patient privilege, this claim would also fail. *Barnes v. Glennon*, 9:05–CV–0153, 2006 WL 2811821, at *4–*5 (N.D.N.Y. Sept.28, 2006).

4   Barrow does not specify which defendants have personal knowledge of each alleged constitutional violations. It appears that Barrow intends to argue that each defendant had personal knowledge of each alleged constitutional violation (*see* Second Am. Compl. at 15 ("All defendants mentioned in these papers ... has [sic] caused Plaintiff ... to be deprived of the 14th and 8th amendment rights secured by the U.S.A. [C]onstitution. Also, the A.D.A. [t]itle II and section 504 of the Rehabilitation Act")). Where Barrow does not identify which defendants he brings each cause of action against, unless otherwise indicated, this report assumes that Barrow is alleging personal involvement of each constitutional violation upon each defendant.

5   All unpublished decisions are attached to this Report and Recommendation.

6   Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision has affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo*, 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella*, 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal's* impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.*, 743 F.Supp.2d 175, 182 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ...."); *D'Olimpio v. Crisafi*, 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

7   Indeed, Barrow concedes that he has had incidents of exposure while incarcerated. Dkt. No. 50, at 18.

8   The United States Supreme Court has held that "[w]hether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, cruel and unusual punishment to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle [v. Gamble]." Wilson v. Seiter*, 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

9   Barrow did not include a claim regarding any of his parole concerns in the instant complaint. Even if he had, such claims should be dismissed. The Supreme Court has held that

> while there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence, a state's authority scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest.

*Robles v. Dennison*, 745 F.Supp.2d 244, 263 (W.D.N.Y.2010) (citing *Greenholtz v. Inmates of the Nebraska Penal and Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1987); *Board of Pardons v. Allen*, 482 U.S. 369, 371, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987)). The Second Circuit has determined that because New York's parole scheme delegates discretion to the Parole Board in granting an inmate parole, that scheme does not create a due process liberty interest in parole. *Barna v. Travis*, 239 F.3d 169, 170–71 (2d Cir.2001) (citing *Greenholtz*, 442 U.S. at 11–13). Because Barrow cannot allege that he has a liberty interest in his parole, to the extent that he has attempted to, he has failed to state a due process claim.

10  Insofar as Barrow complains that his failure to attend programming negatively impacted his parole date, as noted (*supra* n. 8), even if this statement were sufficient to raise a denial of a liberty interest claim, such claim must fail, as there is no due process interest in parole. *See Barna*, 239 F.3d at 170–71.

2015 WL 417084

11   To avoid repetition or confusion, to the extent Barrow may raise privacy claims under both the Eighth and Fourteenth
Amendment, they will both be discussed in this section of the Report.

12   Even assuming Barrow alleged sufficient facts to state a claim under the ADA or RA, the individual defendants cannot
be held liable for a violation of the ADA or RA. *See Lee v. City of Syracuse,* 603 F.Supp.2d 417, 448 (N.D.N.Y.2009).

---

**End of Document**                                          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

🔖 KeyCite Yellow Flag - Negative Treatment
Distinguished by Smith v. Hayman, D.N.J., March 30, 2012

152 Fed.Appx. 34
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Carnell HUNNICUTT, Plaintiff-Appellant,
v.
John J. ARMSTRONG, Larry Myers, Thomas
Coates, Christine Whidden, Michael Lajoie,
William Faneuff, Maurice Butler, Kim Weir,
Patricia Wollenhaupt, Saundra Katz Feinberg, Paul
Chaplin, Tom Latier, Irene Wooven, Kevin Power,
Peter Matos, Jack Tokarz, Defendants-Appellees.

Docket No. 04-1565-PR.
|
Oct. 13, 2005.

**Synopsis**
**Background:** State inmate filed action against prison
officials alleging various civil rights violations. The United
States District Court for the District of Connecticut, 305
F.Supp.2d 175, Peter C. Dorsey, J., granted state's motion
to dismiss, and inmate appealed as to some defendants.

**Holding:** The Court of Appeals held that inmate
adequately alleged constitutional and state law right to
privacy claims, based on the public discussion of his
mental health issues.

Affirmed in part, reversed in part, and remanded.

West Headnotes (1)

[1]     **Civil Rights**
        👉 Prisons and Jails;Probation and Parole
        State inmate adequately alleged constitutional
        and state law right to privacy claims in
        his civil rights complaint, based on the
        public discussion of his mental health issues,

even through he did not identify the Ninth
Amendment or any other amendment as the
source of his claim. U.S.C.A. Const.Amend.
9; Fed.Rules Civ.Proc.Rule 8, 28 U.S.C.A.

9 Cases that cite this headnote

**\*35** Upon Due Consideration, it is Hereby Ordered,
Adjudged and Decreed that the judgment of the United
States District Court for the District of Connecticut
(Dorsey, J.) is Affirmed in part, and Vacated and
Remanded in part.

**Attorneys and Law Firms**

Carnell Hunnicutt, Cheshire, CT, for Appellant.

Ann E. Lynch, Assistant Attorney General, (Richard
Blumenthal, Attorney General of Connecticut), Hartford,
Ct, for Appellees.

Present: NEWMAN, SOTOMAYOR, Circuit Judges,
and DANIELS, District Judge. *

**SUMMARY ORDER**

**\*\*1** Plaintiff-appellant Carnell Hunnicutt
("Hunnicutt"), *pro se,* appeals from the judgment
dismissing his civil rights action for, *inter alia,* failing
to comply with Rule 8 of the Federal Rules of Civil
Procedure. We assume the parties' familiarity with the
facts of the case, its relevant procedural history, and the
issues on appeal.

We find that Hunnicutt adequately alleged a right to
privacy claim, even through he did not identify the
Ninth Amendment or any other amendment as the source
of his claim. In faulting Hunnicutt for not citing the
Ninth Amendment, the District Court demanded far
more than the "short and plain statement of the claim"
required by Rule 8. We have held that the liberal pleading
requirements of Rule 8 do not permit dismissal for "
'failure in a complaint to cite a statute, or to cite the correct
one ....,' " *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d
41, 46 (2d Cir.1997) (quoting *Albert v. Carovano,* 851 F.2d
561, 571 n. 3 (2d Cir.1988) (*in banc*)). " 'Factual allegations
alone are what matters.' " *Id.*

Although Hunnicutt's amended complaint is not a model of brevity or clarity, it nevertheless achieved the goal of fair notice. *See Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d Cir.1995). A paragraph of the amended complaint, entitled "Fraudulent Mental Health Services/ Non-Existant [sic] Psychological Evaluations," alleged that the defendants "discussed the plaintiff['s] private/ personal mental health issues on the tier outside of the plaintiff [ ] and in front of other prisoners and D.O.C. employees violating psychiatrist/psychologist-patient privileged communications." In the section of the amended complaint identifying the defendants, Hunnicutt asserted that Irene Wooven and Kevin Power "violated psychiatrist/patient privileged communication by discussing the plaintiff['s] mental health issues on the tier in the presence of other prisoners," and Paul Chaplin "routinely talked to the plaintiff[ ] on the tier while violating psychiatrist/psychologist-patient communications." In his claims for relief, Hunnicutt alleged that defendants "Chaplain-Latier-Wooven and Powers ... allow[ed] non-health staff access to [prisoners'] confidential health records," albeit identifying this as a violation **\*36** of the 8th Amendment. In light of these allegations, the amended complaint gave adequate notice of a right to privacy claim based on the public discussion of Hunnicutt's mental health issues. Indeed, in dismissing the amended complaint, the district court itself noted Hunnicutt's allegation that "[a]ny meeting with mental health staff was conducted on the tier within hearing of other inmates." The district court even found that "Hunnicutt alleges that the defendants violated his Eighth Amendment right to psychiatrist-patient confidentiality."

**\*\*2** For the reason discussed, we VACATE the judgment, in part, as it relates to the dismissal of the constitutional privacy claim concerning the defendants' discussion of the plaintiff's private/personal mental health issues in front of other prisoners and D.O.C. employees, as well as the state law claim involving the right to psychiatrist/psychologist-patient confidentiality, and REMAND for further proceedings. *See Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002) (reinstating and remanding a state law claim with a federal claim where the state law claim "form[s] part of the same case or controversy"). We express no view on whether other grounds exist to dismiss the complaint once it is amended. *See Scutti Enters., LLC v. Park Place Entm't Corp.,* 322 F.3d 211, 215 (2d Cir.2003) (noting that more extensive pleading of facts is not required under Rule 8 because the federal rules " 'provide other devices besides pleadings that ... serve to define the facts and issues' ") (quoting 2 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 8.04[1] (3d ed.1999) (citation omitted)). On appeal, Hunnicutt challenges only the dismissal of his right to privacy claim against defendants-appellees Tom Latier, Wooven, Power, and Chaplin, and consequently we deem his other claims abandoned and, to that extent, AFFIRM the judgment. *See LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995).

**All Citations**

152 Fed.Appx. 34, 2005 WL 2573525

Footnotes

\*      The Honorable George B. Daniels, of the United States District Court for the Southern District of New York, sitting by designation.

**End of Document**                © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 62512
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Rogelio Medina, Plaintiff,
v.
Shirly Watson, Defendant.

CASE NO. 3:16-cv-2061 (VAB)
|
Signed 01/05/2017

**Attorneys and Law Firms**

Rogelio Medina, Newtown, CT, pro se.


**INIITAL REVIEW ORDER**

Victor A. Bolden, United States District Judge

**\*1** Plaintiff, Rogelio Medina, currently incarcerated at the Garner Correctional Center, filed this Complaint *pro se* under 42 U.S.C. § 1983. Mr. Medina's Complaint was received on December 15, 2016, and his motion to proceed *in forma pauperis* was granted on December 22, 2016. The Defendant is Shirly Watson, Mr. Medina's Social Worker. Mr. Medina alleges that Ms. Watson violated his Ninth Amendment right to privacy by disclosing his mental health diagnosis to custodial staff. He seeks damages from the Defendant in her individual capacity.


**I. Standard of Review**

Under section 1915A of title 28 of the United States Code, the Court must review prisoner civil complaints and dismiss any portion of the complaint that is "frivolous or malicious, that fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A. In reviewing a *pro se* complaint, the Court must assume the truth of the allegations, and interpret them liberally to "raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013); *see also Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for pro se litigants).

Although detailed allegations are not required, the Complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.


**II. Allegations**

On August 23, 2016, Mr. Medina was walking about the tier during the recreation period. Compl., ECF No. 1, 1. He allegedly overheard the defendants speaking with Correctional Officer Judkins. *Id.* Ms. Watson allegedly told Officer Judkins that Mr. Medina suffers from borderline personality disorder and is constantly paranoid. *Id.* at 2. Mr. Medina allegedly never gave the Defendant permission to discuss his diagnosis with custodial staff. *Id.* at 3.

Other inmates allegedly overheard the conversation as well. Compl., 4. They allegedly knew who was being discussed because Ms. Watson allegedly referred to him as Medina and there are no other inmates named Medina in the cell block. *Id.* After the conversation, other inmates allegedly have made Mr. Medina paranoid by making him think they are after him. *Id.* at 5. The other inmates allegedly "call [Mr. Medina] retard slow dumb and say kill yourself." *Id.* The harassment allegedly has affected Mr. Medina mentally and emotionally because he also suffers from depression. *Id.* at 6.


**III. Discussion**

The Second Circuit has recognized a constitutional right to "maintain the confidentiality of previously undisclosed medical information." *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999). Accordingly, prison officials can only disclose medical information to the extent that disclosure relates to a "legitimate penological interest." *Id.* "The gratuitous disclosure of an inmate's confidential medical information as humor or gossip ... is not reasonably related to a legitimate penological interest," and therefore "violates the inmate's constitutional right to privacy." *Id.*

**\*2** The degree of protection afforded to an inmate's right to confidentiality regarding a medical condition varies with the "sensitive" nature of the condition.

2017 WL 62512

*Powell*, 175 F.3d at 111. To state a claim for violation of this right, Mr. Medina must show that he suffers from an unusual or sensitive medical condition that, if disclosed, would expose him to ridicule, discrimination or even violence, particularly when the word of the condition is likely to spread through "humor or gossip[.]" *Id.* at 112; *see also Rodriguez v. Ames*, 287 F. Supp. 2d 213, 220 (W.D.N.Y. 2003) (dismissing case because plaintiff did not have an "unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence"); *Webb v. Goldstein*, 117 F. Supp. 2d 289, 298-99 (E.D.N.Y. 2000) (dismissing a Fourteenth Amendment claim because the prisoner "has not alleged that his prison records contained the sort of sensitive medical information at issue in ... *Powell*").

Mr. Medina alleges that Ms. Watson improperly disclosed information about his mental health. The Second Circuit has held that an allegation of public disclosure of mental health issues is sufficient to state a privacy claim. *Hunnicutt v. Armstrong*, 152 Fed.Appx. 34, 35-36 (2d Cir. 2005) (reversing dismissal because plaintiff's allegations that the defendants "discussed [his] private/ personal mental health issues on the tier" and "in front of other prisoners and D.O.C. employees" gave "adequate notice of a right to privacy claim based on the public discussion of [plaintiff's] mental health issues").

Accordingly, Mr. Medina's claim will proceed forward at this time.

### ORDERS

In accordance with the foregoing analysis, the court enters the following orders:

(1) **The Clerk shall** verify the current work address for defendant Watson with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet to her at the confirmed address within **twenty-one (21) days** of this Order, and report to the court on the status of the waiver request on the thirty-fifth (35) day after mailing. If the defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on the defendant in her individual capacity and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(2) **The Clerk shall** send written notice to plaintiff of the status of this action, along with a copy of this Order.

(3) **The Clerk shall** send a courtesy copy of the Complaint and this Ruling and Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(4) Defendant shall file her response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver form is sent. If she chooses to file an answer, she shall admit or deny the allegations and respond to the cognizable claim recited above. She also may include any and all additional defenses permitted by the Federal Rules.

(5) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this order. Discovery requests need not be filed with the court.

(6) All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this order.

(7) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(8) If Mr. Medina changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court. Failure to do so can result in the dismissal of this case. Mr. Medina must give notice of a new address even if he is incarcerated. Mr. Medina should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Mr. Medina has more than one pending case, he should indicate all of the case numbers in the notification of change of address. Mr. Medina should also notify the defendant or the attorney for the defendant of his new address.

**\*3** (9) Mr. Medina shall utilize the Prisoner E-filing Program when filing documents with the court.

**SO ORDERED** at Bridgeport, Connecticut, this 5th day of January 2017.

**All Citations**

Slip Copy, 2017 WL 62512

---

2016 WL 4435081
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Dashante Scott Jones, Plaintiff,
v.
Scarlett Forbes, et al., Defendants.

Case No. 3:16cv14 (VAB)
|
Signed 08/19/2016

**Attorneys and Law Firms**

Dashante Scott Jones, Newtown, CT, pro se.

### RULING AND ORDER

VICTOR A. BOLDEN, UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff, Dashante Scott Jones, currently resides in Hartford, Connecticut. He has filed a complaint under 42 U.S.C. § 1983, alleging violations of law that occurred while he was in the custody of Connecticut's Department of Correction. He has named Mental Health Workers Scarlett Forbes, Pat Ward, Debi Ward and William Longo, Drs. Mark Frayne, Gerold Gonye, Johny Wu and Carson Wright, Captain Marinelli, Warden Ann Cornouyer and Health Services Administrator Ritchard Farey as Defendants. Mr. Jones has also filed a motion for injunctive relief and a motion to preserve videotapes. For the reasons set forth below, the Complaint is dismissed in part, and the pending motions are denied.

### I. Initial Review of the Complaint [ECF No. 1]

Under 28 U.S.C. § 1915A(a) and (b), the Court must review prisoner civil complaints against governmental actors and "dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." *Id.* Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Although detailed allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). A complaint that includes only " 'labels and conclusions,' or 'a formulaic recitation of the elements of a cause of action,' " or " 'naked assertion[s] devoid of 'further factual enhancement,' " does not meet the facial plausibility standard. *Id.* (quoting *BellAtl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). Although courts have an obligation to interpret "*a pro se* complaint liberally," a complaint must include sufficient factual allegations to meet the standard of facial plausibility. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted).

#### A. Factual Allegations

Mr. Jones claims that on May 22, 2014, at Corrigan Correctional Institution ("Corrigan"), prison staff sexually assaulted him.[1] Prison officials allegedly transferred him to Northern Correctional Institution ("Northern") later that day. Mr. Jones claims that he was not able to submit a claim under the Prison Rape Elimination Act ("PREA") until fifteen days after he was allegedly sexually assaulted by prison staff at Corrigan. In early June 2014, Captain Marinelli allegedly falsified reports that he submitted in connection with Mr. Jones's claim under the PREA. Mr. Jones also claims that Warden Cornouyer refused to report the alleged sexual assault on the Mr. Jones to the Connecticut State Police.

**\*2** Mr. Jones claims that Dr. Frayne examined him on May 23, 2014 at Northern. During this exam, Dr. Frayne allegedly noted that someone had kicked Mr. Jones in the testicles. Mr. Jones claims that Dr. Frayne refused to characterize the assault by prison officials at Corrigan as a sexual assault because Dr. Frayne had allegedly sexually assaulted individuals at a prior place of employment.

At Northern, Defendants Debi Ward, Scarlett Forbes and Pat Ward allegedly refused to speak to Mr. Jones privately about his mental health issues. Instead, he claims that they would speak to him at his cell door so that other inmates could hear what was said about his mental health issues,

in violation of his right to privacy. This conduct allegedly occurred for seven months. Mr. Jones claims that when he told Defendant Farey about this conduct, Farey failed to take any action.

Defendant Gonye allegedly discontinued Mr. Jones's mental health medications despite the fact that Mr. Jones had been previously diagnosed as suffering from Post Traumatic Stress Disorder. Dr. Gonye allegedly informed Mr. Jones that he had discontinued the medications because he did not think Mr. Jones suffered from a condition that required medication. Mr. Jones also claims that Dr. Gonye considered the requests for mental health treatment and medication as an attempt by Mr. Jones to influence the sentence that he might receive in connection with his state criminal case.

Mr. Jones alleges that Defendant Wright did not prescribe medication for his head injury in a timely manner. Dr. Wright also allegedly refused to issue an order that Mr. Jones undergo an MRI, but did prescribe pain medication for the injury to his testicles.

Mr. Jones claims that he filed a complaint against the Defendants with the Commission on Human Rights and Opportunities ("CHRO") in August or September 2014. On November 6, 2014, after Mr. Jones accused Defendant Frayne of having molested individuals at his prior place of employment, Defendant Frayne allegedly issued Mr. Jones a disciplinary report for using foul language and intimidating staff. Defendant Longo was listed as a witness to the disciplinary infraction, but Mr. Jones claims that he was not present at the scene.

On November 7, 2014, Defendant Frayne allegedly placed Mr. Jones on behavior observation status in retaliation for filing his complaint with the CHRO. He also allegedly ordered prison officials to remove legal work from Mr. Jones's cell. Mr. Jones claims that when he informed Defendant Cornouyer of his unlawful placement on behavior observation status, she failed to take any action.

Finally, Mr. Jones claims that Dr. Johny Wu is the supervisor of all of the Defendants. He alleges that he contacted Dr. Wu in 2014 seeking medical treatment for his injuries from a medical provider outside of the Department of Correction, and Dr. Wu failed to take any action. In January 2015, prison officials at Northern allegedly transferred Mr. Jones to Cheshire Correctional Institution.

### B. Official Capacity Claims

For relief, Mr. Jones seeks monetary damages. To the extent that Mr. Jones seeks damages against the Defendants in their official capacities, the claims are barred by the Eleventh Amendment. See *Quern v. Jordan*, 440 U.S. 332, 342 (1979); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64, 71 (1989). All such claims are dismissed under 28 U.S.C. § 1915A(b)(2).

### C. Captain Marinelli and Warden Cornouyer

**\*3** Mr. Jones claims that Captain Marinelli submitted reports that inaccurately described the assault that occurred on May 22, 2014 at Corrigan. Captain Marinelli submitted these reports in connection with Mr. Jones's claim under the PREA, 42 U.S.C. § 15601. Mr. Jones also alleges that Warden Cornouyer refused to call the State Police to investigate the assault.

There is nothing in the PREA that suggests that Congress intended to create a private right of action for inmates to sue prison officials for non-compliance with the Act. *See Chao v. Ballista*, 772 F. Supp. 2d 337, 341 n.2 (D. Mass. 2011) (collecting cases and noting that "every court to address the issue" has held that the PREA does not provide a private cause of action); *Chinnici v. Edwards*, No. 1:07-cv-229, 2008 WL 3851294, at \*3 (D. Vt. Aug. 12, 2008) ("[T]he PREA confers no private right of action. The PREA is intended to address the problem of rape in prison, authorizes grant money, and creates a commission to study the issue.") (citation omitted). The Act authorizes the compilation of data and statistics concerning incidences of prison rape and the development and implementation of national standards for the detection, prevention, reduction, and punishment of prison rape. *See* PREA, 42 U.S.C. §§ 15602-03, 15606-07. The Act does not grant any specific rights to inmates. Moreover, the United States Supreme Court has held that in the absence of "an 'unambiguous' intent to confer individual rights," such as a right to sue, courts will not imply such a right in a federal funding provision. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 279-81 (2002). Because the PREA does not provide a private right of action, the allegations that Captain Marinelli submitted reports that did not accurately describe the assault on Mr.

Jones by prison staff do not state a claim upon which relief may be granted and are dismissed.

In addition, "[t]he law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Banks v. Annuci*, 48 F. Supp. 3d 394, 414 (N.D.N.Y. 2014) (citations omitted). Nor is a victim of allegedly criminal conduct entitled to a criminal investigation or prosecution of the alleged perpetrator of the crime. *See Leeke v. Timmerman*, 454 U.S. 83, 86-87 (1981) (per curiam) (inmates alleging beating by prison guards lacked standing to challenge prison officials' request to Magistrate Judge not to issue arrest warrants); *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[I]n American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"); *McCrary v. Cnty. of Nassau*, 493 F. Supp. 2d 581, 588 (E.D.N.Y. 2007) ("A private citizen does not have a constitutional right to compel government officials to arrest or prosecute another person."); *Osuch v. Gregory*, 303 F. Supp. 2d 189, 194 (D. Conn. 2004) ("An alleged victim of a crime does not have a right to have the alleged perpetrator investigated or criminally prosecuted."). Thus, the fact that Warden Cornouyer may have refused to call the State Police on Mr. Jones's behalf regarding his allegations of sexual assault, does not constitute a constitutional violation.

In sum, the claim that Defendant Warden Cornouyer refused to contact the State Police on behalf of Mr. Jones and all claims against Defendant Captain Marinelli are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### D. Mental Health Worker William Longo

**\*4** Mr. Jones claims that William Longo was listed on the disciplinary report for insulting language as a witness to the statements that he allegedly made to Dr. Frayne on November 6, 2014. Mr. Jones contends that William Longo was not present at the location where he made the statements. Thus, he could not have heard the statements.

The fact that William Longo may not have been a witness to the alleged disciplinary infraction does not state a claim of a violation of Mr. Jones's federally or constitutionally protected rights. Inmates have "no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v.*

*Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988). Furthermore, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) (citation omitted).

Mr. Jones asserts no other claims against Defendant William Longo. Accordingly, all claims against Defendant Long are dismissed for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b)(1).

### E. Fourth, Fifth and Fourteenth Amendment Claims

Mr. Jones generally asserts that the Defendants violated his Fourth and Fifth Amendment rights as well as his right to equal protection under the Fourteenth Amendment. There are no facts to support claims any such claims. Accordingly, the Fourth, Fifth and Fourteenth Amendment claims are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### F. The Remaining Federal Claims

Mr. Jones alleges that Defendants Johny Wu, Gerold Gonye, Carson Wright, Mark Frayne, Debi Ward, Pat Ward, Scarlett Forbes, Anne Cornouyer and Ritchard Farey were deliberately indifferent to either his mental health or medical needs. He also claims Defendants Debi Ward, Pat Ward and Scarlett Forbes were deliberately indifferent to his safety and violated his right to privacy by discussing his mental and medical needs in front of other inmates. In addition, he alleges that Defendant Dr. Frayne retaliated against him for filing a claim with the CHRO.

Under 42 U.S.C. § 1983, prison officials may be liable to a prisoner for a violation of the Eighth Amendment, if the officials acted with "deliberate indifference" to his safety. *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). Deliberate indifference constitutes more than mere negligence, it constitutes recklessness and requires an official to "act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). It can apply to both claims that prison officials denied or provided insufficient medical or mental health care and that they failed to protect inmates from physical harm. *See e.g.*, *id.*; *Hendricks v. Coughlin*, 942 F.2d 109, 112-13 (2d Cir. 1991). After a careful review of the Complaint and consideration of this standard, the Court concludes

that, at this time, Mr. Jones has stated plausible Eighth Amendment claims of deliberate indifference to mental health and medical needs and deliberate indifference to safety. However, to survive summary judgment on these Eighth Amendment claims, Mr. Jones must produce evidence supporting all of the required legal elements of this type of claim, including evidence raising an inference that the Defendants acted recklessly.

**\*5** To state a First Amendment retaliation claim under section 1983, a prisoner must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citation omitted). Here, Mr. Jones alleges that he filed a CHRO complaint, which is a protected activity. *Cf. Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003); *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). He claims that, as a result, Defendant Frayne issued a disciplinary report. Applying this standard and construing the complaint liberally, the Court concludes that Mr. Jones has stated a plausible First Amendment retaliation claim at this stage. To survive summary judgment on this claim, Mr. Jones must produce evidence supporting all of the required legal elements of this claim, including evidence that the report was issued because of his CHRO complaint, by for example, demonstrating that the report was false.

Finally, inmates do have some privacy interest in their medical history and medical records. *See generally Whalen v. Roe*, 429 U.S. 589, 599 (1977) (recognizing an interest in avoiding disclosure of "personal matters"); *see also Taylor v. Macomber*, No. 97 Civ. 4127(DAB), 1999 WL 349696, at \*2 (S.D.N.Y. May 27, 1999) (discussing how this interest applies to prison inmates). This right is not absolute in the prison context and generally must be balanced against the government's interest in disclosing the medical history and whether that interest is "reasonably related to a penological interest." *See Taylor*, 1999 WL 349696, at \*3. Allowing other inmates to listen to discussions between Mr. Jones and his mental health professionals could plausibly infringe on Mr. Jones's right to privacy without a reasonable relationship to any penological interest. Thus, the right to privacy claim will proceed at this time.

### G. State Law Claims

Finally, Mr. Jones also alleges state law claims of negligence, medical malpractice, and infliction of emotional distress. His Complaint indicates that he believes Defendants Gonye and Wright did not give him the medical treatment that he should have received. Under Connecticut law, to state a plausible medical malpractice claim, a plaintiff must allege facts in support of the following elements: "(1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury ...." *Hayes v. Camel*, 283 Conn. 475, 484 (2007). At this stage, construing the Complaint liberally, the Court finds that Mr. Jones has stated a plausible medical malpractice claim. However, his Complaint does not explain the nature of his negligence and infliction of emotional distress claims sufficiently for the Court to find that his claims are plausible. Accordingly, those claims are dismissed under 28 U.S.C. § 1915A(b)(1).

### II. Motion to File Emergency Request [ECF No. 8]

Mr. Jones has filed a motion seeking relief regarding prison conditions that occurred at Garner Correctional Institution ("Garner") in February 2016. Because Mr. Jones is no longer incarcerated and now resides in Hartford, Connecticut, the request is moot.

"The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983). An inmate's requests for injunctive and declaratory relief against correctional staff or conditions of confinement at a particular correctional institution become moot when the inmate is discharged or transferred to a different correctional institution. *See Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2011) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.") (citing *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) (per curiam)); *Young v. Coughlin*, 866 F.2d 567, 568 n.1 (2d Cir.), *cert. denied*, 492 U.S. 909 (1989); *Mawhinney v. Henderson*, 542 F.2d 1, 2 (2d Cir. 1976). As a result, Mr. Jones's request for emergency relief is denied as moot.

### III. Motion for Order of Federal Evidence Release of Video Preservation [ECF No. 7]

**\*6** Mr. Jones has filed a motion referring to incidents that occurred in G Unit at Garner in February 2016. He claims that he asked Warden Falcone to preserve video tapes of the incidents, but he has refused to do so. Mr. Jones also seeks Garner employee work rosters for the months of January and February 2016.

Warden Falcone is not a defendant in this action and the allegations regarding conditions at Garner do not pertain to the allegations in the operative Complaint in this case. It would be inappropriate for the Court to enter an order with regard to claims outside of the scope of this case. *See De Beers Consol. Mines Ltd. v. United States*, 325 U.S. 212, 220 (1945) (preliminary injunction appropriate to grant intermediate relief of "the same character as that which relief may be granted finally," but inappropriate where the injunction "deals with a matter lying wholly outside the issues in the suit."); *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) ("a preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action"); *Lewis v. Johnson*, No. 08-CV-482(TJM)/ (ATB), 2010 WL 1268024, at \*3 (N.D.N.Y. Apr. 1, 2010) (denying motion for preliminary injunction based on actions taken by staff at Great Meadow Correctional Facility in 2010 where complaint alleged wrongdoing by staff at Franklin and Upstate Correctional Facilities in 2006 and 2007). Therefore, the motion seeking to preserve videotapes and the production of employment rosters is denied.

### ORDERS

The Court enters the following orders:

(1) The claims for money damages against the Defendants in their official capacities are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(2). The Fourth, Fifth and Fourteenth Amendment claims against all Defendants, the claim that Defendant Anne Cornouyer refused to contact the State Police on behalf of Mr. Jones, the negligence and intentional infliction of emotional distress claims, and all claims against Defendants William Longo and Captain Marinelli are **DISMISSED** under 28 U.S.C. § 1915A(b)(1).

The Motion to File Emergency Request **[ECF No. 8]** is **DENIED AS MOOT.** The Motion for Court Order of Federal Evidence Release of Video Preservation **[ECF No. 7]** is **DENIED.**

The Eighth Amendment deliberate indifference to medical and mental health needs claims will proceed against Defendants Johny Wu, Gerold Gonye, Carson Wright, Mark Frayne, Debi Ward, Pat Ward, Scarlett Forbes, Anne Cornouyer and Ritchard Farey in their individual capacities; the Eighth Amendment deliberate indifference to safety claims will proceed against Defendants Debi Ward, Pat Ward and Scarlett Forbes in their individual capacities; the right to privacy claim will proceed against Defendants Debi Ward, Pat Ward and Scarlett Forbes in their individual capacities; the First Amendment retaliation claim will proceed against Defendant Mark Frayne in his individual capacity; and the medical malpractice claims will proceed against Defendants Gonye and Wright.

(2) **Within twenty-one (21) days of this Order**, the Clerk shall ascertain from the Department of Correction Office of Legal Affairs the current work addresses for: Dr. Johny Wu, Dr. Gerold Gonye, Dr. Carson Wright, Dr. Mark Frayne, Debi Ward, Pat Ward, Scarlett Forbes, Warden Anne Cornouyer and Health Services Administrator Ritchard Farey and mail a waiver of service of process request packet to each Defendant in his or her individual capacity at his or her current work address. On the thirty-fifth (35th) day after mailing, the Clerk shall report to the court on the status of the request. If any Defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service and that Defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

**\*7** (4) Defendants shall file their response to the complaint, either an answer or motion to dismiss, **within sixty (60)** days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If the Defendants choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

(5) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed **within six months (180 days)** from the date of this order. Discovery requests need not be filed with the court.

(6) All motions for summary judgment shall be filed **within seven months (210 days)** from the date of this order.

SO ORDERED at Bridgeport, Connecticut this 19th day of August 2016.

**All Citations**

Slip Copy, 2016 WL 4435081

Footnotes

1       The Court notes that, because of the very small handwriting on unlined paper, this Complaint is extremely difficult to read and understand.

---

**End of Document**                          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3171783
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Bryan L. RUPLE, Plaintiff,
v.
Lynne BAUSCH, County Nurse at Otsego County Jail; Richard Devlin, Jr., Sherriff of Otsego County; and Laura Child, Information Officer for Otsego County Jail, Defendants.

No. 09–CV–1108 (NAM/DRH).
|
July 21, 2010.

**Attorneys and Law Firms**

Bryan L. Ruple, Attica, NY, pro se.

Bailey, Kelleher & Johnson, P.C., Nannette R. Kelleher, Esq., of Counsel, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Bryan Ruple ("Ruple"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that while he was incarcerated at the Otsego County Jail, three County employees, violated his constitutional rights under the Fourteenth Amendment, the Health Insurance Portability and Accountability Act, 29 U.S.C. § 1182 ("HIPAA"), Section 18 of the New York State Public Health Law, and the New York State Freedom of Information Law. Compl. (Dkt. No. 1). Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 17. Ruple opposes the motion. Dkt. No. 19. For the following reasons, it is recommended that defendant's motion be granted and the complaint be dismissed with prejudice.

**I. Background**

The facts are related herein in the light most favorable to Ruple as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999). All events appear to have occurred during 2007 and 2008 when Ruple was incarcerated at Otsego County Jail, prior to his transfer to DOCS custody. Compl. ¶¶ 1–4, 6.

On December 15, 2008, defendant Bausch, a nurse, disclosed medical records to defendant Sheriff Devlin, who in turn submitted those records to the County Attorney James Konstanty, without first obtaining Ruple's permission. Compl. ¶ 6; *see also* Dkt. No. 1–1 at 2. The surrender of such records coincides with Ruple's filing of a previous lawsuit in the Northern District of New York. [2] Compl. ¶ 5. Ruple contends that the disclosures made by Bausch "did not pertain to ... [the] pending case." *Id.* ¶ 6; *see also* Dkt. No. 1–1 at 3–4. During 2007 and 2008, Bausch allegedly provided unnamed correctional staff with information regarding the medications prescribed for Ruple. Compl. ¶ 6. Additionally, defendant Child released medical information from Ruple's medical file, to Ruple, which he had requested. *Id.* ¶ 6; *see also* Dkt. No. 1–1 at 5–8. This action followed.

**II. Discussion**

**A. Legal Standard**

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

**\*2** Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950–51.

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

## B. HIPAA

HIPAA creates a monetary remedy for the wrongful disclosure of medical information. 42 U.S.C. § 1320d–6. "However, HIPAA does not confer a private cause of action to any particular class of individuals or either explicitly or implicitly, confer to private individuals a right of enforcement." *Hamilton v. Smith,* No. 06–CV–805 (GTS/DRH), 2009 WL 3199531, at \*20 (N.D.N.Y. Jan. 13, 2009) *modified* 2009 WL 3199520 (N.D.N.Y. Sept. 30, 2009) (internal quotation marks and citations omitted). "Furthermore, HIPAA provides for no federal cause of action; instead, HIPAA provides for an enforcement mechanism for the Secretary of Health and Human Services [HHS]." *Id.* (citations omitted). Therefore, Ruple cannot sustain his HIPAA claim since there is no private cause of action granted by the statute. Ruple's only recourse through this statute is to request the State of New York or the Secretary of HHS to bring the action on his behalf.

Accordingly, defendants' motion to dismiss on this ground should be granted.

## C. Privacy in Medical Records

Claims surrounding disclosure of confidential medical information have been analyzed under both the Eighth and Fourteenth Amendments. *See generally Rodriguez v. Ames,* 287 F.Supp.2d 213, 218–221 (S.D.N.Y.2003). Liberally construing the complaint, Ruple has also alleged an Eighth Amendment violation pertaining to the disclosure of his medical records.

### 1. Eighth Amendment

The Eighth Amendment provision against cruel and unusual punishment includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must demonstrate deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

**\*3** " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical

condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id* . at 703. Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Ruple has failed to allege what, if any, serious medical need he suffered from so that the disclosure of his medical records could be considered deliberately indifferent to his serious medical needs. Without such an allegation, Ruple has failed to proffer facts upon which relief could be granted. Accordingly, he has failed to establish the first prong of the Eighth Amendment analysis.

However, even if the unknown conditions reflected in Ruple's records did constitute serious medical needs, the disclosure of that information to staff and ultimately the county attorney did not constitute malicious interference or deliberate indifference. The disclosures were necessary (1) to investigate the pending litigation and determine its validity, (2) to provide Ruple with the appropriate medication to ensure his health and safety and (3) comply with a facility request to provide Ruple with his own health information which he had properly requested. The disclosures were limited in scope and purpose and, at most, could be categorized as negligent if others viewed them. As previously discussed, negligent behavior is not actionable under § 1983. *Hathaway,* 99 F.3d at 553.

Accordingly, to the extent that Ruple alleges an Eighth Amendment violation, such allegation is without merit and defendants' motion to dismiss the claim should be granted.

### 2. Fourteenth Amendment

**\*4** As of 1994, the Second Circuit recognized a prisoner's privacy interest in confidentiality of medical and health-related information. *Doe v. City of N.Y.,* 15 F.3d 264, 267 (2d Cir.1994). The Second Circuit further held that prisoners retained a right to privacy for medical information unless (1) that disclosure was reasonably related to legitimate penological interests or (2) the information contained within the medical records was not the type of sensitive medical information contemplated by the courts for constitutional protection. *See Powell v. Schriver,* 175 F.3d 107, 111–13 (2d Cir.1999); *see also Rodriguez v. Ames,* 287 F.Supp.2d 213, 219–20 (W.D.N.Y.2003) (upholding Fourteenth Amendment protection in cases where the prisoner "has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence," or where the information "spread through 'humor or gossip.' ") (quotations omitted); *Webb v. Goldstein,* 117 F.Supp.2d 289, 298–99 (E.D.N.Y.2000) (dismissing a Fourteenth Amendment claim because the prisoner "has not alleged that his prison records contained the sort of sensitive medical information at issue in … *Powell.*" ). The Second Circuit has extended Due Process protection to medical information surrounding the conditions of transsexualism and a positive HIV status. [3] *Watson v. Wright,* No. 08–CV–62 (NAM/GJD), 2010 WL 55932, at \*1 (N.D.N.Y. Jan. 5, 2010). The "person's interest in the privacy of medical information will vary with the medical condition." *Id.* Therefore, where a prisoner holds a right to privacy in his medical condition, "prison officials may impinge on it only to the extent that their actions are reasonably related to legitimate penological interests." *Id.*

Here, Ruple fails to allege from what, if any, severe health condition he suffers. As the only two noted conditions worthy of protection are transsexualism and HIV, and there is no plausible indication in the record that Ruple was suffering from either condition, he has failed to plausibly establish a Fourteenth Amendment claim. In fact, the medical information attached to the complaint shows numerous liver enzyme tests and a conclusion that Ruple's elevated enzyme levels "were due to fatty infiltrations and med[ication]s." Dkt No. 1–1 at 8. Such notations do not indicate an active HIV infection but

instead a quest to seek out potential liver damage and its cause. The only other ailment which was noted in the attached medical records was depression, for which Ruple was not receiving active treatment and was not indicated to be of a severe or emergent nature. Dkt. No. 1–1 at 8. Accordingly, this medical information is not the kind expected to invoke discrimination, intolerance, or violence. Additionally, these disclosures were made to (1) marshal evidence for a defense in litigation which Ruple commenced, (2) inform staff of medication for which Ruple required disbursement to maintain his health and safety, and (3) comply with a facility request initiated by Ruple requesting his own medical records, all of which represent legitimate penological interests.

**\*5** Accordingly, Ruple's Fourteenth Amendment claim is without merit and defendants' motion to dismiss should be granted as to this claim.

### D. State Law

Ruple contends that defendants have also violate Section 18 of the New York State Public Health Law and the New York State Freedom of Information Law. First, "[a] violation of state law neither gives [Ruple] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim." *Doe v. Conn. Dep't of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) (internal quotation marks and citations omitted); see *also Patterson v. Coughlin,* 761 F.2d 886, 891 (2d Cir.1985) ("[A] state employee's failure to conform to state law does not itself violate the Constitution and is not alone actionable under § 1983 ...."); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since federal constitutional standards rather than state law define the requirements of procedural due process.") (internal quotation marks and citations omitted). Accordingly, for this reason, the defendants' motion to dismiss should be granted as to Ruple's state law claims.

Second, even if the substance of the laws were to be considered, Ruple has failed to allege any statutory violations. Protection of patient information from disclosure to any other person is ensured by Section 18 of the Public Health Law. However, providing medical information to "an attorney consulted by," a health care provider does not constitute a disclosure of patient information to an unconsented to third party. N.Y. Pub. Health Law § 18(1)(e). Therefore, Bausch's disclosure of Ruple's medical records to defendant Devlin for ultimate dispersal to the county attorney did not constitute a violation of the law because the records were being delivered to an attorney for litigation purposes. [4]

Furthermore, Bausch's alleged disclosure of a list of medications for prescribed to Ruple was also not in contravention of state law. First, there are no facts alleged to identify when and to whom the list of medications was divulged. Even if such events did occur, however, they were still lawful because New York State rules and regulations require that, if medications are warranted, inmates shall be provided such medications by staff as prescribed by the facility physician. N.Y. Comp.Codes R. & Regs. tit. 9, § 7010.2(e), (j). Therefore, to the extent that any medication lists were disclosed to staff, such disclosures are authorized so that medication may be properly provided.

Additionally, Ruple's contentions fail to support his allegations against Child. The Public Health Law provides that "upon the written request of any subject, a health care provider shall provide an opportunity ... for such subject to inspect any patient information concerning or relating to the examination or treatment of such subject ....," including a copy of such records. N.Y. Pub. Health Law § 18(2)(a), (g). Therefore, Child was obligated to provide Ruple with his medical information, unless "review of the information c[ould] reasonably be expected to cause substantial and identifiable harm to the subject ...." *Id. §* 18(3)(a). Such cause for concern has not been advanced and, therefore, there is nothing in the record to rebut Child's duty to provide Ruple with such documents. This statutory interpretation, along with a similar conclusion when applying the New York Freedom of Information Law ("FOIL"), has also been utilized by the state court in holding that patients have a right to initiate inquiry into, and discovery of, their own medical records and that limitations on the dissemination of such information occur only when there is a showing of "substantial and identifiable harm to the subject or others which would outweigh the qualified person's right of access." *Mantica v. New York State Dep't of Health,* 248 A.D.2d 30, 31–33 (3d Dep't 1998) (citing N.Y. Pub. Health Law § 18(2), (6); N.Y. Pub. Off. Law § 87).

**\*6** Accordingly, defendants' motion to dismiss should be granted as to this claim.

### E. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights ... immunity might still be available as a bar to ... suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citations omitted). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

In this case, the second prong of the inquiry need not be reached because, as discussed *supra,* accepting all of Ruple's allegations as true, he has not alleged that defendants violated his constitutional rights. Accordingly, in the alternative, defendants' motion to dismiss should be granted on this ground.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 17) be **GRANTED** and that the complaint be **DISMISSED WITH PREJUDICE** as to all defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)–(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3171783

---

Footnotes

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   The previous lawsuit was cited in Ruple's complaint and alleged an Eighth Amendment violation that he was subjected to excessive force. *See* Compl. ¶ 5; *see also Ruple v. Reckeweg,* No. 08–CV–1307 (FJS/RFT)); Defs. Mem. of Law (Dkt. No. 17–2) at 1–2. The case was settled. Compl. ¶ 5.

3   This and other districts in the circuit have contemplated numerous illnesses which have not been deemed worthy of Fourteenth Amendment protection with regard to medical confidentiality, including Hepatitis A and C, high blood pressure, high cholesterol, wrist injuries, stomach problems, and proctitis. *Watson v. Wright,* No. 08–CV–62 (NAM/GJD), 2010 WL 55932, at \*1 (N.D.N.Y. Jan. 5, 2010) (citations omitted)

4   Moreover, to the extent Ruple contends that the records pre-dated the excessive force incident at issue in his prior action, such contentions are legitimately explained by the attorney wishing to see what, if any, preexisting conditions and treatment Ruple was undergoing in the weeks prior to the alleged incident. Compl. ¶ 6; Dkt. No. 1–1 at 4.

---